UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

EXXON MOBIL CORPORATION;
EXXONMOBIL DEVELOPMENT COMPANY;
and EXXONMOBIL OIL CORPORATION,

                    Plaintiffs,

      - against -

STEVEN MNUCHIN, in his official capacity as
the Secretary of the United States Department of
the Treasury; ANDREA M. GACKI, in her offi-
cial capacity as the Director of the United States
Department of the Treasury's Office of Foreign
Assets Control; and UNITED STATES
DEPARTMENT OF THE TREASURY'S
OFFICE OF FOREIGN ASSETS CONTROL,

                 Defendants.

No. 3:17-cv-1930
The Honorable Jane Boyle

**SEALED MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

P<small>AGE</small>

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

    I.    BACKGROUND .......................................................................................... 3

           A.    The Adoption Of The Ukraine-Related Sanctions Regulations ................... 3

           B.    ExxonMobil's Transactions With Rosneft ................................................... 8

           C.    OFAC's Imposition Of Penalties On ExxonMobil ..................................... 9

    II.   PROCEDURAL HISTORY ...................................................................... 13

STANDARD OF REVIEW ..................................................................................... 16

ARGUMENT ........................................................................................................... 18

    I.    THE CHALLENGED CONDUCT DID NOT VIOLATE THE UKRAINE-
        RELATED SANCTIONS REGULATIONS ................................................. 18

           A.    ExxonMobil Did Not Deal In The Blocked Property Of A Specially Designated
                National ....................................................................................................... 19

           B.    ExxonMobil Did Not Deal In Any Services Of, Or Receive Any Services From, A
                Specially Designated National ..................................................................... 22

           C.    Contemporaneous White House and Treasury Statements Confirm The
                Foregoing Interpretation Of The Ukraine-Related Sanctions Regulations ............... 24

           D.    In Its Penalty Notice, OFAC Simply Ignored The Dispositive Legal Question ....... 28

           E.    OFAC's Interpretation Of The Ukraine-Related Sanctions Regulations Is Not
                Entitled To Deference ................................................................................. 30

    II.   BY IMPOSING PENALTIES ON EXXONMOBIL, OFAC DREW ARBITRARY AND
        CAPRICIOUS DISTINCTIONS THAT CONTRADICTED EARLIER
        POSITIONS OF THE TREASURY DEPARTMENT ................................... 32

           A.    OFAC's Decision To Impose Penalties Was Inconsistent With Earlier
                Positions Of The Treasury Department ....................................................... 32

           B.    OFAC's Decision To Impose Penalties Drew Arbitrary And Capricious
                Distinctions Between Substantively Indistinguishable Conduct ............... 34

    III.  BY FAILING TO PROVIDE FAIR NOTICE OF ITS INTERPRETATION OF THE
        UKRAINE-RELATED SANCTIONS REGULATIONS, OFAC VIOLATED DUE
        PROCESS ...................................................................................................... 36

           A.    The Plain Text Of Executive Order 13661 Does Not Provide Ascertainable
                Certainty Of OFAC's Current Interpretation ............................................. 37

           B.    The Contemporaneous Statements Of White House And Treasury Officials
                Preclude A Finding Of Fair Notice ............................................................. 38

C.  OFAC Did Not Adopt Its Current Interpretation Or Publicly Disclose It Until After ExxonMobil Executed The Rosneft Documents.........................................................39

CONCLUSION.............................................................................................................................44

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Auer v. Robbins*,
519 U.S. 452 (1997) ........................................................................30

*Cardinal Health 110, Inc. v. Cyrus Pharm., LLC*,
560 F.3d 894 (8th Cir. 2009) ........................................................22

*CFTC v. Weintraub*,
471 U.S. 343 (1985) ........................................................................23

*Christensen v. Harris Cty.*,
529 U.S. 576 (2000) ........................................................................30

*Covington v. Aban Offshore Ltd.*,
650 F.3d 556 (5th Cir. 2011) ........................................................21

*Di Giammatteo v. Olney*,
794 S.W.2d 103 (Tex. App.—Dallas 1990, no writ) ....................21

*Diamond Roofing Co. v. Occupational Safety & Health Review Comm'n*,
528 F.2d 645 (5th Cir. 1976) ...............................................17, 36, 37

*Dravo Corp. v. Occupational Safety & Health Review Comm'n*,
613 F.2d 1227 (3d Cir. 1980) ........................................................37

*Emp'r Sols. Staffing Grp. II, L.L.C. v. Office of the Chief Admin. Hearing Officer*,
833 F.3d 480 (5th Cir. 2016) .....................................................16, 17

*EP Operating Co. v. FERC*,
876 F.2d 46 (5th Cir. 1989) .......................................................17, 34

*Epsilon Elecs., Inc. v. U.S. Dep't of the Treasury*,
857 F.3d 913 (D.C. Cir. 2017)........................................................28

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
867 F.3d 564 (5th Cir. 2017) .....................................................17, 30

*Fabi Constr. Co. v. Sec'y of Labor*,
508 F.3d 1077 (D.C. Cir. 2007)......................................................40

*Gen. Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995).........................................17, 36, 37, 41

iii

*Horne v. Dep't of Agric.*,
   135 S. Ct. 2419 (2015)..................................................................................17

*Indep. Petrol. Ass'n of Am. v. Babbitt*,
   92 F.3d 1248 (D.C. Cir. 1996)....................................................................34

*Judulang v. Holder*,
   565 U.S. 42 (2011) ..................................................................................2, 36

*Jupiter Energy Corp. v. FERC*,
   407 F.3d 346 (5th Cir. 2005) ......................................................................17

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)...........................................................................30, 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .........................................................................16, 17, 28

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*,
   418 U.S. 264 (1974) .................................................................................24-25

*In re Pilgrim's Pride Corp.*,
   728 F.3d 457 (5th Cir. 2013) ......................................................................24

*Powell v. McCormack*,
   395 U.S. 486 (1969) ....................................................................................17

*Roe v. Ladymon*,
   318 S.W.3d 502 (Tex. App.—Dallas 2010, no pet.) ..................................21

*Rollins Envtl. Servs. (NJ) Inc. v. EPA*,
   937 F.2d 649 (D.C. Cir. 1991)...............................................................38, 39

*S&H Riggers & Erectors, Inc. v. Occupational Safety & Health Review Comm'n*,
   659 F.2d 1273 (5th Cir. 1981) ....................................................................36

*Schirle v. Sokudo USA, L.L.C.*,
   484 Fed. Appx. 893, 897 (5th Cir. 2012).....................................................23

*Sea-Land Serv., Inc. v. Interstate Commerce Comm'n*,
   738 F.2d 1311 (D.C. Cir. 1984)...................................................................24

*Trinity Broad. of Fla., Inc. v. FCC*,
   211 F.3d 618 (D.C. Cir. 2000).....................................................................37

*Trinity Marine Nashville, Inc. v. Occupational Safety and Health Rev. Comm'n*,
    275 F.3d 423 (5th Cir. 2001)...........................................................................39

*United States v. Bestfoods*,
    524 U.S. 51 (1998).........................................................................................22

*United States v. Garner*,
    767 F.2d 104 (5th Cir. 1985)..........................................................................17

S<small>TATUTES</small> & R<small>ULES</small>

5 U.S.C. § 706....................................................................................................13

5 U.S.C. § 706(2).................................................................................................16

5 U.S.C. § 706(2)(B)...........................................................................................36

31 C.F.R. pt. 589...................................................................................................5

31 C.F.R. pt. 589, App. B ............................................................................ *passim*

31 C.F.R. § 537.101............................................................................................42

31 C.F.R. § 589.201..............................................................................................5

31 C.F.R. § 589.308............................................................................................22

31 C.F.R. § 598.101............................................................................................42

79 Fed. Reg. 26,365 (May 8, 2014) .....................................................................5

O<small>THER</small> A<small>UTHORITIES</small>

6 Anderson, *U.C.C.* § 3-403:102 .......................................................................21

18B Am. Jur. 2d *Corporations* § 1573 (2004).....................................................21

*Black's Law Dictionary* (10th ed. 2014).............................................................24

FAQ 3, OFAC FAQs: General Questions, <tinyurl.com/hbjazyp>......................43

FAQ 398, OFAC FAQs: General Questions, <tinyurl.com/hbjazyp>............11, 44

FAQ 400, OFAC FAQs: General Questions, <tinyurl.com/hbjazyp>.......11, 16, 39, 44

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2014) .................................24

Plaintiffs Exxon Mobil Corporation, ExxonMobil Development Company, and ExxonMobil Oil Corporation (collectively, "ExxonMobil") respectfully submit this memorandum of law in support of their motion for summary judgment to set aside the penalty notice issued by the Office of Foreign Assets Control (OFAC) and to enjoin OFAC from collecting any penalties in this matter.

## INTRODUCTION

The question before the Court is whether OFAC can penalize ExxonMobil on the basis of a countertextual interpretation of an executive order—an interpretation that OFAC reached only after the occurrence of the conduct it penalizes and that is contrary to contemporaneous statements from the Administration that issued it.  It cannot.

The Ukraine-related sanctions regulations prohibit dealing in the blocked property of designated individuals or entities, including Igor Sechin, the sanctioned president of a non-sanctioned Russian oil company, Rosneft.  OFAC contends that ExxonMobil violated the sanctions regulations, and in particular Executive Order 13661 (which is incorporated in those regulations), when it signed certain documents with Rosneft in 2014.  In imposing penalties on ExxonMobil, OFAC relied on a flawed premise:  that ExxonMobil executed these documents, and thereby entered into prohibited transactions, with Sechin, who was the subject of sanctions.  But Rosneft, not Sechin, was the party to each of those documents, and Rosneft was indisputably not subject to sanctions at that time.  OFAC's plainly incorrect interpretation of an unambiguous regulation—of which ExxonMobil had no notice—is not entitled to deference.

Defendants have since conceded that the documents at issue were executed with Rosneft. With that concession, the imposition of sanctions cannot stand.  By their terms, the Ukraine-related sanctions regulations block only the property (and property interests) of certain persons specified

in Executive Order 13661 or designated thereafter.  Rosneft is not among them.  Indeed, the White House and Treasury Department repeatedly confirmed, in contemporaneous statements, that the sanctions targeted only Sechin's "personal assets and wealth" and his "personal business"; that the sanctions did not target "the companies [he] may manage"; and that the sanctions applied only to Sechin "in his individual capacity."  None of the documents executed with Rosneft pertains to Sechin's personal assets or wealth, involves his personal business, or was signed by him in his individual capacity.  By conflating Rosneft with Sechin in imposing sanctions, OFAC contravened the plain terms of the regulations and ignored White House and Treasury Department statements.

OFAC's interpretation of the regulations also draws untenable distinctions between substantively equivalent conduct, in direct conflict with the earlier position of the cabinet department of which OFAC is a part.  The Treasury Department has expressly endorsed the very principle OFAC rejects here:  that business dealings with Sechin in connection with Rosneft are permissible.  Treasury Department officials advised that U.S. persons could interact with Sechin in his capacity as a Rosneft board member as long as it was Rosneft's business, and not Sechin's personal business, that was being discussed.  There is no meaningful difference between those interactions and the interactions here, yet OFAC permitted the former and penalized the latter.  Moreover, OFAC apparently would have permitted execution of the very same Rosneft documents by another Rosneft executive—even if Sechin had delegated signing authority to that executive or instructed the executive to sign.  Those are precisely the kinds of "head-scratching oddit[ies]" that the Supreme Court has rejected as arbitrary.  *Judulang v. Holder*, 565 U.S. 42, 57 (2011).

The relevant inquiry for purposes of applying sanctions is whether the property of a designated party is at issue—in other words, whether it is Sechin's or Rosneft's business that is being conducted.  Only the former is prohibited under the plain language of the regulations.  OFAC

crafted its alternative interpretation—that the involvement of a specially designated national, re-
gardless of who owned the property at issue, is restricted—out of whole cloth without any basis in
the text of the regulations.  What is more, in the course of this litigation, Defendants have begrudg-
ingly provided documents establishing that OFAC did not decide that the regulations would pro-
hibit the conduct at issue here until after the relevant documents were signed, and in fact was
"avoiding providing formal guidance" concerning U.S. persons' involvement with Rosneft and
Sechin.  (AR 23741.)

For all of these reasons, the penalty notice should be vacated under the Administrative
Procedure Act (APA) as arbitrary, capricious, and not in accordance with law.

OFAC's penalty notice should also be vacated on the independent ground that it contra-
venes the fundamental constitutional principle of due process and fair notice.  ExxonMobil could
not have predicted with any ascertainable certainty that OFAC would contravene the plain lan-
guage of the regulations and take a position contrary to the position set out in contemporaneous
White House and Treasury Department statements.  Without such ascertainable certainty, there
can be no fair notice.  If allowed to stand, OFAC's penalty notice would unfairly and unlawfully
penalize ExxonMobil.  For that reason, too, the penalty notice should be vacated.

## STATEMENT OF FACTS

### I.    BACKGROUND

#### A.    The Adoption Of The Ukraine-Related Sanctions Regulations

Since the late 1980s, ExxonMobil has done business in Russia in partnership with Rosneft,
the country's largest oil company.  (AR 23408.)  Rosneft is owned by the Russian government.
The United States government has historically supported ExxonMobil's relationship with Rosneft.
(AR 23438-40.)

3

In February 2014, Russia annexed Crimea.  In March 2014, in response to Russia's action, President Obama issued a series of executive orders authorizing sanctions against certain Russian individuals and sectors of the Russian economy.  This case concerns one of those executive orders, Executive Order 13661, which authorized the Secretary of the Treasury, in consultation with the Secretary of State, to designate certain persons (known as "specially designated nationals") with whom certain transactions would be prohibited.[1]  Specifically, section 1 of Executive Order 13661 prohibits transferring, paying, exporting, withdrawing or otherwise dealing in the "property and interests in property" "of" the "persons" designated by the Secretary of the Treasury where such property or property interests are either in the United States or within the possession or control of any United States person.  31 C.F.R. pt. 589, App. B, § 1(a) (2019).  Section 4 provides that the "prohibitions in Section 1 . . . include but are not limited to the making of any contribution or provision of funds, goods, or services, by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order" and "the receipt of any contribution or provision of funds, goods, or services from any such person."  *Id.* § 4.

On April 28, 2014, the Secretary of the Treasury designated Igor Sechin as a specially designated national for purposes of Executive Order 13661.  (AR 23689-93.)  Sechin serves as the president of Rosneft and is also chairman of its management board and deputy chairman of its board of directors; he holds a *de minimis* stake in the company.  (AR 23501; MSJ App. 46.)  Notably, in its press release announcing the designation, the Department of the Treasury confirmed

---

[1] A timeline illustrating the major events described here is attached as Exhibit 1 to the Declaration of Neil MacBride in Support of Plaintiffs' Motion for Summary Judgment (MSJ App. 1).

that, while Sechin was being sanctioned, "Rosneft is a state-owned company and has not been sanctioned." (AR 23689.)

On May 8, 2014, OFAC implemented the President's executive orders by adopting the Ukraine-related sanctions regulations (codified at 31 C.F.R. pt. 589). As is relevant here, those regulations prohibit any transactions that would violate any of the executive orders, and they incorporate those executive orders verbatim as appendices to the regulations. *See* 31 C.F.R. § 589.201 (2019). The regulations provide a limited number of definitions, but otherwise do not elaborate on the executive orders and were "published in abbreviated form." 79 Fed. Reg. 26,365 (May 8, 2014). Although OFAC indicated that it intended to supplement the regulations with a "more comprehensive set of regulations, which may include additional interpretive and definitional guidance," *id.*, it has not done so to this day.

In the wake of Executive Order 13661 and the adoption of the Ukraine-related sanctions regulations, various White House and Treasury Department officials issued public statements explaining the scope of the sanctions. On March 17, 2014—the morning after the President signed Executive Order 13661—a senior White House official explained in a background briefing that "our current focus is to identify . . . cronies of the Russian government and target their personal assets and wealth, rather than the business entities and industries that they may manage or oversee." (AR 23490.) The White House Office of the Press Secretary also disseminated a fact sheet to the same effect, stating that the sanctions had been "fashioned . . . to impose costs on named individuals who wield influence in the Russian government" and adding that "[o]ur current focus is to identify these individuals and target their personal assets, but not companies that they may manage on behalf of the Russian state." (AR 23484.) Both the transcript of the briefing and the fact sheet were posted on the White House website. *See* White House Archives, Background

5

Briefing by Senior Administration Officials on Ukraine <tinyurl.com/y3qtxce5>; White House Archives, Fact Sheet: Ukraine-Related Sanctions, <tinyurl.com/yycqoypw>.

In a statement posted on the White House website on April 28, 2014, the White House Press Secretary described the designations of Sechin and others as "targeted sanctions on a number of Russian individuals." (MSJ App. 297.) On a conference call with reporters that day, a senior administration official described Sechin as a "key member[] of Russian leadership's inner circle"; while recognizing that Sechin was Rosneft's president and chairman of the management board, he reiterated that the government was "imposing sanctions on Sechin . . . individually." (AR 23501.) A transcript of this call was also posted to the White House website. *See* White House Archives, Background Conference Call on Ukraine Sanctions <tinyurl.com/yyqcmenn>.

That same day, White House Deputy National Security Advisor Tony Blinken participated in a televised interview on *PBS NewsHour*. In that interview, Mr. Blinken explained Sechin's association with Rosneft and underscored that Rosneft "wasn't designated itself"; instead, Sechin "was[,] in his individual capacity." (AR 204.) Discussing the impact of the sanctions on the designated individuals, Mr. Blinken elaborated that "U.S. persons . . . will not [be] able to do business with them in their individual capacities." (AR 206.)

On the same day, the White House Press Secretary noted that the government had the power to impose more costly sanctions on entire sectors of the Russian economy under another of the President's executive orders, and he warned that it would do so in the event of "further Russian military intervention in Ukraine." (MSJ App. 297.) And a senior administration official likewise warned that, "if Russia persists on destabilizing Ukraine[,] . . . we have at our disposal additional tools . . . that can … have [a] very significant impact on the Russian economy." (AR 23510-11.)

Treasury officials made statements to the same effect.  As reported in *Foreign Policy* on April 28, 2014, "Sechin's personal assets will be frozen, but Treasury officials said the designation [of Sechin] wouldn't impact U.S. companies' ability to do business with Rosneft because Sechin does not control the firm."  (AR 23522.)  The *New York Times* echoed the message that the sanctions applied to Sechin only in his personal capacity, reporting that "[t]he United States did not place sanctions on Rosneft, and Mr. Sechin does not own a majority of the company, so American companies can still work with Rosneft."  (AR 23579.)  The *Times* also quoted a Treasury official as advising that "U.S. persons are not prohibited from dealing with Rosneft, including participating in meetings of the company board, on which Sechin sits."  (*Id.*)

On May 15, 2014, the *Wall Street Journal* reported statements from Treasury officials that the designation of Sechin as an individual did not prevent "U.S. persons" such as Bob Dudley, the chief executive officer of BP and a member of the Rosneft board, from interacting with Sechin in his capacity as a board member.  (AR 23582-86.)  As reported by the *Journal* the following day, a Treasury official explained that "Mr. Dudley may participate in board meetings with Mr. Sechin, as long as they are covering Rosneft business and not Mr. Sechin's personal business." (AR 23584.)

OFAC did not issue any statements or guidance contradicting any of these statements or give any indication that it disagreed.  Indeed, at that time OFAC was considering whether to give public guidance related to the signing of a contract by a specially designated national, as a senior OFAC official explained in a July 2014 internal email.  (AR 23768 ("[T]here's some confusion out there on the contract piece in particular, and if we feel that signing a new contract with an SDN is prohibited, I think it would be good to get that message out there.").)

### B.    ExxonMobil's Transactions With Rosneft

In imposing penalties on ExxonMobil, OFAC cited eight documents that ExxonMobil executed with Rosneft (hereafter the "Rosneft documents").  Those documents relate to two business ventures that predated the Ukraine-related sanctions regulations:  (1) a joint venture for the potential development of hydrocarbon resources in the Kara and Black Sea basins, and (2) a project for the extraction of liquefied natural gas in the Russian Far East.

Seven of the eight documents are completion deeds for the Kara/Black Sea joint venture, executed on May 15, 2014.  Those deeds acknowledged the fulfillment of certain conditions precedent in preexisting agreements between ExxonMobil Oil Corporation and Rosneft—agreements that, again, predated the Ukraine-related sanctions regulations.  Those deeds created no new contractual rights, nor did they modify any existing ones.  ExxonMobil Oil Corporation signed the deeds through its president, and Rosneft signed the deeds through its president, Sechin.  (*See, e.g.*, AR 1882.)[2]

The last of the eight documents merely memorialized an extension of time under another agreement that predated the sanctions.  On May 14, 2014, ExxonMobil Development Company executed an amendment to that preexisting agreement through its president, and on May 23, 2014, Rosneft signed the amendment through its president, Sechin.  (AR 1566.)

At the time the Rosneft documents were executed, Sechin had been designated as a specially designated national, but Rosneft itself had not been designated and was not subject to any sanctions.  The Treasury Department's first action against Rosneft itself came approximately two months after the conduct challenged here, on July 16, 2014.  Even then, the Treasury Department

---

[2] All of the deeds are substantively identical; for convenience, all references to the deeds are to the deed available at AR 1877-82.

merely issued a directive imposing certain restrictions on Rosneft's access to new financing by U.S. persons. Notably, while that directive limited Rosneft's access to U.S. capital markets, it did not prohibit U.S. companies from otherwise engaging in business with Rosneft. (MSJ App. 299-303.)

In a White House background briefing held on July 16, 2014, a senior Treasury Department official stressed that the Treasury Department was for the first time imposing sanctions under the separate executive order permitting broader sanctions against sectors of the Russian economy. (*See* AR 23514.) The official noted that, "[f]rom the very beginning, we have been thoughtful and strategic in our approach to sanctions and have carefully calibrated our steps to impose increased pressure on the Russian government." (AR 23515.) The official noted that the new sanctions did not block the property of firms subject to these sectoral sanctions (including Rosneft) and did not more broadly prohibit transactions with these firms, while emphasizing that the scope of the prohibitions could be further expanded "if the situation warrants." (*Id.*)

On September 12, 2014, the Treasury Department issued an additional directive further limiting certain activities with Rosneft relating to the development of deepwater, Arctic offshore, or other unconventional oil sources. (*See* MSJ App. 305-306.)

Significantly, OFAC has not alleged that ExxonMobil has engaged in any prohibited transactions with Rosneft or that it violated the July or September 2014 directives. (*See* MSJ App. 308-10.) Nor has Rosneft ever been designated as a specially designated national itself. *See* 31 C.F.R. pt. 589, App. B, § 1(a)(ii)(C).

### C.    OFAC's Imposition Of Penalties On ExxonMobil

On July 22, 2014, OFAC issued an administrative subpoena to ExxonMobil seeking documents related to any dealings with Sechin subsequent to his designation as a blocked person under

Executive Order 13661.  (AR 336-42.)  In response, ExxonMobil expressed its willingness to stip-

ulate to the key facts, which were not in dispute:  ExxonMobil had executed documents after

Sechin's designation that Sechin had signed in his capacity as Rosneft's corporate representative.

At that time, ExxonMobil noted—and OFAC did not disagree—that OFAC had not taken a public

position on whether, as a legal matter, the execution of corporate documents by a designated indi-

vidual constituted a violation of the Ukraine-related sanctions regulations.  (*See* AR 23601-03.)

ExxonMobil subsequently confirmed that proposed stipulation in writing, reiterating that "the fun-

damental question is legal rather than factual" and that, "[a]s discussed, OFAC ha[d] not publicly

stated its position specifically on this issue." (AR 23603.)  Again, OFAC did not disagree.  Instead,

on July 30, 2014, the OFAC official in charge of the investigation informed ExxonMobil that

OFAC wanted to review Exxon's response to the subpoena before resolving that legal question,

and that OFAC would work expeditiously to resolve the legal question once it had ExxonMobil's

response.  (AR 23602.)  The OFAC official did not dispute that OFAC had not publicly taken a

position on that question.  ExxonMobil completed its production of documents responsive to the

subpoena in December 2014.

On August 13, 2014—three months after the execution of the Rosneft documents and one

month after the issuance of the subpoena—OFAC posted two "frequently asked questions" in

which it specifically addressed for the first time whether certain interactions with specially desig-

nated nationals "representing" or "acting on behalf of" non-designated entities were permissible

under the Ukraine-related sanctions regulations.

FAQ 398 addressed whether entities controlled by a specially designated national were

considered blocked.  OFAC answered that question "no," though it noted that "persons should be

cautious in dealings with such a non-blocked entity to ensure they are not, for example, dealing

with a blocked person representing the non-blocked entity, such as [by] entering into a contract that is signed by a blocked person." *See* FAQ 398, OFAC FAQs: General Questions <tinyurl.com/y28l5nty>. FAQ 400 addressed whether U.S. persons can "engage in negotiations, enter into contracts, or process transactions involving a blocked individual when that blocked individual is acting on behalf of the non-blocked entity that he or she controls." *See* FAQ 400, OFAC FAQs: General Questions <tinyurl.com/yxbmbxzr>. OFAC answered that "OFAC sanctions generally prohibit transactions involving, directly or indirectly, a blocked person, absent authorization from OFAC, even if the blocked person is acting on behalf of a non-blocked entity." *Id*.

Notably, even these FAQs related only to non-blocked entities *controlled* by a specially designated national; they did not address situations where, as is the case with respect to Sechin, the specially designated national is merely a corporate representative. Sechin serves as Rosneft's president but does not control its management board, its board of directors, or its ownership. (AR 23501; MSJ App. 46.)

Although OFAC issued its FAQs in August 2014, it has conceded that it did not reach a definitive decision regarding the "meaning of [its] regulations" until after November 2014, and that it continued to deliberate over the legal implications of a specially designated national's executing a contract on behalf of a non-blocked entity as late as February 2015. (*See* MSJ App. 324.)

On June 29, 2015, OFAC issued a pre-penalty notice to ExxonMobil, citing the eight Rosneft documents and contending that ExxonMobil had committed "apparent violations" by "dealing in the blocked services of . . . Igor Sechin." (AR 52-57.) OFAC proposed to impose a penalty of $2 million—the maximum available amount. (*Id*.)

ExxonMobil responded to the pre-penalty notice on August 5, 2015. (AR 23406-36.) In that response, ExxonMobil noted that, as a matter of plain language and as confirmed by the contemporaneous White House and Treasury statements, the Ukraine-related sanctions regulations were not violated by actions taken by Sechin in his representative capacity on behalf of Rosneft. (AR 23406; *see also* AR 23413, 23417-20.) ExxonMobil also explained that, because OFAC did not adopt its contrary interpretation until well after the execution of the Rosneft documents, the imposition of a penalty based on that interpretation would violate constitutional principles of due process and fair notice. (AR 23419-24.)

Nearly two years later, on July 20, 2017, OFAC issued ExxonMobil a penalty notice, finding that ExxonMobil had violated the Ukraine-related sanctions regulations and imposing a civil penalty in the amount of $2 million. (AR 1-13.) In the penalty notice, OFAC did not articulate the legal basis for its finding of a violation. Instead, it merely incorporated by reference the pre-penalty notice, which had referred generically to "dealing in the blocked services of . . . Igor Sechin." (*Id.*; AR 53.) OFAC also cited a "warning sign" in the form of guidance regarding the unrelated Burmese sanctions regime, FAQ 285, that "signaled" that OFAC had prohibited U.S. parties from entering into contracts signed with a specially designated national. (AR 5.) And it concluded, without elaboration, that ExxonMobil had "disregard[ed] . . . U.S. sanctions requirements by executing documents with, and engaging the services of, a known [specially designated national], Igor Sechin." (AR 6.) In the penalty notice, OFAC stated that it had "analyzed the arguments contained in ExxonMobil's Responses," but it did not address those arguments or say anything about the significance of Sechin's acting in a representative capacity on behalf of Rosneft, a non-designated entity. (*Id.*)

## II.      PROCEDURAL HISTORY

On the same day that OFAC issued its penalty notice, Plaintiffs filed suit in this Court against OFAC, its director, and the Secretary of the Treasury.  The complaint alleged that the imposition of penalties on ExxonMobil was arbitrary and capricious and contrary to law because it contravened the plain text of Executive Order 13661, contradicted the position set out in contemporaneous statements by the White House and Treasury Department, and drew illogical distinctions between materially similar conduct.  The complaint also alleged that OFAC violated Plaintiffs' Fifth Amendment rights to due process because OFAC failed to provide notice of the specific transactions that would be deemed unlawful until after the allegedly unlawful conduct occurred.

As is required under the APA, *see* 5 U.S.C. § 706 (2019), Defendants prepared the administrative record.  ECF No. 22.  As initially certified, the more than 23,000-page record contained only a few documents created by OFAC: two highly sanitized final drafts of decision memoranda prepared well after the conduct at issue, and short minutes of meetings between ExxonMobil and OFAC.  (*See* AR 18-19, 59-73, 173, 208-209, 957-61.)  Although OFAC asserted in these two drafts that it had "long" held the legal view expressed in the penalty notice concerning the Ukraine-based sanctions regulations, OFAC provided no publicly available support for that assertion.

To the contrary, Defendants eventually produced a privilege log, which strongly indicated that OFAC did not resolve its position on the central legal question until well after the Rosneft documents had been executed—and, indeed, after OFAC had issued its subpoena to ExxonMobil.  On August 1, 2014, the log revealed, OFAC personnel had engaged in "email correspondence" about an internal meeting to discuss "legal issues" about "signing a contract with [a specially designated national]."  (MSJ App. 338.)   Notably, that correspondence occurred just two days after

the OFAC official in charge of the investigation acknowledged to ExxonMobil that the central legal question remained unresolved.  (AR 23602.)

The log further revealed that OFAC continued to deliberate over the central legal question for several more months.  Beginning on February 2, 2015, OFAC personnel engaged in further email correspondence, scheduled meetings, and prepared internal memoranda containing purportedly privileged legal advice on "[specially designated national] interest in contract issues raised in connection with Exxon proposed penalty."  (MSJ App. 342-43.)  Even six months after issuing the subpoena, therefore, OFAC was *still* deliberating over the legal implications of a specially designated national executing a contract on behalf of a non-blocked entity.

Almost a year after the initial production, Defendants supplemented the administrative record with 19 partially redacted documents that had erroneously been withheld on privilege grounds.  Several months later, in response to Magistrate Judge Toliver's order, Defendants produced an additional 25 documents (or portions thereof) that had previously been withheld or redacted on privilege grounds.

Those documents were astonishing.  Not only did they confirm that OFAC had not reached a definitive interpretation of the Ukraine-related sanctions regulations until after ExxonMobil had executed the documents at issue, they revealed that OFAC was aware of the public uncertainty regarding the meaning of these regulations.  What is more, in internal communications, OFAC acknowledged that its own tentative interpretation of the sanctions was inconsistent with the interpretation set out by administration officials in publicly issued statements, yet it deliberately declined to issue corrective guidance to the public.

For example, in correspondence on April 29, 2014, regarding the Treasury statements that participating in Rosneft board meetings would not violate the sanctions, one OFAC employee

14

stated, "I can tell this issue is going to be a sticky one and so we may need to revi[s]e the talking points altogether."  (AR 23729.)  That same employee later stated that she was "trying to figure out a way to update our lines without looking like we're going back on what we've publicly said." (*Id.*)

On May 2, 2014, a senior OFAC official wrote an internal OFAC email summarizing a call with the State Department's Coordinator for International Energy Affairs to "discuss a number of questions he's getting and anticipating on U.S. person involvement with Rosneft and [specially designated national] Igor Sechin."  (AR 23741.)  The email stated, "[w]hile avoiding providing formal guidance because so much will depend on the facts and circumstances of a given scenario, we suggested that [the designation of Sechin] *could* mean that signing a contract with Rosneft executed by Sechin *could* be prohibited."  (*Id.* (emphases added).)  In similarly equivocal terms, the OFAC official added that, in "execut[ing] commercial transactions with . . . [a specially designated national], U.S. sanctions *may* well apply."  (*Id.* (emphasis added).)

On May 14, 2014, following an inquiry from the Russian Embassy asking whether there were "forms of interaction with [Sechin] as leader of private companies that are not under sanctions," a senior OFAC official endorsed a similarly noncommittal approach.  Commenting on an OFAC response that advised that meetings with Sechin in connection with preparing or executing a commercial transaction *could* be subject to sanctions but that the applicability of sanctions would be determined on a case-by-case basis, the official stated:  "I think this holds the line just fine.  It doesn't bind us—the idea is that OFAC has historically interpreted negotiations to be more akin to 'conversations,' but it is really something we evaluate case by case."  (AR 23714.)  OFAC's equivocal interpretation was not shared with the public, and OFAC never identified the "facts and circumstances" that would purportedly inform its assessment.  (AR 23714-15, 23741.)

On July 9, 2014—approximately two months after the Rosneft documents were executed—OFAC employees discussed the language of the FAQs that they intended to publish, including the statement in FAQ 400 that "U.S. persons may not . . . enter into contracts that are signed by a blocked person."  (AR 23770.)  In connection with that discussion, a senior OFAC official expressly acknowledged public uncertainty over OFAC's interpretation of the Ukraine-related sanctions regulations.  The official wrote: "I'm not so worried about the public relations piece of saying no signing contracts with a [specially designated national] . . . .  I think there's some confusion out there on the contract piece in particular, and if we feel that signing a new contract with [a specially designated national] is prohibited, I think it would be good to get that message out there, even if there might be someone who says we did it in reaction to a particular deal."  (AR 23708.)  In response, the deputy director of OFAC said, "I agree."  (*Id.*)

Not until August 13, 2014, months after the Rosneft documents had been signed, did OFAC publish FAQ 400, stating that "U.S. persons may not . . . enter into contracts that are signed by a blocked individual," and even then its guidance was limited to entities the specially designated national controls.  FAQ 400, OFAC FAQs: General Questions <tinyurl.com/yxbmbxzr>.

## STANDARD OF REVIEW

The APA requires a court to set aside an agency action if it determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2).  Agency action is invalid under the arbitrary-and-capricious standard when it is inconsistent with the regulation at issue, *Emp'r Sols. Staffing Grp. II, L.L.C. v. Office of the Chief Admin. Hearing Officer*, 833 F.3d 480, 491 (5th Cir. 2016); fails to consider an important aspect of the issue presented, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); conflicts with another

16

position the agency has taken, *Jupiter Energy Corp. v. FERC*, 407 F.3d 346, 349 (5th Cir. 2005); or draws unreasonable distinctions between similar situations, *EP Operating Co. v. FERC*, 876 F.2d 46, 50 (5th Cir. 1989).

While review under the arbitrary-and-capricious standard is "highly deferential," it is "by no means a rubber stamp." *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985). In order to survive review, "the agency must examine the relevant data and articulate a 'rational connection between the facts found and the choice made,'" and the Court may not accept the government's "post hoc rationalizations for agency action." *State Farm*, 463 U.S. at 43, 50 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Agency action violates the Due Process Clause of the Fifth Amendment to the Constitution when a penalty is assessed in the absence of fair notice, without which "an agency may not deprive a party of property by imposing civil or criminal liability." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995). A party has received fair notice only where, acting in good faith, it could have determined with ascertainable certainty the standard to which it was expected to conform its conduct. *Id.* at 1329. As the Fifth Circuit has explained, it is the agency's responsibility to provide fair notice and "'state with ascertainable certainty what is meant by the standards [it] has promulgated.'" *Emp'r Sols.*, 833 F.3d at 488 (quoting *Diamond Roofing Co. v. Occupational Safety and Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976)); *see also ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017). Courts may issue declaratory judgments that government actions were unconstitutional and vacate any penalties imposed by such actions. *See Powell v. McCormack*, 395 U.S. 486, 489 (1969); *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2425, 2433 (2015).

**ARGUMENT**

This Court should set aside OFAC's penalty notice because ExxonMobil's conduct did not violate the Ukraine-related sanctions regulations and because ExxonMobil was not on fair notice that its conduct would be deemed to violate those regulations. *First*, ExxonMobil did not violate the sanctions regulations: as a matter of law, the purported "transactions" identified in the penalty notice (i.e., the execution of the Rosneft documents) did not involve either the blocked property of a specially designated national or the receipt of any services from such a national. The Court can set aside the penalty notice on that basis alone. *Second*, OFAC's interpretation of the sanctions regulations relies on irrational distinctions between substantively indistinguishable conduct and is contrary to interpretations set out in contemporaneous White House and Treasury Department statements, providing an independent basis to set aside the penalty notice. *Third*, OFAC violated due process because it did not provide notice that signing the Rosneft documents would be deemed to violate the sanctions regulations, and contemporaneous statements uniformly indicated that continuing to do business with Rosneft was permitted.

## I.   THE CHALLENGED CONDUCT DID NOT VIOLATE THE UKRAINE-RELATED SANCTIONS REGULATIONS

OFAC's penalty notice is unlawful because it penalizes ExxonMobil for conduct that did not violate the Ukraine-related sanctions regulations. That is because ExxonMobil did not deal in the blocked property of a specially designated national, nor did it receive blocked services from such a national. *See* 31 C.F.R. pt. 589, App. B, §§ 1(a), 4(b). The fact that Sechin was acting exclusively in a representative capacity on behalf of a non-blocked entity precludes any finding that the property *of* a sanctioned party, or services *from* such a party, were at issue. As a matter of law, ExxonMobil "transacted" solely with *Rosneft*, and it dealt only with Rosneft's property and

services.  Moreover, the property or services of a designated person such as Sechin are not *blocked* unless and until the property or services are in the United States or come "within the possession or control of any United States person."  Yet no property or services of Sechin ever entered ExxonMobil's "possession or control."

Contemporaneous White House and Treasury statements confirm the plain meaning of the Ukraine-related sanctions regulations, repeatedly underscoring that Sechin was designated in his individual capacity only and that U.S. persons could continue to do business with Rosneft.  And it bears emphasis that the penalty notice fails to refute—or even acknowledge—the argument that the sanctions regulations do not apply to Sechin's actions in a representative capacity on behalf of a non-blocked entity.  That telling omission underscores the arbitrary and capricious nature of OFAC's actions.  The penalty notice cannot be reconciled with the plain text of the sanctions regulations, and it must therefore be set aside.

### A.     ExxonMobil Did Not Deal In The Blocked Property Of A Specially Designated National

ExxonMobil did not violate section 1 of Executive Order 13661 when it executed the Rosneft documents because it did not deal in the blocked property of a specially designated national. Section 1, incorporated into the Ukraine-related sanctions regulations, prohibits transferring, paying, exporting, withdrawing or otherwise dealing in the "property and interests in property" "of" the "persons" designated by the Secretary of the Treasury where such property or property interests are either in the United States or within the possession or control of any United States person. 31 C.F.R. pt. 589, App. B, § 1(a).  ExxonMobil's execution of the Rosneft documents did not violate that provision because the Rosneft documents do not involve any property of a specially

designated national, much less any such property that came into the possession or control of a U.S. person.

At the heart of OFAC's penalty notice is the stark misstatement that ExxonMobil executed the Rosneft documents "with Sechin," rather than with Rosneft.  (AR 1, 4; *see also* AR 53-54 (identifying each of the eight challenged documents as executed "with Sechin").)  That is plainly incorrect.  The parties to each of those documents were ExxonMobil and Rosneft.  (*See, e.g.*, AR 1879; 1565.)  Sechin is not a party any more than the executive who signed the documents on behalf of ExxonMobil; the documents impose no personal obligations on Sechin and entitle him to no personal benefits apart from those he received as a *de minimis* shareholder of Rosneft (benefits he would receive from any agreement by Rosneft, regardless of whether he signed it).  In addition, the transactions to which the documents relate carried no relative economic value to Sechin, as such value is held solely by Rosneft and ExxonMobil.  (MSJ App. 46.)  Defendants have since conceded that the penalty notice relies on documents that ExxonMobil executed "*with OAO Rosneft Oil Company*" (MSJ App. 365), and this Court has already recognized as much, ECF No. 42, at 2 (stating in an order that "ExxonMobil executed several . . .  documents with Rosneft").  Defendants further conceded that the "documents were countersigned *on behalf of Rosneft* by Igor Sechin" (MSJ App. 365 (emphasis added))—a concession that Defendants repeated in subsequent briefing (MSJ App. 318).

In addition, the Rosneft documents relate exclusively to ExxonMobil's business with Rosneft and not to any matters in which Sechin had an interest in his individual capacity.  The completion deeds contain representations and warranties made by ExxonMobil and Rosneft, and all legal rights and obligations flowing from the parent agreements to which the completion deeds relate also belong solely to ExxonMobil and Rosneft.  (*See, e.g.*, AR 23219.)  The same is true of

the amendment to the Russian Far East project agreement, which itself creates rights and imposes obligations solely as between ExxonMobil and Rosneft.  (*See* AR 1565, 1557.)

It is a familiar principle that the law attaches significance to whether documents are executed by persons in their individual capacities or in their capacities as representatives of a corporation.  The Rosneft documents were executed by "Rosneft Oil Company."  (*See* MSJ App. 318.) The signature blocks indicate that the documents were executed on behalf of Rosneft "by" "Name: Igor I. Sechin," "Title: President."  (*See, e.g.*, AR 1882, 1566.)  It is beyond dispute that Sechin signed in his representative capacity, not his individual one.  *See, e.g.*, 6 Anderson *U.C.C.* § 3-403:102 (noting that, "[w]hen a person signs followed by a title, such as . . . 'president,' the representative capacity is disclosed"); *Di Giammatteo v. Olney*, 794 S.W.2d 103, 105 (Tex. App.—Dallas 1990, no writ) (holding that the defendant signed in his representative capacity where he signed as a corporation's president and identified the corporation as the principal).  As a matter of law, therefore, Sechin was not a party to the Rosneft documents.  *See, e.g.*, *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 315 (5th Cir. 2011) (citing *Roe v. Ladymon*, 318 S.W.3d 502, 515 (Tex. App.—Dallas 2010, no pet.)).

The familiar distinction between individual capacity and representative capacity has important legal consequences.  Most notably, unless an executive signs a contract in his *individual capacity*, the executive cannot be liable on it.  *See, e.g.*, 18B Am. Jur. 2d *Corporations* § 1573 (noting that "[a] correct form of signature that imposes no personal liability upon a corporate officer signing it is a signature containing the corporate name, followed by the word "per" or "by," followed by the name of the corporate officer"); *Covington v. Aban Offshore Ltd.*, 650 F.3d 556, 559, 562 (5th Cir. 2011) (holding that an individual signing an agreement on behalf of an entity did not sign "the contract in his individual capacity" and thus was not "personally bound by that

21

agreement"); *see also Cardinal Health 110, Inc. v. Cyrus Pharm., LLC*, 560 F.3d 894, 899 (8th Cir. 2009) (explaining that, for a corporate officer to be liable on a guaranty under state law, the officer should sign once on behalf of the corporation and a second time in his "individual capacity"). Executive Order 13661 and the sanctions regulations should be understood against the backdrop of that familiar principle. *Cf. United States v. Bestfoods*, 524 U.S. 51, 63 (1998) (noting that "the failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that [in] order to abrogate a common-law principle, the statute must speak directly to the question").

At the time the Rosneft documents were executed by ExxonMobil and Rosneft, Rosneft was not the target of any sanctions. OFAC itself confirmed as much in its press release announcing Sechin's designation, stating that "Rosneft is a state-owned company and has not been sanctioned." (AR 23689.) Because the Rosneft documents at most concern the property of Rosneft and not the blocked property of any specially designated national, the execution of those documents by ExxonMobil cannot violate section 1 of Executive Order 13661.

### B.  ExxonMobil Did Not Deal In Any Services Of, Or Receive Any Services From, A Specially Designated National

The fact that the prohibitions in section 1 of Executive Order 13661 reach "services," as well as "property," does not alter the analysis. The Ukraine-related sanctions regulations define "property" as used in section 1 of Executive Order 13661 to include "services," meaning that they prohibit transferring, paying, exporting, withdrawing or otherwise dealing in the services of a sanctioned person. 31 C.F.R. § 589.308. As with any other form of property, however, the services must be services "of" the specially designated national in order to trigger the prohibition. *See* 31 C.F.R. pt. 589, App. B, § 1(a).

Sechin's signature as corporate representative of Rosneft was not a "service" of Sechin himself.  Just as any contractual obligations under the Rosneft documents belong to Rosneft alone, the acts of signing the Rosneft documents constitute acts only of Rosneft.  "As an inanimate entity, a corporation must act through agents." *CFTC v. Weintraub*, 471 U.S. 343, 348 (1985).  Corporations necessarily act through human representatives and control their employees' conduct within the scope of employment.  *See Schirle v. Sokudo USA, L.L.C.*, 484 Fed. Appx. 893, 897 (5th Cir. 2012) (stating that the test for whether an employment relationship exists is the entity's "right to control the employee's conduct").  Thus, to whatever extent the execution of the Rosneft documents as ExxonMobil's counterparty were to be deemed a "service," it would be a service only of Rosneft, not of Sechin.

In addition, because ExxonMobil did not deal with Sechin in his individual capacity, ExxonMobil's execution of the Rosneft documents similarly does not constitute a violation under section 4 of Executive Order 13661.  That section provides that the prohibitions in section 1 include the *receipt* of services *from* a specially designated national.  *See* 31 C.F.R. pt. 589, App. B, § 4(b).  ExxonMobil did not receive any services from a specially designated national, for the same reason stated above: even if ExxonMobil could be said to have received a "service" in connection with the Rosneft documents, it received that service from its counterparty, Rosneft—not from Sechin.  *See* Part I.A, *supra*.

Finally, even if the execution of the Rosneft documents could be deemed a "service" of Sechin (and not of Rosneft), it would not constitute a violation of section 1 of Executive Order 13661 for the additional reason that such services were never within the possession or control of a U.S. person and were therefore not blocked.  Only property (including services) of a specially designated national that is located in the United States or "within the possession or control of [a]

23

United States person" is blocked under Executive Order 13661.  31 C.F.R. pt. 589, App. B, § 1(a).

"Possession" refers to "the fact of having or holding property in one's power; the exercise of do-

minion over property." *Black's Law Dictionary* 1351 (10th ed. 2014).  "Control" means "[the]

power or authority to guide or manage." *Merriam-Webster's Collegiate Dictionary* 272 (11th ed.

2014); *see also In re Pilgrim's Pride Corp.*, 728 F.3d 457, 461 n.4 (5th Cir. 2013).  OFAC cannot

assert that ExxonMobil had any possession or control over Sechin's services or his property.  Exx-

onMobil simply signed documents with Rosneft as its counterparty.  It exercised no dominion,

power, or authority over Sechin, and it had no legal relationship with Sechin.  There is thus no

sense in which ExxonMobil possessed or controlled Sechin's services (or other property).

Because ExxonMobil did not deal in any services of, or receive any services from, a spe-

cially designated national, there is no valid theory on which ExxonMobil's conduct could have

violated Executive Order 13661.  OFAC's penalty notice therefore cannot stand.

### C.   Contemporaneous White House and Treasury Statements Confirm The Foregoing Interpretation Of The Ukraine-Related Sanctions Regulations

Consistent with the plain language of the relevant provisions, the White House and Treas-

ury Department contemporaneously issued numerous unambiguous statements confirming that

Executive Order 13661 was intended to sanction designated individuals only in their "individual

capacit[ies]" and to block only their personal assets, not the property of companies that those in-

dividuals might manage (such as Rosneft).  Where "[t]he 'law' at issue . . . is an Executive Order

promulgated by the President," the relevant intent is that of the President.  *Sea-Land Service, Inc.*

*v. Interstate Commerce Commission*, 738 F.2d 1311, 1314 (D.C. Cir. 1984); *see, e.g.*, *Old*

*Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 274-

75 (1974) (citing a presidential statement to understand "one of the primary purposes of [an]

24

[e]xecutive [o]rder"). While the text of Executive Order 13661 is unambiguous, those statements confirm the President's intent to apply the sanctions to designated individuals only in their individual capacities.

For example, on March 17, 2014 (the morning after the President signed Executive Order 13661), in a background briefing that was also posted on the White House website, a senior administration official stated:

> I want to be clear that while we will not rule out taking additional steps in the future, our current focus is to identify these cronies of the Russian government and target their personal assets and wealth, rather than the business entities and industries that they may manage or oversee.

(AR 23490.)

That same day, and reiterating that message, the White House Office of the Press Secretary disseminated a fact sheet defining the objectives of the newly authorized sanction:

> We have fashioned [the] sanctions to impose costs on named individuals who wield influence in the Russian government and those responsible for the deteriorating situation in Ukraine. . . . Our current focus is to identify these individuals and target their personal assets, but not companies that they may manage on behalf of the Russian state.

(AR 23484.) The fact sheet was posted on the White House website.

On April 28, 2014—the day that Sechin was designated as a specially designated national for purposes of Executive Order 13661—the White House Press Secretary described the designations of Sechin and others as "targeted sanctions on a number of Russian individuals." (MSJ App. 297.) The White House also posted the transcript of a conference call with a senior administration official that again spoke to the design and intent of the sanctions:

> Of note, in today's set of sanctions are two key members of Russian leadership's inner circle. They [include] Igor Sechin, who's the President and Chairman of the Management Board of Rosneft, Russia's leading petroleum operation . . . . We are imposing sanctions on Sechin . . . individually.

(AR 23501.)

That same day, White House Deputy National Security Advisor Tony Blinken reiterated in a televised *PBS NewsHour* interview that Rosneft "wasn't designated itself"; instead, Sechin "was[,] in his individual capacity." (*See* AR 204.) Mr. Blinken elaborated that "U.S. persons . . . will not [be] able to do business with them in their individual capacities." (*Id.*) And when specifically asked during the interview if a subsequent decision to designate Rosneft as a specially designated national (as well as Sechin) would "have an immediate impact on" U.S. companies "[l]ike ExxonMobil," Mr. Blinken explained:

> What we have been focused on is making sure that we maximize the pressure we're exerting on Russia and minimize the impact here in the United States or in Europe. That's why we have done it in such a deliberate, careful fashion. That has been the result to date. . . . [T]he step-by-step process is to make sure that everything we do is focused on exerting pressure on Russia and minimizing any impact or consequences on American companies . . . .

(*Id.*)

That the White House imposed limited sanctions on Rosneft in July 2014 under its discrete power to sanction sectors of the Russian economy, and then expanded those sanctions in September 2014, further confirms the limited nature of the sanctions that had been imposed on Sechin (but not Rosneft) by May 2014, when the Rosneft documents were signed. By their own admission, the White House's and Treasury Department's incremental sanctions decisions in 2014 were intended to keep more severe options in reserve for later use in the event of "further Russian military intervention in Ukraine" (MSJ App. 297), minimizing the impact on U.S. companies and the global economy. A senior administration official warned that, "if Russia persists on destabilizing Ukraine[,] . . . we have at our disposal additional tools . . . that can . . . have [a] very significant

impact on the Russian economy." (AR 23510-11.) The expansive interpretation reflected in OFAC's penalty notice cannot be reconciled with that carefully calibrated and targeted approach.[3]

The Treasury Department echoed the White House's statements, advising that only Sechin's personal assets were affected by the sanctions and that U.S. persons could continue to do business with Rosneft. As reported in *Foreign Policy* on April 28, 2014, "Treasury officials said the designation [of Sechin] wouldn't impact U.S. companies' ability to do business with Rosneft because Sechin does not control the firm." (AR 23522.) The *New York Times* echoed the message that the sanctions applied to Sechin only in his personal capacity, quoting a Treasury official as advising that "U.S. persons are not prohibited from dealing with Rosneft, including participating in meetings of the company board [on which Sechin sits]." (AR 23579.) As reported by the *Wall Street Journal* on May 15, 2014, Treasury officials explained that U.S. persons could interact with Mr. Sechin—for example, as BP's chief executive officer and U.S. citizen Bob Dudley did by serving on Rosneft's board—as long as "they are covering Rosneft business and not Mr. Sechin's personal business." (AR 23584.)

In sum, the White House and the Treasury Department repeatedly confirmed the plain meaning of Executive Order 13661: the sanctions targeted specially designated nationals only in their "individual capacit[ies]" and blocked only their personal assets, not the property of companies that those individuals might manage. Indeed, in their statements, the White House and the Treasury Department specifically noted that Rosneft was not sanctioned and that U.S. companies

---

[3] Rather than explaining how its interpretation of Executive Order 13661 comported with the President's intent, OFAC suggested to ExxonMobil during a September 26, 2016, meeting that it disagreed with the White House's statements, that its position trumped any statements made by the White House, and that ExxonMobil would have been unjustified in relying on the White House's statements with respect to how the executive order applied. (*See* AR 101.) OFAC's position is untenable and entirely inconsistent with the law. *See* p. 24, *supra.*

could continue to do business with Rosneft. Because the Rosneft documents involved Rosneft's business and because Sechin signed those documents only in a representative capacity, ExxonMobil plainly did not violate the Ukraine-related sanctions regulations by executing those documents. OFAC's action is therefore arbitrary and capricious and contrary to law and should be set aside.

### D.    In Its Penalty Notice, OFAC Simply Ignored The Dispositive Legal Question

Tellingly, in its penalty notice, OFAC failed even to acknowledge—much less address—the dispositive question at the heart of this matter: whether, contrary to the contemporaneous position of the White House and the Treasury Department, the Ukraine-related sanctions regulations could apply to actions taken by a specially designated national in his capacity as a representative of a non-blocked entity. Where an agency "entirely fail[s] to consider an important aspect of the problem," its action is "[n]ormally arbitrary and capricious." *State Farm*, 463 U.S. at 43. OFAC, however, did not engage in the "reasoned decisionmaking" that is required of agencies whose actions are subject to the APA. *See State Farm*, 463 U.S. at 43; *see also Epsilon Elecs., Inc. v. U.S. Dep't of Treas.*, 857 F.3d 913, 927 (D.C. Cir. 2017) (partially vacating an OFAC penalty notice to the extent that OFAC had failed to explain its conclusion). OFAC's refusal to engage on this critical question only highlights the inconsistency between its position and the plain language of Executive Order 13661.

ExxonMobil's position was hardly a surprise to OFAC. In its response to OFAC's pre-penalty notice, ExxonMobil set out that position at length, emphasizing from the very first page of its response that the challenged documents were executed with Rosneft and that Sechin had acted in a purely representative capacity in signing those documents. (*See* AR 23406-25.) ExxonMobil also consistently took that position in other written and oral communications with OFAC. (*See* AR 104, 242, 175, 193, 201.)

28

In its penalty notice, however, OFAC studiously avoided even using the words "representative," "representative capacity," or even "on behalf of," even though it claimed to have "review[ed]" and "analyzed the arguments in ExxonMobil's [r]esponses." (AR 2.) Instead, it attacked a straw man, seemingly addressing a distinction between acting in "personal" and "professional" capacities. (AR 2-3.) The reasons are clear. If OFAC had acknowledged that Sechin was acting in his "representative" capacity, it would also have had to concede that ExxonMobil was executing documents only with Rosneft, a non-sanctioned party, on whose exclusive behalf Sechin was acting. *See* Part I.A, *supra*. In addition, OFAC would have had to explain what administration officials could have meant when they repeatedly referred to Sechin's "individual capacity," seemingly excluding actions taken in a representative capacity. And as more fully explained below, any acknowledgment that Sechin was acting only in a representative capacity would be equally fatal as a matter of fair notice: it was only in August 2014, well after the challenged conduct, that OFAC first issued public guidance addressing the issue of specially designated nationals "representing" or "acting on behalf of" non-blocked entities, and only in the context of a specially designated national who controlled the entity. *See* Part III.C, *infra*.

While it was unwilling to do so in its penalty notice itself, OFAC has since conceded that Sechin was acting as a corporate representative when he executed the Rosneft documents. OFAC initially claimed that its penalty notice "related to ExxonMobil's execution of an amendment to an agreement of a liquefied natural gas project and seven completion deeds *with Igor Sechin*" (emphasis added). That statement was demonstrably incorrect, however, and OFAC soon backed away from it. In subsequent briefing, it openly acknowledged that "[t]his case concerns the legality of a series of documents executed between Plaintiffs and OAO Rosneft Oil Company" and that "Igor Sechin . . . countersigned the documents on behalf of Rosneft." (MSJ App. 365; *see also*

MSJ App. 318 (same)).  Despite that concession, however, OFAC has never come to grips with the legal significance of Sechin's acting in a representative capacity—a fact that is fatal to any effort to apply Executive Order 13661 to ExxonMobil's conduct.

OFAC's failure to respond to, or even acknowledge, what had been ExxonMobil's primary argument since it first engaged with OFAC on this issue in 2014 sharply illustrates the deficiencies in its legal interpretation and the arbitrary and capricious nature of its decision to impose penalties. The interpretation underlying OFAC's decision to impose penalties is indefensible.  OFAC's action should therefore be set aside.

### E.    OFAC's Interpretation Of The Ukraine-Related Sanctions Regulations Is Not Entitled To Deference

OFAC cannot salvage the fatally flawed interpretation of the sanctions regulations underlying the penalty notice by invoking the doctrine of agency deference to OFAC's interpretation of its Ukraine-related sanctions regulations.  As a threshold matter, agencies receive deference only when interpreting ambiguous regulations.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000); *ExxonMobil Pipeline*, 867 F.3d at 573.  Earlier this year in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), the Supreme Court emphasized the limited nature of such deference, underscoring several key restrictions on its use.  The Court explained that, even where a regulation is genuinely ambiguous (and an agency's interpretation is reasonable), a court may afford an agency interpretation of the regulation deference only where "the character and context of the agency interpretation entitles it to controlling weight."  *Kisor*, 139 S. Ct. at 2416.  Specifically, to be entitled to deference, an agency interpretation must: (1) be the agency's 'authoritative' or 'official position,' rather than any more *ad hoc* statement not reflecting the agency's views" (*id.* (citation omitted)); (2) "implicate its substantive expertise" so as to trigger

the presumption that Congress granted interpretive lawmaking power to the agency (*id.* at 2417); and (3) "reflect 'fair and considered judgment'" (*id.* (citation omitted)).  In other words, as explained by Justice Kagan, "a court may defer only to an agency's authoritative and considered judgments.  No *ad hoc* statements or *post hoc* rationalizations need apply. . . . Deference turns on whether an agency's interpretation creates unfair surprise or upsets reliance interests."  *Id.* at 2421 (plurality opinion).

As discussed above, the Ukraine-related sanctions regulations unambiguously do not prohibit dealing with Rosneft or with its officers solely in their capacity as Rosneft representatives, as the contemporaneous statements of the White House and the Treasury Department confirm.  *See* Parts I.A-I.C, *supra*.  An agency is entitled to deference only where a court determines that a regulation is "genuinely ambiguous" after "employing all its interpretive tools."  *Kisor*, 139 S. Ct. at 2415-16.  Because Executive Order 13661 is not only not ambiguous, but is unambiguous contrary to OFAC's interpretation, that interpretation is not entitled to deference.  *See id.*

Even if Executive Order 13661 were ambiguous (and OFAC's interpretation were within the zone of ambiguity), moreover, OFAC's interpretation would not receive deference because "the character and context of the agency interpretation" do not "entitle[] it to controlling weight." *Kisor*, 139 S. Ct. at 2416.  Among other things, that interpretation unexpectedly departed from a previous interpretation from the same department, *see* Part II.A, *supra*, and it thereby resulted in unfair surprise to ExxonMobil, *see* Part III, *supra*.  When "an agency substitutes one view of a rule for another" and "[t]he new interpretation . . . creates 'unfair surprise' to regulated parties," a court may not defer to that interpretation.  *Kisor*, 139 S. Ct. at 2417-18.

31

II.     BY IMPOSING PENALTIES ON EXXONMOBIL, OFAC DREW ARBITRARY
        AND CAPRICIOUS DISTINCTIONS THAT CONTRADICTED EARLIER
        POSITIONS OF THE TREASURY DEPARTMENT

In addition to resting on an invalid interpretation of Executive Order 13661, OFAC's de-

cision to impose penalties on ExxonMobil resulted in arbitrary and capricious distinctions with

other substantively indistinguishable conduct that the Treasury Department and OFAC had

deemed to be lawful.  Thus, even if the penalty notice rested on a permissible interpretation—

which, for the reasons explained above, it does not—it still cannot stand.  To begin with, OFAC's

decision to impose penalties ran contrary to the Treasury Department's stated position that U.S.

persons could permissibly deal with Sechin in his capacity as a member of Rosneft's board of

directors as long as Rosneft's business was being discussed.  It was arbitrary and capricious for

OFAC to impose penalties on ExxonMobil when it dealt with Sechin not in his capacity as a mem-

ber of Rosneft's board, but rather in his representative capacity as Rosneft's president when he

was signing documents on Rosneft's behalf.  In addition, because OFAC concedes that it is legal

to conduct business with Rosneft even though Sechin is its chief executive, OFAC must also con-

cede that ExxonMobil would not have been penalized if any other duly authorized executive had

signed the documents on Rosneft's behalf.  But such a hyperformalistic distinction does not further

any of the purposes of the Ukraine-related sanctions regime.  For those additional reasons, OFAC's

penalty notice should be set aside.

A.     OFAC's Decision To Impose Penalties Was Inconsistent With Earlier
        Positions Of The Treasury Department

OFAC's decision to impose penalties on ExxonMobil for interacting with Sechin in his

representative capacity as a Rosneft executive is irreconcilable with the Treasury Department's

statements that U.S. persons may lawfully interact with Sechin in his capacity as a member of

32

Rosneft's board.  On April 28, 2014, for example, a Treasury Department official was quoted by the *New York Times* as advising that "U.S. persons are not prohibited from dealing with Rosneft, including participating in meetings of the company board, on which Sechin sits."  (AR 23579.)  A few weeks later, on May 16, 2014, a Treasury Department official reiterated that interpretation in the *Wall Street Journal*, stating with reference to Bob Dudley, an American who was chief executive officer of BP and a member of the Rosneft board, that "Mr. Dudley may participate in board meetings with Mr. Sechin, as long as they are covering Rosneft business and not Mr. Sechin's, personal business."  (AR 23584.)

In concluding that a U.S. person could interact with Sechin on a board of directors "as long as they are covering Rosneft business and not Mr. Sechin's personal business," the Treasury Department tracked the White House's broader statements that the Ukraine-related sanctions regime targeted only the personal assets and wealth of specially designated nationals.  The key consideration, according to those Treasury officials, was whose business was being conducted:  Rosneft's or Sechin's.

OFAC has never coherently explained how it can maintain that position while penalizing ExxonMobil for executing a document signed by Sechin in his representative capacity for Rosneft. The penalty notice is entirely silent on the issue, even though ExxonMobil had argued it at length in its response to the pre-penalty notice.[4]  (*See* AR 23418.)  OFAC has no response because there is none to be made.  If merely signing a document on behalf of Rosneft constitutes a "service"

---

[4] In its Web post regarding the penalty notice, OFAC acknowledged that ExxonMobil had relied on a news article regarding Board participation, but responded only that the statement attributed to the Treasury Department official "did not address the conduct in this case."  (MSJ App. 309.)  OFAC did not make any attempt to explain why Board meeting participation with Sechin would be acceptable if Sechin's signature of a document on behalf of Rosneft is not.

from Sechin (even though it is at most a service provided by Sechin to Rosneft), so too must serving on a corporate board with him, which requires interaction with Sechin in his representative capacity for a mutual benefit and to take action with legal effects.  If anything, serving on a board of directors requires far more direct interaction with Sechin than does mailing an extension agreement to Rosneft and seeing that document returned with Sechin's signature.  To use the words of the penalty notice, jointly participating on a board of directors would "undercut Treasury's efforts to isolate Sechin" at least as much as the conduct alleged here.  (*See* AR 7.)

### B.   OFAC's Decision To Impose Penalties Drew Arbitrary And Capricious Distinctions Between Substantively Indistinguishable Conduct

OFAC's penalty notice should also be set aside on the basis that it drew arbitrary and capricious distinctions between substantively indistinguishable conduct.  The "very meaning of the arbitrary and capricious standard" is that "[t]he treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent." *Indep. Petrol. Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996).  Where an agency fails to "provide[] a reasonable explanation" for treating two subjects differently despite "marked similarities in operational characteristics," its action cannot stand.  *EP Operating Co.*, 876 F.2d at 50.

In imposing the penalty here, OFAC took the position that no violation would have occurred if Sechin had simply passed the pen to another authorized representative of Rosneft, taking the view that "the fact that signing a document with Rosneft would not be prohibited absent the involvement of Sechin . . . does not supersede the prohibition on transactions with Sechin." (AR 4.)  As this explanation made clear, OFAC's decision to impose penalties here was divorced from the economic substance of the conduct at issue and was instead based solely on the formality

of whose signature appears on behalf of a non-sanctioned corporation.  OFAC has offered no ex-planation for treating the transaction here as a violation when it concedes that it would deem a substantively identical transaction that confers no less benefit on Sechin as permissible.

OFAC's decision to impose penalties was all the more untenable because the Ukraine-related sanctions regulations expressly prohibit U.S. persons from *indirectly* engaging in prohib-ited conduct or engaging in conduct *designed to avoid* the prohibitions.  *See* 31 C.F.R. pt. 589, App. B, § 5(a).  It is peculiar that OFAC seemingly takes the position that ExxonMobil could and should have avoided penalties by asking that Sechin pass the pen to a colleague—conduct that would seemingly itself have violated the regulations.  That incongruity further illustrates the ab-surdity of OFAC's position.

Whereas the interpretation set out on the face of Executive Order 13661 and in the con-temporaneous statements of White House and Treasury officials provides clear and actionable guidance to the public, the ill-defined and unexpressed interpretation on which OFAC relied in imposing penalties will only lead to hopeless confusion.  For example, it is our understanding that, under Russian corporate law and Rosneft's charter, documents binding on Rosneft may be signed only by its president or pursuant to a power of attorney signed by the president.  (AR 23417-18.) What if Sechin authorizes another individual to sign on Rosneft's behalf?  Would that trigger pen-alties?  What if another individual signed Sechin's name, or applied a stamp with Sechin's signa-ture?  Because OFAC has not identified, and cannot identify, exactly why Sechin's signature on behalf of Rosneft constitutes a violation, it is impossible to determine which of these or myriad other scenarios share the purportedly violative characteristics of Sechin's conduct here, where Sechin merely physically signed for Rosneft in a representative capacity.  The "head-scratching

oddit[ies]" of OFAC's position confirm that the agency acted arbitrarily and capriciously in imposing penalties on ExxonMobil. *Judulang*, 565 U.S. at 486.

At bottom, OFAC's position is simply incoherent. And the best way to avoid that incoherence is to apply the clear rule that inheres in the plain language of the Ukraine-related sanctions regulations (and that White House and Treasury officials had espoused, including in the specific context of Sechin's involvement with Rosneft, before OFAC's decision to impose penalties): the relevant inquiry for purposes of applying sanctions is whether the property of a designated party is at issue, which in turn depends on whose business is being conducted—Sechin's or Rosneft's. *See* Part I.A, *supra*. OFAC's decision to impose penalties on ExxonMobil was the very definition of arbitrary and capricious agency behavior, and it should be invalidated on that ground as well.

## III. BY FAILING TO PROVIDE FAIR NOTICE OF ITS INTERPRETATION OF THE UKRAINE-RELATED SANCTIONS REGULATIONS, OFAC VIOLATED DUE PROCESS

Finally, OFAC's penalty notice should be set aside for the independent reason that it violates the Due Process Clause of the Fifth Amendment by depriving ExxonMobil of its property without fair notice of the regulatory requirement that ExxonMobil allegedly violated. *See S&H Riggers & Erectors, Inc. v. Occupational Safety and Health Rev. Comm'n*, 659 F.2d 1273, 1281 (5th Cir. 1981); *see also* 5 U.S.C. § 706(2)(B). In light of the plain language of Executive Order 13661 and the contemporaneous statements by White House and Treasury officials, OFAC failed to provide the "ascertainable certainty" of the agency's interpretation necessary to afford fair notice and subject ExxonMobil to penalties. *Gen. Elec.*, 53 F.3d at 1329; *Diamond Roofing*, 528 F.2d at 649. Put differently, "reviewing the regulations and other public statements" from OFAC would not have enabled the public to "identify . . . the standards with which [OFAC] expects

parties to conform," and OFAC thus failed "fairly [to] notify [the public] of [its] interpretation." *Gen. Elec.*, 53 F.3d at 1329.

A. **The Plain Text Of Executive Order 13661 Does Not Provide Ascertainable Certainty Of OFAC's Current Interpretation**

When assessing whether a regulation provides "ascertainable certainty," a court looks first to the regulation's text. *Gen. Elec.*, 53 F.3d at 1329. For fair-notice purposes, the relevant inquiry is not whether the agency's interpretation of a regulation is correct or incorrect, but instead whether it is "ascertainably certain." *Trinity Broad. of Fla. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000). The text must be sufficiently clear and precise to provide the regulated person with notice of the allegedly prohibited conduct. For example, where a regulation does not define a key term, an agency's position may not satisfy the "ascertainable certainty" standard. *See id.* at 630-31.

Here, the plain text of Executive Order 13661 does not contain any restriction on the execution of documents with non-blocked corporations whose executives are specially designated nationals, including where those executives sign the documents on the corporation's behalf. Because the unambiguous text does not prohibit the conduct at issue, it does not provide sufficient notice of OFAC's interpretation that the conduct is in fact prohibited. *See Dravo Corp. v. Occupational Safety & Health Review Comm'n*, 613 F.2d 1227, 1232 (3d Cir. 1980).

OFAC contends that ExxonMobil could have "sought guidance from OFAC" regarding the proper interpretation of the Ukraine-related sanctions regulations before executing the Rosneft documents. (AR 4.) On some level, that is always true, but it is ultimately irrelevant to whether ExxonMobil had adequate notice. To begin with, it is the government's burden to communicate its interpretation of its own regulations with sufficient clarity for the public to be able to comply. *See Diamond Roofing*, 528 F.2d at 649. The plain language of the regulation indicated that the

37

conduct for which ExxonMobil was penalized was permitted.  ExxonMobil was under no affirm-

ative obligation to take further action to confirm the agency's interpretation of such an unambigu-

ous regulation.

Even if ExxonMobil had sought such clarification, moreover, it is far from clear that it

would have been forthcoming.  As Defendants conceded in their recent briefing, OFAC itself had

not yet arrived at a final interpretation of the Ukraine-related sanctions regulations by the time the

Rosneft documents were executed.  (MSJ App. 327.)  As a result, OFAC could not have offered

definitive "guidance" to ExxonMobil at that time—and even if it had, that guidance may well have

been inconsistent with the interpretation OFAC advances now.  Where the penalized party might

have been given different advice "depending on which official responded to the inquiry," it cannot

be said to have fair notice of an agency's interpretation.  *Rollins Envtl. Servs. (NJ) Inc. v. EPA*,

937 F.2d 649, 653-54 (D.C. Cir. 1991).

### B.     The Contemporaneous Statements Of White House And Treasury Officials Preclude A Finding Of Fair Notice

The statements issued by the White House and the Treasury Department in the immediate

aftermath of Executive Order 13661 also made clear that it was permissible to execute documents

with Rosneft (including with Sechin signing in his capacity as a Rosneft representative).  The clear

conflict between those contemporaneous statements and OFAC's position in the penalty notice

precludes a finding of ascertainable certainty and thus of fair notice.  The statements are discussed

at length above.  *See* pp. 24-28, *supra*.  They explained, *inter alia*:

- That the Ukraine-related sanctions regulations targeted the "personal assets and wealth" of the Russian specially designated nationals, "rather than the business entities and industries that they may manage or oversee."  (AR 23490; *see also* AR 23484 (same).)

- That the sanctions regulations targeted Sechin "in his individual capacity," such that "U.S. persons, U.S. companies will not [be] able to do business with [sanctioned individuals] in their individual capacities."  (AR 206.)

- That "Sechin's personal assets will be frozen, but . . . the designation wouldn't impact U.S. companies' ability to do business with Rosneft because Sechin doesn't control the firm."  (AR 23522.)

- That the sanctions on Sechin did not prohibit U.S. persons from interacting with Sechin "as long as they are covering Rosneft business, and not Mr. Sechin's personal business."  (AR 23584.)

In the face of those contemporaneous (and consistent) statements from White House and Treasury officials, OFAC's contrary and undisclosed interpretation could not be or have been determined with ascertainable certainty.  Where an agency issues "conflicting advice," *Rollins*, 937 F.2d at 953, or had "implicitly approved" the practice for which the agency seeks to impose penalties, *Trinity Marine Nashville, Inc. v. Occupational Safety and Health Rev. Comm'n*, 275 F.3d 423, 431 (5th Cir. 2001), the agency cannot be said to have provided fair notice to the public.  That is all the more true given the evidence that OFAC was aware of the public uncertainty regarding the meaning of the Ukraine-based sanctions regulations, yet did nothing about it until well after ExxonMobil had executed the documents at issue.  *See* p. 16, *supra*.

### C.   OFAC Did Not Adopt Its Current Interpretation Or Publicly Disclose It Until After ExxonMobil Executed The Rosneft Documents

At the time of the challenged conduct, OFAC had never issued guidance concerning transactions between a U.S. person and a non-blocked entity represented by an individual designated under the Ukraine-related sanctions.  The first guidance on that question was not issued until several months later, in August 2014 (and even that guidance applied only to entities controlled by specially designated nationals).   *See*  FAQ 400, OFAC FAQs: General Questions <tinyurl.com/yxbmbxzr>.  OFAC's failure to adopt or publicly disclose its interpretation until after

39

the conduct at issue further demonstrates the lack of due process afforded to ExxonMobil.  Where an agency "ma[kes] no announcement or any other indication" of the interpretation forming the basis for its enforcement action, the regulated party cannot identify the agency's position with ascertainable certainty, and the agency's action must be set aside.  *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1088 (D.C. Cir. 2007).

Remarkably, even after it issued an administrative subpoena to ExxonMobil, OFAC admitted to ExxonMobil that it had not yet formulated a legal position as to how Executive Order 13661 applied to the challenged conduct.  At that time, ExxonMobil offered to stipulate to the relevant facts:  most importantly, that ExxonMobil had executed documents after Sechin's designation that Sechin had signed in his capacity as Rosneft's corporate representative.  And it made clear that the only open question was the purely legal one on which OFAC had not publicly stated a position.  In response, OFAC did not dispute that it had not formulated a position, stating that it preferred to review ExxonMobil's response to its subpoena and would only then act "expeditiously . . . to resolve the legal question."  (AR 23602.)

Documents disclosed in this litigation, moreover, confirm that OFAC had not reached a definitive interpretation of the Ukraine-related sanctions regulations until after ExxonMobil had executed the documents at issue.  In May 2014, shortly before the execution of the documents, a senior OFAC official "suggested" to the State Department only that designating Sechin as a specially designated national "could" mean that entering into a contract with Rosneft signed by Sechin "could" be prohibited, depending on unidentified "facts and circumstances."  (AR 23731.) OFAC's reluctance to take a definitive position on this issue—even in private communications with the State Department, another Executive Branch agency—reveals the agency's total uncertainty about the meaning of the law at the time of the relevant conduct.  And while OFAC issued

its FAQs in August 2014 (providing guidance to entities *controlled* by specially designated nationals), it has conceded that it did not reach a definitive decision regarding the "meaning of [its] regulations" until at least November 2014 (*see* MSJ App. 324), and the government's privilege log indicates that OFAC continued to deliberate over the legal implications of a specially designated national's executing a contract on behalf of a non-blocked entity as late as February 2015, *see* pp. 11, 14, *supra*.

What is more, the disclosed documents revealed that OFAC was aware of the public uncertainty regarding the meaning of the sanctions regulations, yet it failed to do anything about it. Months after the Rosneft documents were executed, a senior OFAC official wrote that "I think there's some confusion out there" about whether U.S. persons could enter into agreements with non-blocked entities that were signed by a specially designated national. (AR 23768.) The official further suggested that, "if" the agency "feels" that such conduct is unlawful, it ought to "get that message out there, even if there might be someone who says we did it in reaction to a particular deal." (*Id.*) Those statements demonstrate beyond any doubt that there was no clear guidance from OFAC on this issue.

Plainly, ExxonMobil cannot have been on fair notice of an interpretation of Executive Order 13661 at which OFAC itself had not yet arrived, even internally, before the challenged conduct. "Where . . . the regulations and other policy statements are unclear, where the petitioner's interpretation is reasonable, and where the agency itself struggles to provide a definitive reading of the regulatory requirements, a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations, and may not be punished." *Gen. Elec.*, 53 F.3d at 1333-34. That principle applies *a fortiori* here, where the regulations and contemporaneous statements pointed unambiguously in the *opposite* direction to OFAC's eventual interpretation. And ExxonMobil could hardly

41

have been on notice of OFAC's interpretation at the time it executed the documents when the agency itself was still acknowledging public confusion regarding whether specially designated nationals could sign contracts months later.

OFAC tries to establish that ExxonMobil had notice by pointing to FAQ 285—an earlier FAQ regarding the Burma sanctions program that OFAC published in 2013, revised in 2015, and removed from its website in 2016.  That question asked, "If a Burmese Government minister is [a specially designated national], how does that impact the ministry he leads"?  (AR 1100-01.)  As originally drafted, the answer to that question stated:  "A government ministry is not blocked solely because the minister leading it is [a specially designated national].  U.S. persons should, however, be cautious in dealings with the ministry to ensure that they are not, for example, entering into any contracts that are signed by the [specially designated national]."  (*Id*.)  But that FAQ is plainly inapposite here, because it was specific to the now-terminated Burma sanctions program.  Unlike FAQs 398 and 400, which were filed under the category of "General Questions" and thus identified as applicable to *all* sanctions programs, FAQ 285 was filed under the category of "Burma," reflecting that it was put out by OFAC as guidance with respect to that sanctions program only.  FAQ 285 did not purport to interpret other sanctions regulations, including the separate Ukraine-related sanctions regulations that were the basis for the penalty imposed in this case.

As OFAC itself has made clear, each sanctions program is unique.  The Ukraine-related sanctions regulations make that point expressly, stating that "[these regulations are] separate from, and independent of" other sanctions-related regulations and that "[d]iffering foreign policy and national security contexts may result in differing interpretations of similar language among the parts of this chapter."  31 C.F.R. § 598.101.  The now-lifted Burma sanctions regulations made the same point, as do OFAC's FAQs themselves.  *See* 31 C.F.R. § 537.101; OFAC FAQs: General

Questions, Basic Information on OFAC and Sanctions <tinyurl.com/hbjazyp>; *see also* FAQ 3 ("Because each [sanctions] program is based on different foreign policy and national security goals, prohibitions may vary between programs."). That FAQ 285 was specific to the Burma sanctions program is underscored by the fact that OFAC *removed* that FAQ from its website when the Burma sanctions were lifted in October 2016. And while OFAC ultimately relied on FAQ 285 in its penalty notice (albeit citing a version of the FAQ that was not yet in effect at the time the Rosneft documents were executed),[5] Defendants have conceded that, as of May 8, 2017 (shortly before the issuance of the penalty notice), OFAC was still deliberating over the "meaning" of FAQ 285 and its "application" to ExxonMobil. (MSJ App. 325.) Even OFAC was seemingly uncertain about whether FAQ 285 was binding on other sanctions programs until well after the Rosneft documents had been executed.

There were good reasons, moreover, why FAQ 285 was intended to apply only to the Burma sanctions program—notwithstanding OFAC's late-breaking efforts to extend it to the Ukraine-related sanctions program. The Burma sanctions were implemented in part to address rampant government bribery in that country. In 2012, shortly before FAQ 285 was published, the White House stated that it "remain[ed] deeply concerned about the lack of transparency in Burma's investment environment" and that "those individuals [in the Burmese government] who continue[d] to engage in abusive, corrupt, or destabilizing behavior going forward [should] not reap

---

[5] In its penalty notice, OFAC quoted the amended version of FAQ 285, which was not issued until May 2015—a year after the Rosneft documents were executed. (*See* AR 4 n.5.) In that version, unlike in the original version, OFAC stated that entering into a contract that is "signed by" a specially designed national constitutes the provision of a service "to" that person. (AR 1101.) The fact that this issue was only addressed in the FAQ issued in May 2015, too, undercuts any suggestion that the interpretation OFAC espouses here represented the fair and considered judgment of the agency in May 2014.

the rewards of reform." (*See* AR 23600.)  Given the United States government's particular concern for Burmese government officials abusing their public positions for personal gain, it is not surprising that OFAC took the position that those officials could not sign contracts with U.S. persons on behalf of their respective ministries—risking suspicion that the officials were using their authority to obtain a personal benefit.  FAQ 285 thus provides no basis from which ExxonMobil or the public could have inferred that entering into a contract signed by a Russian specially designated national on behalf of a non-blocked entity would be viewed as violating the Ukraine-related sanctions regulations.

It was not until August 2014, then, that OFAC first issued public guidance concerning whether interactions with specially designated nationals "representing" or "acting on behalf of" non-designated entities were permissible under the *Ukraine-related* sanctions regulations.  *See* FAQs 398, 400, OFAC FAQs: General Questions <tinyurl.com/hbjazyp>.  That guidance plainly came too late:  guidance issued after the relevant conduct cannot suffice to provide notice to regulated parties of an agency's interpretation.  OFAC's penalty notice thus contravenes the fundamental constitutional principle of fair notice and due process, as well as constituting an invalid interpretation of the Ukraine-based sanctions regulations and an arbitrary and capricious agency action.  For all of those reasons, OFAC's penalty notice should be vacated.

## CONCLUSION

OFAC has no authority to rewrite the President's executive order.  Nothing in Executive Order 13661 or the Ukraine-based sanctions regulations prohibited execution of the Rosneft documents, and OFAC's contrary, retroactive reinterpretation of the sanctions to penalize ExxonMobil should be rejected as contrary to law and antithetical to the Constitution.  OFAC's penalty notice must be vacated.  First, it penalizes conduct that does not violate the sanctions.  Second,

OFAC's interpretation draws untenable distinctions between substantively indistinguishable conduct and is contrary to the Treasury Department's earlier positions.  Finally, it assesses a penalty even though OFAC had provided no fair notice that this regulation would be interpreted in a manner completely contrary to contemporaneous statements by the White House and the Treasury.

     For all of these reasons, and those set forth above, this Court should grant ExxonMobil's motion for summary judgment.  The Court should enter judgment declaring the penalty notice unlawful, vacating the penalty notice, and enjoining Defendants from enforcing it.

Dated:   Dallas, Texas
        August 19, 2019

                          By:   */s/Nina Cortell*
                                 Shannon Ratliff
                                 State Bar No. 16573000
                                 sratliff@ratlifflaw.com
                                 Davis, Gerald & Cremer
                                 600 Congress Avenue, Suite 3100
                                 Austin, TX 78701
                                 (512) 493-9600
                                 Fax: (512) 493-9625

                                 Nina Cortell
                                 State Bar No. 04844500
                                 nina.cortell@haynesboone.com
                                 Haynes & Boone, LLP
                                 2323 Victory Avenue, Suite 700
                                 Dallas, TX 75219
                                 (214) 651-5579
                                 Fax: (214) 200-0411

                                 Neil H. MacBride
                                 District of Columbia Bar No. 439137
                                 neil.macbride@davispolk.com
                                 Davis Polk & Wardwell LLP
                                 901 15th Street, N.W.
                                 Washington, DC 20005
                                 (202) 962-7030
                                 Fax: (202) 962-7118

*Admitted pro hac vice*

Antonio J. Perez-Marques
New York Bar No. 4168571
antonio.perez@davispolk.com
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4559
Fax: (212) 701-5559
*Admitted pro hac vice*

Kannon K. Shanmugam
District of Columbia Bar No. 474304
kshanmugam@paulweiss.com
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
Fax: (202) 204-7397
*Admitted pro hac vice*

Patrick J. Conlon
Exxon Mobil Corporation
State Bar No. 24054300
patrick.j.conlon@exxonmobil.com
22777 Springwoods Village Parkway
Spring, TX 77389
(832) 624-6336
*Admitted pro hac vice*

*Attorneys for Exxon Mobil Corporation,*
*ExxonMobil Development Company, and*
*ExxonMobil Oil Corporation*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 19th day of August 2019, a true and correct copy of the foregoing document was filed electronically via the CM/ECF system, which gave notice to all counsel of record pursuant to Local Rule 5.1(d).

<u>/s/*Nina Cortell*_____</u>