# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

|  |  |
|---|---|
| EXXON MOBIL CORPORATION; EXXONMOBIL DEVELOPMENT COMPANY; and EXXONMOBIL OIL CORPORATION, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| STEVEN MNUCHIN, in his official capacity as Secretary of the U.S. Department of the Treasury; ANDREA M. GACKI, in her official capacity as the Director of the U.S. Department of the Treasury's Office of Foreign Assets Control; and the U.S. DEPARTMENT OF THE TREASURY'S OFFICE OF FOREIGN ASSETS CONTROL, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

Action No. 3:17-cv-1930-B

The Honorable Jane Boyle

Magistrate Judge Renee Harris Toliver

## CONSOLIDATED BRIEF IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

SUMMARY ........................................................................................................... 1

BACKGROUND ................................................................................................... 4

I.    The Ukraine-Related Sanctions Program and the Designation of Igor Sechin .................. 4

      A.    Background Briefings Related to Executive Order 13661 ................................. 5

      B.    The Designation of Igor Sechin and Related Background Briefings .................... 5

      C.    The Ukraine-Related Sanctions Regulations and OFAC's Interpretation
            Thereof ......................................................................................... 7

II.   Exxon Mobil's Execution of Contracts with Blocked Person Igor Sechin ...................... 9

III.  OFAC's Issuance of a Penalty to Exxon Mobil for Violation of the Ukraine-
      Related Sanctions Program ................................................................... 11

      A.    OFAC's Civil Penalty Process ........................................................... 11

      B.    The Process of Issuing a Civil Penalty to Exxon Mobil ............................... 13

            1.    OFAC's Administrative Subpoena ........................................... 13

            2.    Exxon Mobil's Productions ................................................... 13

            3.    OFAC's Prepenalty Notice ................................................... 14

            4.    Exxon Mobil's Response to the Prepenalty Notice ....................... 16

            5.    OFAC's Preliminary Determination and Exxon Mobil's Additional
                  Responses to Treasury and OFAC .......................................... 17

            6.    The Final Penalty Notice ..................................................... 18

LEGAL STANDARDS ....................................................................................... 18

ARGUMENT .................................................................................................... 19

I.    The Penalty Issued to Exxon Mobil Was Neither Arbitrary Nor Capricious, But
      Rather Warranted by Exxon Mobil's Prohibited Conduct ..................................... 19

      A.    OFAC's Decision to Impose a Penalty on Exxon Mobil Was Reasonable
            and Considered ............................................................................ 21

      B.    The Ukraine-Related Sanctions Regulations Prohibit Exxon Mobil's
            Conduct. ..................................................................................... 24

i

1.      OFAC's Interpretation of Its Regulations Is Consistent with Their
        Plain Meaning. ............................................................................................ 25

2.      Even If the Language Were Ambiguous, OFAC's Reasonable
        Interpretation of Its Regulations Is Entitled to Deference. ....................... 33

C.      OFAC's Actions Are Consistent with Treasury's Public Statements................... 38

D.      OFAC's Distinction between Contracts Executed by Blocked Persons and
        Those Executed by Non-Blocked Parties Is Principled and Logical. ................... 42

II.     Exxon Mobil Had Fair Notice that Its Conduct Was Prohibited. ..................................... 43

CONCLUSION ............................................................................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*Am. Petroleum Inst. v. EPA*,
   661 F.2d 340 (5th Cir. 1999) .................................................................. 20

*Anthony v. United States*,
   520 F.3d 374 (5th Cir. 2008) .................................................................. 25

*Arlington v. FCC*,
   569 U.S. 290 (2013) .................................................................................. 34

*Associated Builders & Contractors of Tex., Inc. v. Nat'l Labor Relations Bd.*,
   826 F.3d 215 (5th Cir. 2016) .................................................................. 20

*Boudreaux v. Swift Transp. Co.*,
   402 F.3d 536 (5th Cir. 2005) ............................................................ 18, 19

*Bowman Transp., Inc. v. Ark.–Best Freight System, Inc.*,
   419 U.S. 281 (1974) .................................................................................. 20

*Camp v. Pitts*,
   411 U.S. 138 (1973) .................................................................................. 19

*Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*,
   651 F.2d 800 (1st Cir. 1981) .................................................................. 26

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000) .................................................................................. 41

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) .................................................................................. 34

*Consarc Corp. v. Iraqi Ministry*,
   27 F.3d 695 (D.C. Cir. 1994) ............................................................ 26, 27

*Diamond Roofing Co. v. Occupational Safety & Health Review Comm'n*,
   528 F.2d 645 (5th Cir. 1976) ............................................................ 43, 44

*Emp'r Sols. Staffing Grp. II, LLC v. Office of the Chief Admin. Hearing Officer*,
   833 F.3d 480 (5th Cir. 2016) ............................................................ 43, 45

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
   867 F.3d 564 (5th Cir. 2017) ............................................................ 44, 45

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .................................................................................. 20

*Gen. Elec. Co. v. EPA*,
   53 F.3d 1324 (D.C. Cir. 1995) ........................................................................ 43, 44

*Global Relief Found., Inc. v. O'Neill*,
   315 F.3d 748 (7th Cir. 2002) ............................................................................ 26, 27

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003) .................................................................... 26, 27, 35

*Humanitarian Law Project v. Reno*,
   205 F.3d 1130 (9th Cir. 2000) ................................................................................ 20

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ................................................................................... *passim*

*Kitty Hawk Aircargo, Inc. v. Chao*,
   418 F.3d 453 (5th Cir. 2005) .................................................................................... 4

*Knapp v. U.S. Dep't of Agric.*,
   796 F.3d 445 (5th Cir. 2015) .................................................................... 19, 25, 33

*La. Public Serv. Comm'n v. FERC*,
   761 F.3d 540 (5th Cir. 2014) .................................................................................. 19

*Lorenz v. Valley Forge Ins. Co.*,
   815 F.2d 1095 (7th Cir. 1987) ................................................................................. 7

*Luminant Generation Co. v. EPA*,
   714 F.3d 841 (5th Cir. 2013) .......................................................................... 19, 20, 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................................... 20, 21

*OKKO Business PE v. Lew*,
   133 F. Supp. 3d 17 (D.D.C. 2015) .......................................................................... 36

*Paradissiotis v. Rubin*,
   171 F.3d 983 (5th Cir. 1999) ....................................................................... 28, 34, 35, 36

*Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*,
   374 F.3d 362 (5th Cir. 2004) .................................................................................. 19

*Regan v. Wald*,
   468 U.S. 222 (1984) ............................................................................................... 20

*Roark and Hardee LP v. City of Austin*,
   522 F.3d 533 (5th Cir. 2008) .......................................................................... 43, 47

*Sacks v. Office of Foreign Assets Control,*
    466 F.3d 764 (9th Cir. 2006) ...................................................................... 35

*Skelton v. U.S. Postal Serv.,*
    678 F.2d 35 (5th Cir. 1982) ........................................................................ 38

*Tex. Clinical Labs, Inc. v. Sebelius,*
    612 F.3d 771 (5th Cir. 2010) ................................................................. 19, 20

*Tex. Oil & Gas Ass'n v. E.P.A.,*
    161 F.3d 923 (5th Cir. 1998) ...................................................................... 20

*Thomas Jefferson Univ. v. Shalala,*
    512 U.S. 504 (1994) .................................................................................... 33

*Trinity Broad. of Fla., Inc. v. FCC,*
    211 F.3d 618 (D.C. Cir. 2000) ............................................................... 44, 47

*United States v. Banki,*
    685 F.3d 99 (2d Cir. 2012) ............................................................. 27, 28, 34

*United States v. Clinical Leasing Serv., Inc.,*
    925 F.2d 120 (5th Cir. 1991) ...................................................................... 48

*United States v. Ehsan,*
    163 F.3d 855 (4th Cir. 1998) ...................................................................... 37

*United States v. Fafalios,*
    817 F.3d 155 (5th Cir. 2016) ...................................................................... 25

*United States v. Lindh,*
    212 F. Supp. 2d 541 (E.D. Va. 2002) .................................................... 28, 34

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) .................................................................................... 33

*United States v. Radley,*
    632 F.3d 177 (5th Cir. 2011) ...................................................................... 27

*United States v. Tansley,*
    986 F.2d 880 (5th Cir. 1993) ...................................................................... 43

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) .................................................................................... 47

*Ward v. Succession of Freeman,*
    854 F.2d 780 (5th Cir. 1988) ........................................................................ 7

*Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*,
   340 F.3d 233 (5th Cir. 2003) ........................................................................ 18

*Young v. Wells Fargo Bank, N.A.*,
   Civ. A. No. 3:15-cv-2289-L, 2017 WL 3722148 (N.D. Tex. Aug. 29, 2017) ........................... 4

*Zarmach Oil Servs., Inc. v. U.S. Dep't of Treasury*,
   750 F. Supp. 2d 150 (D.D.C. 2010) ................................................................. 20

## STATUTES

5 U.S.C. §§ 551 *et seq.* ............................................................................. 19

5 U.S.C. § 706 ....................................................................................... 19

50 U.S.C. §§ 1701 *et seq.* ........................................................................... 4

50 U.S.C. § 1702 ..................................................................................... 26

## RULES

Fed. R. Civ. P. 56 ................................................................................... 18

## REGULATIONS

31 C.F.R. § 501 App. A .......................................................................... *passim*

31 C.F.R. § 537 ...................................................................................... 8

31 C.F.R. §§ 589 *et seq.* ....................................................................... *passim*

31 C.F.R. § 589.201 ............................................................................. *passim*

31 C.F.R. § 589.308 ............................................................................. *passim*

## OTHER AUTHORITIES

Blocking Property of Certain Persons Contributing to the Situation in Ukraine,
   Exec. Order No. 13660, 79 Fed. Reg. 15585 (Mar. 6, 2014) ....................................... 4

Blocking Property of Additional Persons Contributing to the Situation in Ukraine, Exec. Order
   No. 13661, 79 Fed. Reg. 15535 (Mar. 16, 2014) .............................................. *passim*

Blocking Property of Persons Threatening the Peace, Security, or Stability of Burma, Exec.
   Order 13619, 77 Fed. Reg. 41243, § 1 (July 11, 2012) ......................................... 46

*Merriam-Webster*, Definition of "Service"
   https://www.merriam-webster.com/dictionary/service ....................................... 27, 32

*The American Heritage Dictionary of the English Language*, Definition of "Service"
https://ahdictionary.com/word/search.html?q=service ............................................................. 27

U.S. Dep't of the Treasury, Resource Center, Note on Frequently Asked Questions,
https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/note.aspx .............................. 8

## SUMMARY

The issue presented here is simple:  whether the Office of Foreign Assets Control (OFAC) of the U.S. Department of the Treasury (Treasury) acted reasonably in determining that Plaintiffs Exxon Mobil Corporation, Exxon Mobil Development Company, and Exxon Mobil Oil Corporation (collectively, Exxon Mobil) violated the Ukraine-Related Sanctions Regulations by executing eight agreements with a known designated person, when the Executive Order underlying the sanctions explicitly prohibited the "receipt" by any U.S. person of "services" from any designated individual.  The answer is plainly yes.  Although Exxon Mobil attempts to complicate the issue, and improperly asks the Court to substitute its judgment for that of the agency, OFAC's considered decision should be upheld.

In March 2014, President Barack Obama issued an Executive Order authorizing the Secretary of the Treasury to block the property and interests in property of, among others, cronies of the Russian government, with the intent of isolating those designated individuals and imposing costs on Russia for its illegal actions in the Crimea region of Ukraine.  *See* Blocking Property of Additional Persons Contributing to the Situation in Ukraine, Exec. Order No. 13661, 79 Fed. Reg. 15535 (Mar. 16, 2014) (Defs.' App. 1–5).  The President's Order expressly prohibited "the receipt of any contribution or provision of funds, goods, or services" from any person so designated.  *Id.* § 4.  The White House made clear in background press briefings that "U.S. persons are prohibited from doing business with [persons designated pursuant to the Order]."  The White House, Office of the Press Secretary, Background Briefing by Senior Administration Officials on Ukraine, https://obamawhitehouse.archives.gov/the-press-office/2014/03/17/background-briefing-senior-administration-officials-ukraine (Defs.' App. 7).

Under the authority granted by the President, the Secretary designated Russian oligarch Igor Sechin in April 2014 for the purpose of isolating Mr. Sechin and imposing costs upon him as

an official of the Russian government.  The press release announcing Mr. Sechin's designation explained that "transactions by U.S. persons or within the United States involving the individuals and entities designated today are generally prohibited."  Dep't of the Treasury, Press Center, Announcement of Additional Treasury Sanctions on Russian Government Officials and Entities, https://www.treasury.gov/press-center/press-releases/Pages/jl2369.aspx (Defs.' App. 20).  Shortly after Mr. Sechin's designation, OFAC issued regulations governing the Ukraine-Related Executive Orders.  These Regulations prohibited all transactions prohibited pursuant to, *inter alia*, Executive Order 13661.  31 C.F.R. § 589.201.  The Regulations also made clear that the blocked "property" and "property interests" of designated persons included "services *of any nature whatsoever*" and "contracts *of any nature whatsoever*."  31 C.F.R. § 589.308 (emphases added).

Despite these clear directives prohibiting U.S. persons from transacting with Igor Sechin, Exxon Mobil chose to do just that.  Under pressure from the Russian government to continue business as usual, sixteen days after Mr. Sechin's designation was announced, Exxon Mobil executed eight contracts with him on behalf of Mr. Sechin's employer.  Although Exxon Mobil is a sophisticated international company with experience dealing with OFAC, it entered into these agreements without consulting with or seeking a license from OFAC, and with the approval of the company's very top executives, despite their knowledge that Mr. Sechin would act as signatory. At the same time, Exxon Mobil tried to avoid drawing attention to the signings, and it failed to report its actions to Treasury.  Following a lengthy investigation and review process, during which OFAC considered multiple submissions and presentations from Exxon Mobil, OFAC determined that Exxon Mobil's reckless violation of the Regulations, which thwarted the intent of the sanctions program, warranted a civil monetary penalty.

Exxon Mobil now seeks to avoid the plain meaning of the Regulations by insisting that snippets of press statements that predate the Regulations, and address different issues, somehow

2

excuse and justify its flouting of the rules.  The crux of Exxon Mobil's argument is that administration and Treasury officials publicly stated that Mr. Sechin was designated, but his employer was not, and that U.S. persons were not prohibited from interacting with Mr. Sechin's employer, including sitting on its board of directors.  The only sensible way read these statements, however, is in harmony with the Regulations and with contemporaneous governmental statements that U.S. persons were prohibited from transacting with designated persons.  And such a harmonious reading is possible:  U.S. persons could do business with Mr. Sechin's employer, but not with Mr. Sechin, a designated person.  This logical reading also comports with OFAC's past treatment of designated persons employed by non-designated organizations.  Moreover, this interpretation of the Regulations is critical to a key policy goal of the sanctions:  to isolate Mr. Sechin.  Indeed, it would contravene the intent of the sanctions and allow for easy evasion were OFAC to permit designated persons to continue engaging in high-profile business transactions with U.S. persons, simply because they did so in a "representative" capacity.

Exxon Mobil also attempts to obfuscate the issue by claiming that because Rosneft, not Mr. Sechin, was the party to the agreements, the fact that Mr. Sechin signed the agreements should not matter.  But the execution of an agreement or the signing of a contract with a blocked person is a violation of the Regulations, and OFAC made clear that it was penalizing Exxon Mobil for dealing in Mr. Sechin's blocked services.  At bottom, Exxon Mobil cannot escape the simple truth that Mr. Sechin was a designated person, and Exxon Mobil knowingly received his blocked services in violation of the Regulations.  OFAC's decision to impose a penalty was therefore eminently reasonable.  For these reasons, and as explained further below, the Court should grant summary judgment in favor of Defendants and deny Plaintiffs' motion for summary judgment.

## BACKGROUND

I.     **The Ukraine-Related Sanctions Program and the Designation of Igor Sechin**

On March 6, 2014, President Obama issued Executive Order 13660, in which, under the authority of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701 *et seq.*, he declared a national emergency to deal with the unusual and extraordinary threat to the national security and foreign policy of the United States posed by unauthorized assertions of governmental authority and territorial incursions into the Crimea region of Ukraine.  *See* Blocking Property of Certain Persons Contributing to the Situation in Ukraine, Exec. Order No. 13660, 79 Fed. Reg. 13493 (Mar. 6, 2014).  Following further Russian interference, including the deployment of troops into Crimea, on March 17, 2014, President Obama issued Executive Order 13661 pursuant to IEEPA, in which he expanded the scope of that national emergency based on a finding that the actions and policies of the Russian Government threatened the security, sovereignty, and territorial integrity of Ukraine, thereby posing a threat to the United States.  *See* E.O. 13661, 79 Fed. Reg. 15535.  The President explained that the intention of further sanctions was to "continue to increase the cost on Russia and on those responsible for what is happening in Ukraine," and to "mak[e] it clear that there are consequences for their actions."  Statement by the President on Ukraine,     https://obamawhitehouse.archives.gov/photos-and-video/video/2014/03/17/president-obama-speaks-ukraine#transcript (Defs.' App. 23).[1]

Executive Order 13661, among other things, grants the Secretary of the Treasury, in consultation with the Secretary of State, the authority to designate officials of the Russian

---

[1] This Court may take judicial notice of publicly available information on governmental websites. *See Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005); *Young v. Wells Fargo Bank, N.A.*, Civ. A. No. 3:15-cv-2289-L, 2017 WL 3722148, at *2 (N.D. Tex. Aug. 29, 2017), *dismissing appeal*, 2017 WL 8751904 (5th Cir. 2017) (collecting cases).  For the Court's convenience, Defendants have included copies of these judicially noticeable materials in the appendix accompanying their Motion.

4

Government and those who provide material or other support to such officials and to block any property or interests in property of, and to prohibit U.S. persons from dealing with, persons so designated. *See* E.O. 13661, 79 Fed. Reg. 15535, § 1(a)(ii). Section 4(b) of Executive Order 13661 explicitly prohibits "provision of funds, goods, or services by, to, or for the benefit" of any designated person, as well as "the receipt of any contribution or provision of funds, goods, or services" from any designated person. *Id.* § 4.

### A. Background Briefings Related to Executive Order 13661

During a background briefing on the day the Executive Order was issued, a senior administration official explained that "U.S. persons are prohibited from doing business with [persons designated pursuant to the Order]." Background Briefing by Senior Administration Officials on Ukraine (Defs.' App. 7). Consistent with the Order itself, the administration official further explained that the Order was not targeted at the companies managed or overseen by designated individuals, but rather at the individuals themselves, who had "demonstrated support for the illegitimate actions that ha[d] recently taken place in Ukraine and ha[d] contributed to the crisis there." *See id.* (Defs.' App. 7–8). A Fact Sheet issued by the White House made the same general point, while also emphasizing that the purpose of sanctions was "to impose costs on named individuals who wield influence in the Russian government" and to "send a strong message to the Russian government that there are consequences for their actions." *See* The White House, Office of the Press Secretary, Fact Sheet: Ukraine-Related Sanctions, https://obamawhitehouse.archives.gov/the-press-office/2014/03/17/fact-sheet-ukraine-related-sanctions (Defs.' App. 25, 26).

### B. The Designation of Igor Sechin and Related Background Briefings

Pursuant to the authority granted in Executive Order 13661, on April 28, 2014, the Secretary of the Treasury designated Igor Sechin, among others, and thereafter incorporated him

into the Specially Designated Nationals and Blocked Persons List (SDN List).  *See* Announcement of Additional Treasury Sanctions on Russian Government Officials and Entities (Defs.' App. 19). Mr. Sechin was designated as an "official[] of the Russian government" and as a result of his "utter loyalty to Vladimir Putin—a key component of his . . . standing."  *Id.*  The announcement further recognized that Mr. Sechin was (and continues to be) the President and Chairman of the Management Board for OAO Rosneft Oil Company (Rosneft), a Russian state-owned petroleum company.  *See id.*  Rosneft was not sanctioned at that time.[2]  *See id.*  The press release announcing Mr. Sechin's designation explained that "transactions by U.S. persons or within the United States involving the individuals and entities designated today are generally prohibited."  *Id.* (Defs.' App. 20).

The White House held a background conference call that same day, during which a senior administration official explained that "we've already seen that these sanctions and the isolation of Russia has had an impact, a substantial impact, on the Russian economy" and emphasized that "with these additional steps, the impact on the Russian economy will only grow, just as Russia's political isolation is growing."  The White House, Office of the Press Secretary, Background Conference Call on Ukraine Sanctions, https://obamawhitehouse.archives.gov/the-press-office/2014/04/28/background-conference-call-ukraine-sanctions (Defs.' App. 30).  A senior administration official also explained, consistent with the Secretary's decision, that sanctions had been imposed on Mr. Sechin individually, and not Rosneft.  *See id.*

---

[2] Pursuant to authority granted in Executive Order 13662, the Secretary of the Treasury, in consultation with the Secretary of State, identified sectors of the Russian economy appropriate to subject to sectoral sanctions in July 2014.  The Director of the Office of Foreign Assets Control thereafter issued, among others, Directives 2 and 4, which applied to certain of Rosneft's activities. *See* Directive 2,  https://www.treasury.gov/resource-center/sanctions/Programs/Documents/ eo13662_directive2.pdf; Directive 4, https://www.treasury.gov/resource-center/sanctions/ Programs/Documents/eo13662_directive4.pdf.

### C. **The Ukraine-Related Sanctions Regulations and OFAC's Interpretation Thereof**

On May 8, 2014, OFAC issued regulations governing the Ukraine-Related Executive Orders. *See* 31 C.F.R. §§ 589 *et seq.* The Ukraine-Related Sanctions Regulations incorporated by reference and prohibited all transactions delineated in, *inter alia*, Executive Order 13661. 31 C.F.R. § 589.201. The Regulations also made clear that the "property" and "property interest[s]" of persons blocked pursuant to Executive Order 13661 included "services of any nature whatsoever" and "contracts of any nature whatsoever." 31 C.F.R. § 589.308. Neither the Executive Order nor the Regulations articulated a distinction between a blocked person's personal and professional conduct, or indicated in any way that U.S. persons could transact with blocked persons in a representative, but not an individual capacity.

Contemporaneous communications within OFAC from early May 2014, predating Exxon Mobil's conduct at issue here, demonstrate the agency's understanding that it would be problematic for a U.S. person or entity to enter into a contract with a blocked person. *See* AR 23716 ("We've often drawn the line at entry into executory contracts . . . ."); AR 23741 ("signing a contract with Rosneft executed by Sechin could be prohibited (citing prior analogous guidance OFAC has given in the Burma context (FAQ 285))").[3] This understanding was consistent with the answer to Frequently Asked Question (FAQ) 285, published by OFAC in March 2013 in

---

[3] The Government initially withheld these documents as protected under the deliberative process privilege and reserves its right to appeal the overruling of its privilege determinations. *See* July 8, 2019 Order, ECF No. 76. Because Plaintiffs have relied upon these documents to support their allegations, however, *see, e.g.*, Pls.' Mot. 14–15, Defendants may use them to rebut those claims without waiving the privilege, *see Ward v. Succession of Freeman*, 854 F.2d 780, 787–89 (5th Cir. 1988) (holding that defendants did not waive the right to appeal an order requiring production of privileged documents by relying upon those documents "to rebut the plaintiffs' fraud allegations"); *accord Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir. 1987) ("To waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations.").

connection with the Burma Sanctions Regulations.[4]  *See* AR 1100; *see also* AR 23768 ("[T]he particular issue of 'no signing contracts with an SDN' has long been the subject of a public FAQ in the Burma program."); AR 23704 ("In response to an analogous question [FAQ 285], we've said that U.S. persons should be cautious in dealings to ensure that they are not, for example, entering into any contracts that are signed by an SDN (like Sechin).").  FAQ 285 advised that, where a government minister was designated but the ministry itself was not, "U.S. persons should, however, be cautious in dealings with the ministry to ensure that they are not, for example, entering into any contracts that are signed by the SDN."[5]  AR 1100.  This advice was also consistent with OFAC's past practice in connection with the Zimbabwe sanctions program, when, in 2006, OFAC required a license for a U.S. person to execute a contract with a designated bank governor acting on behalf of a non-designated bank.  *See* AR 133–35.  OFAC's longstanding position has also been to "strongly encourage[] parties to exercise due diligence when their business activities may touch on an OFAC-administered program and to contact OFAC if they have any questions about their transactions."  OFAC  FAQ  15  (Sept.  10,  2002),  https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#15 (Defs.' App. 45).

On August 13, 2014, OFAC published FAQ 398 and FAQ 400 in connection with the Ukraine-Related  Sanctions  Regulations.  OFAC  FAQ  398  (Aug.  13,  2014),

---

[4] President Obama terminated the national emergency with respect to the Government of Burma on October 7, 2016.  As a result, OFAC removed regulations implementing economic and financial sanctions with respect to Burma effective June 16, 2017.  *See* 31 C.F.R. § 537 (June 13, 2017).

[5] OFAC's FAQs are "answers to question of general applicability frequently asked by the public," and are "part of OFAC's commitment to regulatory transparency."  U.S. Dep't of the Treasury, Resource Center, Note on Frequently Asked Questions, https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/note.aspx.  Although "specific facts may alter an analysis," the FAQs "highlight key issues and topics relating to economic sanctions and the procedures and practices of OFAC" and are intended to provide "general information to assist persons subject to United States jurisdiction to comply with legal requirements and to facilitate an understanding of the scope and purposes of sanctions programs."  *Id.*

https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#398   (Defs.'

App. 51); OFAC FAQ 400 (Aug. 13, 2014), https://www.treasury.gov/resource-

center/faqs/Sanctions/Pages/faq_general.aspx#400 (Defs.' App. 51).   Both of these FAQ

responses reiterated OFAC's position that "persons should be cautious in dealings with [] a non-

blocked entity to ensure that they are not, for example, dealing with a blocked person representing

the non-blocked entity, such as entering into a contract that is signed by a blocked person."  OFAC

FAQ 398; *see also* OFAC FAQ 400 ("U.S. persons should be careful when conducting business

with non-blocked entities in which blocked individuals are involved; U.S. persons may not, for

example, enter into contracts that are signed by a blocked individual.").  OFAC has never set forth

contrary guidance.

## II.      Exxon Mobil's Execution of Contracts with Blocked Person Igor Sechin

Plaintiff Exxon Mobil Corporation is a multi-billion dollar, publicly traded international

oil and gas company; Plaintiffs Exxon Mobil Development Company (EMDC) and Exxon Mobil

Oil Corporation (EMOC) are its wholly owned subsidiaries.  *See* AR 251–303.  As a sophisticated

international corporation, ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ Exxon Mobil's compliance materials

instructed employees that ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ Following the imposition of the Ukraine-Related Executive

9

Orders, ████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████

      ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ ██

     As Mr. Sechin had promised Mr. Medvedev, Exxon Mobil continued, despite the sanctions, to work together with Mr. Sechin. On May 14, 2014, the President of EMDC, ████████, signed a contract between EMDC and Rosneft concerning an agreement to jointly study the economic viability of constructing a liquefied natural gas (LNG) project in the Russian Far East, referred to as the "Russian Far East LNG Project." *See* AR 23409–10; AR 1565–66. Igor Sechin countersigned the agreement on May 23, 2014. AR 1565–66. Exxon Mobil was generally aware at the time that Mr. Sechin would be the signatory on behalf of Rosneft. AR 5303. Although Exxon Mobil willingly executed the agreement with Mr. Sechin, it sought to avoid media attention regarding the signing, including declining to participate in a signing ceremony as suggested by Rosneft. *See* AR 23410 n.6; *see also* AR 1131, 1997, 5092–100, 5341–43.

---

█████████████████████████████████████████████████████████

█████████████████

The same day the President of EMDC signed the Russian Far East LNG agreement, Mr. Sechin sent a letter to Exxon Mobil's CEO proposing that the two companies work together to create contingency provisions to shield their joint projects from the effects of sanctions.  *See* AR 1916–18.  ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████

During ██████████ May 15, 2014 meeting with Mr. Sechin, also attended by ██████ and the President of EMOC, ████████████ AR 390, ██████████ signed seven completion deeds with Mr. Sechin.  *See* AR 1825–915; *see also* AR 23409.  Exxon Mobil executed the Russian Far East LNG agreement and the seven completion deeds with Mr. Sechin without making any inquiry of OFAC as to the propriety of such actions, notwithstanding the fact that Exxon Mobil was aware of Mr. Sechin's blocked status.  *See* AR 23410 (explaining steps taken by Exxon Mobil as a result of Mr. Sechin's designation).  Exxon Mobil also continued meeting with Mr. Sechin, even after receiving an administrative subpoena from OFAC.  *See, e.g.*, AR 1569–86.

III.   **OFAC's Issuance of a Penalty to Exxon Mobil for Violation of the Ukraine-Related Sanctions Program**

    A.  <u>**OFAC's Civil Penalty Process**</u>

When determining whether to issue a civil penalty, OFAC follows a set process outlined in the agency's regulations.  *See generally* 31 C.F.R. § 501, App. A.  OFAC begins by reviewing

11

the "facts and circumstances surrounding an apparent violation," then applies a set of General Factors to determine whether to initiate a civil penalty proceeding and, where applicable, to determine the appropriate amount of a civil monetary penalty.  *Id.* § 501, App. A(V).  The General Factors OFAC considers include whether any apparent violation was willful or reckless, the subject person or entity's awareness of the conduct, involvement of senior management in the conduct, harm to the sanctions program objectives, and individual factors such as the commercial sophistication and size of the subject person or entity.  *Id.* § 501, App. A(III).  Depending on the facts and circumstances of particular cases, OFAC may determine after investigation, among other outcomes, that no response is warranted (because, for example, the conduct does not rise to a level warranting a response); that additional information is needed; that a cautionary letter should be issued; or that a violation occurred.  *Id.* § 501, App. A(II).

If, after investigation, OFAC has reason to believe that a sanctions violation has occurred and a civil monetary penalty is appropriate, it will issue a Prepenalty Notice (PPN).  *Id.* § 501, App. A(V)(A)(1).  The PPN will include a description of the alleged violations, identify the provisions alleged to have been violated, and reflect OFAC's initial assessment of the appropriate penalty amount.  *Id.*  A person or entity that has received a PPN has the opportunity to submit a written response, either agreeing to the proposed penalty, or setting forth reasons why either a penalty should not be imposed, or a lesser penalty should be imposed.  *Id.* § 501, App. A(V)(A)(2). OFAC will consider all relevant materials submitted in response to the PPN.  *Id.*  If, after receipt of a PPN response, and a review of the information and evidence submitted, OFAC continues to conclude that a civil monetary penalty is warranted, OFAC will issue a final Penalty Notice.  *Id.* § 501, App. A(V)(A)(3).  A Penalty Notice is the final agency determination that a violation has occurred.  *Id.*

**B. The Process of Issuing a Civil Penalty to Exxon Mobil**

    1.  OFAC's Administrative Subpoena

On July 22, 2014, approximately two months after EMDC and EMOC executed contracts with blocked person Igor Sechin, OFAC issued an administrative subpoena to EMDC, informing the company that it had "reason to believe that [EMDC] may have violated the Ukraine-Related Sanctions Regulations, 31 C.F.R. part 589, when [EMDC] entered into a contract with Rosneft that was signed by Mr. Igor Sechin, an individual whose property and interests in property are blocked." AR 336–42; *see also* 31 C.F.R. § 501 App. A(II)(B). OFAC had learned of this transaction as the result of a news article and a Rosneft press release. AR 60; *see also* AR 23698–703. The administrative subpoena sought, among other things, a description of EMDC's dealings with Mr. Sechin in or around May 2014; information about all transactions and dealings of U.S. persons with Mr. Sechin since April 28, 2014; copies of all documents related to transactions with Mr. Sechin since April 28, 2014; and copies of Exxon Mobil's compliance programs related to OFAC's regulations. AR 336–42.

    2.  Exxon Mobil's Productions

On August 21, 2014, outside counsel for EMDC provided a timely but incomplete response to the OFAC subpoena. AR 349–58. EMDC included in that response extensive argument as to why it contested that it had violated the Ukraine-Related Sanctions Regulations. *Id.* EDMC also acknowledged in its production letter that "additional responsive documents" existed, but did not provide those documents to OFAC at that time. *Id.* After OFAC made a follow-up request for these additional materials, *see* AR 383, on October 3, 2014, EMDC provided nearly 20,000 pages of additional responsive documents not originally produced to OFAC, *see* AR 386–96. Significantly, EMDC's initial production failed to include copies of the seven completion deeds executed with Mr. Sechin following his designation. *See* AR 42–43. On October 23, 2014, EMDC

produced additional documents that had been inadvertently omitted from its first two productions. AR 397–99.  Finally, on December 12, 2014, EDMC completed its productions in response to OFAC's administrative subpoena by producing the parent agreements and deeds of amendment to the completion deeds, as well as over 100 additional documents inadvertently omitted from its previous three productions.  AR 402.  On December 16, 2014, at the invitation of Exxon Mobil, OFAC enforcement personnel attended an overview of the Russian Far East LNG project presented by Exxon Mobil's Chief Attorney.  AR 957–59; AR 61.

### 3.  OFAC's Prepenalty Notice

After thorough consideration of the materials submitted in response to the subpoena, on June 29, 2015, OFAC issued a Prepenalty Notice to Exxon Mobil, proposing a civil monetary penalty of $2,000,000 for dealing in the blocked services of Mr. Sechin.  AR 53–58.  The PPN listed eight apparent violations:  the execution of the LNG agreement and the seven completion deeds.  *Id.*  In support of the proposed penalty, the PPN analyzed the General Factors, finding most significant that Exxon Mobil acted recklessly in "ignoring an abundance of warning signs to engage the services of SDN Igor Sechin"; that the company's senior-most executives were aware of Mr. Sechin's blocked status when executing agreements with him; that Exxon Mobil's actions caused significant harm to the objectives of the Ukraine-related sanctions program by engaging the services of Mr. Sechin; and that Exxon Mobil is a sophisticated and experienced company that routinely deals with U.S. export controls.  *Id.*  OFAC also took into account that Exxon Mobil did not make a voluntary disclosure of the transactions.  *Id.*  As explained, OFAC learned of the Russian Far East LNG agreement as a result of a news report and a Rosneft press release.  AR 60.  It learned of the completion deeds only after issuing the administrative subpoena to EMDC.  *See, e.g.*, AR 42–43.

In support of the Prepenalty Notice, OFAC prepared a detailed analysis memorandum further setting forth the bases underlying its initial determination that Exxon Mobil had violated the Ukraine-Related Sanctions Regulations.[7]  AR 59–73.  That memorandum noted the defenses Exxon Mobil had raised—in particular, the contention that Exxon Mobil had not violated the Regulations because it had transacted with Mr. Sechin in his professional capacity as a representative of Rosneft, and not in his personal capacity.  AR 63.  It also engaged in a more extensive discussion of OFAC's application of the General Factors.  AR 64–70.  Specifically, among other things, OFAC provided further information in support of its finding that Exxon Mobil had "demonstrated reckless disregard for U.S. sanctions requirements by ignoring an abundance of sanctions-related warning signs and engaging in the services of an SDN."  AR 64.  OFAC pointed to evidence in the record demonstrating that the company's senior executives and legal counsel were aware of the sanctions and engaged in internal deliberations about them, yet still executed agreements with Mr. Sechin.  AR 64–68.  OFAC also noted that the Regulations had been published in the Federal Register prior to Exxon Mobil's conduct.  AR 65.  Exxon Mobil's corporate sophistication and wide international presence served as additional reasons why OFAC determined Exxon Mobil's execution of the agreements with Mr. Sechin was reckless.  *Id.*  Moreover, OFAC observed that Exxon Mobil's actions "caused significant harm to the policy objectives" of the sanctions program, insofar as "OFAC designated [Mr.] Sechin in order to isolate him and deny him access both to the U.S. financial system and to business deals with U.S. persons," whereas Exxon Mobil "afforded him access to business deals with U.S. persons."  AR 67.  The analysis memorandum noted the "high-profile nature of the apparent violations" and the

---

[7] This analysis memorandum was prepared in May 2015 for internal use to document the rationale underlying OFAC's decision to issue the PPN to Exxon Mobil.  *See* AR 59–73.  It was not provided to Exxon Mobil at the time.

importance of sending a "clear message" that "U.S. persons should not engage in the services of an SDN, irrespective of the SDN's position or the potential commercial benefit."  AR 70.

### 4.  Exxon Mobil's Response to the Prepenalty Notice

On August 5, 2015, Exxon Mobil submitted a response to OFAC.  *See* AR 23406–29. Exxon Mobil argued that the PPN was based on a "new" interpretation of Executive Order 13661, and that Mr. Sechin had been designated in his personal capacity, not in his capacity as a representative of Rosneft.  *Id.*  Exxon Mobil further asserted that it was arbitrary and capricious for OFAC to issue a penalty for a contract signed by Mr. Sechin, when the same contract would have been permissible if signed by a different Rosneft representative; and that "contemporaneous executive branch guidance" was inconsistent with OFAC's position, thus depriving Exxon Mobil of fair notice that its conduct was prohibited.  *Id.*  Finally, Exxon Mobil argued that OFAC had misapplied the General Factors in determining Exxon Mobil's penalty.  *Id.*  Throughout its response, Exxon Mobil made references to seeking legal advice regarding the issue of sanctions compliance.  *See, e.g.,* ███████████████████████████████████████

████████████████████████████████████████  AR 23427 (same).  Accordingly, OFAC requested that, to the extent Exxon Mobil intended to rely upon an advice-of-counsel defense, that Exxon Mobil "consider a limited waiver of attorney-client privilege" with respect to legal advice it had received prior to executing contracts with the blocked person Igor Sechin.  AR 221.  Exxon Mobil declined to waive the privilege.  AR 222–23.

On September 26, 2016, Exxon Mobil presented its defense in person to OFAC, outlining the arguments contained in its PPN response.  AR 224–39.  On October 12, 2016, Exxon Mobil submitted a supplemental PPN response, responding to certain points raised during its presentation to OFAC.  AR 101–13.  As part of this supplemental response, Exxon Mobil provided OFAC with additional assertions regarding its receipt of legal advice in connection with the designation of Igor

16

Sechin and its subsequent decision to execute contracts with a blocked person, including an "indicative chronology of requests for and receipt of legal advice concerning the Ukraine/Russia Sanctions and the designation of Igor Sechin as an SDN." *Id.* Despite this emphasis on legal advice, subsequent to this submission, Exxon Mobil once again declined to provide a limited waiver of privilege with respect to legal counsel it had received regarding the effects of Mr. Sechin's designation. AR 38; AR 80–84.

     5.   <u>OFAC's Preliminary Determination and Exxon Mobil's Additional Responses to Treasury and OFAC</u>

Following consideration of these additional materials submitted by Exxon Mobil, OFAC held a teleconference with counsel to Exxon Mobil on March 14, 2017, to inform Exxon Mobil that it had determined that a civil monetary penalty was the appropriate response to Exxon Mobil's prohibited conduct, and to provide Exxon Mobil an opportunity to enter into a settlement agreement with OFAC. *See* AR 20; AR 155–62; AR 1353; AR 1361. On March 24, 2017, Exxon Mobil requested an "urgent review" with the Secretary of the Treasury regarding the potential Penalty Notice. AR 20; AR 166–68. The Secretary's Chief of Staff referred Exxon Mobil back to OFAC. *Id.* Accordingly, on March 29, 2017, Exxon Mobil requested a meeting to discuss the penalty with the Director of OFAC and other senior Treasury officials. *See* AR 20; AR 240–43. OFAC granted the meeting, which was held on April 13, 2017. *See* AR 20. Exxon Mobil subsequently followed up with another letter to OFAC. AR 174–75. OFAC determined that neither the arguments presented during the April 13 meeting, nor those included in Exxon Mobil's follow-up letter, were new and that these arguments had already been carefully considered by OFAC during its deliberations on the matter. AR 176. OFAC provided Exxon Mobil until April 21, 2017 to respond to its offer of settlement, *see id.*, and on that date, Exxon Mobil declined the settlement offer, AR 177–78. It did so again on June 23, 2017. AR 181–83.

Exxon Mobil requested another meeting with the Director of OFAC, in response to which Enforcement explained that "without additional information from ExxonMobil, OFAC's position in this matter will not change."  AR 199.  On July 6, 2017, Exxon Mobil submitted a letter purporting to contain "newly discovered facts" regarding a television interview given by a senior White House official, in which that official explained that "U.S. persons [and] U.S. companies will not [be] able to do business with [designated persons] in their individual capacities," which "tends to have a chilling impact on their ability to do business elsewhere around the world."  AR 201–03; *see also* AR 206.  Exxon Mobil did not assert that it had relied upon the statement at the time it executed contracts with Mr. Sechin.  *See* AR 21 n.16; AR 208–09.  OFAC's Director and other senior officials agreed to meet again with Exxon Mobil on July 14, 2017, AR 208–09, after which Exxon Mobil followed up with another letter on July 17, 2017, AR 210–12.  Exxon Mobil declined OFAC's renewed settlement offer on that same date.  AR 214–15.

### 6.   The Final Penalty Notice

On July 20, 2017, OFAC issued a final Penalty Notice to Exxon Mobil.  AR 1–13; *see also* AR 18–49 (Analysis in Support of Penalty Notice).  Exxon Mobil filed this suit the same day.  *See* Compl., ECF No. 1.

### LEGAL STANDARDS

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material fact" is one whose "resolution could affect the outcome of the action." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "A dispute as to a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In reviewing a motion for summary judgment, courts consider the evidence in the light most favorable to the

18

nonmoving party.  *Id.*  In an Administrative Procedure Act (APA) case, such as this one, "[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Luminant Generation Co. v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).

## ARGUMENT

Exxon Mobil contends that OFAC's issuance of a Penalty Notice to Exxon Mobil for executing contracts with a blocked person was arbitrary, capricious, and an abuse of discretion; and that it violated Exxon Mobil's due process rights.  Exxon Mobil is wrong on both counts.  To the contrary, the penalty was the result of a considered and reasonable process; is mandated by the plain text of the Regulations; is entirely consistent with OFAC's past practice and White House and Treasury statements regarding the Ukraine-related sanctions program; and is based upon reasonable distinctions between categorically different conduct.  Summary judgment should be entered for Defendants.

**I.     The Penalty Issued to Exxon Mobil Was Neither Arbitrary Nor Capricious, But Rather Warranted by Exxon Mobil's Prohibited Conduct.**

Pursuant to the APA, 5 U.S.C. §§ 551 *et seq.*, a court may set aside agency action that is "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).  This is a "highly deferential" standard of review.  *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015) (quoting *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.,* 374 F.3d 362, 366 (5th Cir. 2004)).  "In reviewing an agency's decision under the arbitrary and capricious standard, there is a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous."  *La. Public Serv. Comm'n v. FERC*, 761 F.3d 540, 558 (5th Cir. 2014) (quoting *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010)).  When applying arbitrary and capricious review, courts require that an agency "examine the

19

relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). But "[a]n agency's decision 'need not be ideal or even, perhaps, correct so long as not 'arbitrary' or 'capricious' and so long as the agency gave at least minimal consideration to the relevant facts as contained in the record.'" *Tex. Clinical Labs*, 612 F.3d at 775 (quoting *Am. Petroleum Inst. v. EPA*, 661 F.2d 340, 349 (5th Cir. 1999)). And a court "cannot substitute [its] judgment or preferences for that of the agency." *Associated Builders & Contractors of Tex., Inc. v. Nat'l Labor Relations Bd.*, 826 F.3d 215, 224–25 (5th Cir. 2016). Instead, courts "should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (quoting *Bowman Transp., Inc. v. Ark.–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)). "To affirm an agency's action, [a court] need only find a rational explanation for *how* the [agency] reached its decision." *Associated Builders & Contractors of Tex.*, 826 F.3d at 224–25. Although a "reviewing court 'may not supply a reasoned basis for the agency's action that the agency itself has not given,'" *Luminant Generation Co.*, 714 F.3d at 850 (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43), "[i]f the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld," *id.* (quoting *Tex. Oil & Gas Ass'n v. E.P.A.,* 161 F.3d 923, 934 (5th Cir. 1998)).

In addition, courts afford "deference to the political branches in matters of foreign policy." *Regan v. Wald*, 468 U.S. 222, 242 (1984); *see also Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1137 (9th Cir. 2000) (observing that where a "regulation involves the conduct of foreign affairs, we owe the executive branch even more latitude than in the domestic context"). This includes cases involving final decisions by OFAC related to its determination to block the property and interests in property of an individual or entity. *See, e.g., Zarmach Oil Servs., Inc. v. U.S. Dep't*

*of Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) (involving an APA challenge to OFAC's denial of a specific license).

### A.  OFAC's Decision to Impose a Penalty on Exxon Mobil Was Reasonable and Considered.

When undertaking APA review, a court's role is to ensure that an agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43.  As recounted above, the record demonstrates that OFAC engaged in an exhaustive process in determining whether Exxon Mobil had violated the Ukraine-Related Sanctions Regulations.  The agency took into account all relevant data and provided a reasoned explanation for its final decision to penalize Exxon Mobil.  Because these actions far exceed "minimal standards of rationality," they should be upheld.  *See Luminant Generation Co.*, 714 F.3d at 850.

OFAC's process involved multiple steps.  First, when OFAC first became aware of Exxon Mobil's potential violations of Executive Order 13661 and 31 C.F.R. § 589.201, it issued an administrative subpoena to the company to gather data for the purpose of investigating Exxon Mobil's conduct.  AR 336–42.  Over several months, and as a result of OFAC's continued requests, Exxon Mobil produced all responsive documents.  *See* AR 349–58; AR 383; AR 386–96; AR 397–99; AR 402.  Although OFAC did not request it, Exxon Mobil included legal arguments in its correspondence to OFAC accompanying its productions.  *See* AR 349–58.  When Exxon Mobil completed these four productions in December 2014, it had provided more than 21,000 pages of documents to OFAC.  AR 402.  OFAC carefully reviewed these documents, considered the arguments presented in Exxon Mobil's correspondence, and at the invitation of Exxon Mobil, attended an overview of the Russian Far East LNG project presented by Exxon Mobil's Chief Attorney—all prior to OFAC's issuance of a Prepenalty Notice.  AR 957–59; AR 61.

Following this review, OFAC issued a Prepenalty Notice to Exxon Mobil.  AR 53–58.  The PPN informed Exxon Mobil that OFAC considered its execution of eight agreements with Mr. Sechin, after OFAC had added him to the SDN List, to constitute prohibited dealing in the services of a blocked person.  *Id.*  The PPN was not a final agency decision, but rather provided Exxon Mobil with notice of what OFAC considered to be its apparent violations of 31 C.F.R. § 589.201, including a summary of its application of the General Factors.[8]  *See id.*; *see also* 31 C.F.R. § 501, App. A(III).  Following the issuance of the Prepenalty Notice, OFAC afforded Exxon Mobil the opportunity to respond and to argue why a civil monetary penalty should not be imposed.  *See* AR 56; *see also* 31 C.F.R. § 501, App. A(V)(A)(2).

Exxon Mobil took advantage of OFAC's invitation; the company submitted a lengthy response to the PPN, AR 23406–29, which OFAC reviewed and considered.  OFAC also allowed Exxon Mobil the opportunity to present its arguments in response to the PPN in person, AR 85–100, and subsequently reviewed a supplemental response to the PPN that the company submitted to address issues that arose during the presentation, AR 101–13.

In March 2017, approximately a year and a half after Exxon Mobil's response to the Prepenalty Notice, and more than two and a half years following the issuance of the administrative subpoena, OFAC informed Exxon Mobil that it had determined that a civil monetary penalty was the appropriate enforcement response to Exxon Mobil's prohibited conduct.  *See* AR 20; AR 155–62; AR 1353; AR 1361.  Prior to issuing the formal Penalty Notice, the Director of OFAC and other senior OFAC officials agreed to meet with Exxon Mobil twice more for the purpose of considering its arguments against the imposition of  a penalty.  AR 20; AR 208–09; AR 240–43.

---

[8] OFAC also prepared an internal analysis memorandum that included a more detailed discussion of the bases underlying the PPN and took into account Exxon Mobil's arguments as to why it contended it had not violated the Regulations.  AR 59–73.

Treasury and OFAC also considered several letters from Exxon Mobil. *See, e.g.*, AR 174–75; AR 201–03; AR 210–13; AR 240–43.

Only after considering Exxon Mobil's arguments numerous times, providing Exxon Mobil the opportunity to meet with OFAC on several occasions, and fielding multiple letters from Exxon Mobil, did OFAC impose a final Penalty Notice. AR 1–11. The Penalty Notice specifically took into account all of Exxon Mobil's arguments in response to the Prepenalty Notice, analyzed and explained why OFAC did not find Exxon Mobil's responses persuasive, and included a discussion of the General Factors given the most weight in OFAC's decision. *See id.* OFAC also produced a lengthy analysis memorandum in support of the Penalty Notice, which provided further detail regarding OFAC's consideration of Exxon Mobil's arguments, and why it ultimately found them unpersuasive. AR 18–49.

Exxon Mobil's contention that OFAC failed to address its argument that the Ukraine-Related Sanctions Regulations did not "apply to actions taken by a specially designated national in his capacity as a representative of a non-blocked entity" is mere semantics. *See* Pls.' Mot. 28–30. While Exxon Mobil acknowledges that OFAC extensively discussed its conclusion that executing a contract with a blocked person was prohibited whether that person acted in a "professional" or "personal" capacity, Exxon Mobil claims that the fact that OFAC did not use the words "representative" or "representative capacity" in the final Penalty Notice means that OFAC ignored the argument.[9] Pls.' Mot. 28–29. But OFAC explained that its determination that the Regulations prohibited U.S. persons from entering into contracts with blocked persons in their professional capacities was consistent with the plain text of Executive Order 13661 and the Regulations, as well as the policy goals underlying the sanctions. AR 2–5. The fact that OFAC

---

[9] Exxon Mobil fails to mention that it used the term "professional capacity," in addition to the term "representative," in its response to the Prepenalty Notice. *See* AR 23419.

did not use Exxon Mobil's preferred terminology does not alter the fact that the agency considered Exxon Mobil's argument and explained why it was unpersuasive. Moreover, the detailed analysis memorandum prepared in support of the final Penalty Notice *did* use Exxon Mobil's language, and reached the same conclusion. AR 26–27. Thus, OFAC carefully considered, and articulated a valid basis for rejecting, Exxon Mobil's contention that it should not be penalized for transacting with a blocked person in his representative capacity.

At bottom, the amount of information OFAC took into account in reaching its decision; the number of times and the clarity with which it considered and ultimately rejected Exxon Mobil's arguments; the careful and deliberate procedures it followed in reaching its final determination; and the clear explanation underlying the final Penalty Notice all demonstrate that OFAC's decision was reasonable. The penalty should be upheld.

### B.  <u>The Ukraine-Related Sanctions Regulations Prohibit Exxon Mobil's Conduct.</u>

Each of Exxon Mobil's arguments as to why OFAC's issuance of a Penalty Notice was arbitrary, capricious, or otherwise contrary to law fails. First, Exxon Mobil is incorrect that it did not violate the Ukraine-Related Sanctions Regulations. As an initial matter, the unambiguous plain language of the Regulations leaves no doubt that Exxon Mobil engaged in prohibited conduct, particularly in light of the stated purpose of the Regulations. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (instructing courts to "'carefully consider[]' the text, structure, history, and purpose of a regulation" in determining ambiguity (citation omitted)). And even if the Regulations were ambiguous, the Court should defer to OFAC's reasonable interpretation of its own regulations. *See id.* at 2418 (explaining that when certain conditions are met, the agency has "significant leeway to say what its own rules mean").

24

1.  <u>OFAC's Interpretation of Its Regulations Is Consistent with Their Plain Meaning.</u>

Regulations are interpreted "in the same manner as statutes, looking first to the regulation's plain language." *United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016).  "Where the language is unambiguous, [courts] do not look beyond the plain wording of the regulation to determine meaning." *Id.* (quoting *Anthony v. United States*, 520 F.3d 374, 380 (5th Cir. 2008)). Before determining that a regulation is ambiguous, however, courts must also "make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning." *Kisor*, 139 S. Ct. at 2424. Where a regulation's plain language is clear, regulated parties are considered to have fair notice of their potential exposure to civil penalties.  *See Knapp*, 796 F.3d at 458 ("Given the regulation's plain language . . . , [appellant] had fair notice of his exposure to civil penalties . . . .").

As relevant here, the Ukraine-Related Sanctions Regulations proscribe all transactions prohibited pursuant to Executive Order 13661.  31 C.F.R. § 589.201.  The Executive Order sets forth that "[a]ll property and interests in property . . . that are or hereafter come within the possession or control of any United States person (including any foreign branch) of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." E.O. 13661, 79 Fed. Reg. 15535 § 1(a).  This prohibition applies to, *inter alia*, "persons determined by the Secretary of the Treasury, in consultation with the Secretary of State to be an official of the Government of the Russian Federation."  *Id.* § 1(a)(ii)(A).  The Executive Order states that the prohibitions outlined above "include but are not limited to . . . the receipt of any contribution or provision of funds, goods, *or services* from any such person."  *Id.* § 4 (emphasis added).  The Regulations similarly define the terms "property" and "property interest" broadly, explicitly including "services of any nature whatsoever" and "contracts of any nature whatsoever."  31 C.F.R. § 589.308.  It is undisputed that, as a result of the Secretary of the Treasury's designation

determination, Igor Sechin is a blocked person subject to the prohibitions outlined in the Regulations and in Executive Order 13661.  *See* Announcement of Additional Treasury Sanctions on Russian Government Officials and Entities (Defs.' App. 19–22).

President Obama issued Executive Order 13661 pursuant to authority granted him under IEEPA.  That statute provides in relevant part that the President may block "dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest" by U.S. persons.  50 U.S.C. § 1702(a)(1)(B).  Courts have repeatedly held that Congress did not intend to limit the scope of IEEPA's expansive statutory terms, and have accordingly upheld Treasury's authority to interpret these terms broadly.  *See, e.g.*, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162–63 (D.C. Cir. 2003) (upholding Treasury's broad interpretation of the term "any interest"); *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 752–53 (7th Cir. 2002) (same); *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 701 (D.C. Cir. 1994) ("OFAC may choose and apply its own definition of property interests, subject to deferential judicial review."); *see also Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800, 807 (1st Cir. 1981) ("The language of IEEPA is sweeping and unqualified.").

Based on the plain language of the Executive Order and the Regulations, and in light of IEEPA, it is clear that executing a contract with a blocked person constitutes dealing in blocked services.  The Order explicitly states that any property or interest in property of an individual designated by the Secretary of the Treasury that comes within the possession or control of a U.S. person is blocked, and expressly includes the receipt of services within the scope of blocked property.  E.O. 13661, 79 Fed. Reg. 15535 §§ 1(a), 4.  The Regulations further emphasize that "property" and "property interest" include "services of any nature whatsoever" and "contracts of any nature whatsoever," demonstrating that the Regulations are meant to encompass a broad,

26

expansive scope of activities.  31 C.F.R. § 589.308.  And OFAC has historically interpreted IEEPA broadly to ensure the scope of sanctions programs achieve their purposes, which practice courts have upheld.  *See Holy Land Found. for Relief & Dev.*, 333 F.3d at 162–63; *Global Relief Found., Inc.*, 315 F.3d at 752–53; *Consarc Corp.*, 27 F.3d at 701.

Although the Regulations do not define "services," "dictionary definitions inform the plain meaning of a statute," *United States v. Radley*, 632 F.3d 177, 182 (5th Cir. 2011), and the term's ordinary meaning encompasses the provision of work that benefits another.  For example, *Merriam-Webster* defines "services" as a "benefit" and as "useful labor that does not produce a tangible commodity."  *Merriam-Webster*, https://www.merriam-webster.com/dictionary/service. Similarly, *The American Heritage Dictionary* defines "service" as "[w]ork that is done for others as an occupation or business."  *The American Heritage Dictionary of the English Language*, https://ahdictionary.com/word/search.html?q=service.  The U.S. Court of Appeals for the Second Circuit utilized similar definitions in interpreting the term "service" in connection with OFAC's Iran sanctions regulations.  *See United States v. Banki*, 685 F.3d 99, 107–08 (2d Cir. 2012) (finding, in interpreting OFAC's Iran sanctions regulations, that a "service" need not be performed for a fee).  The plain meaning of the term "services," as used in the Regulations, thus includes executing a contract.  In reaching its decision to penalize Exxon Mobil, OFAC took all of this information into account and arrived at the same conclusion.  *See, e.g.*, AR 2–3; AR 24–27.

In contrast, the text of the Regulations provides no basis whatsoever to infer, as Exxon Mobil urges the Court to, any intention to limit the definition of blocked property to services conducted in a blocked person's "individual capacity."  *See* Pls.' Mot. 27–28.  Instead, such a limit is inconsistent with the language of IEEPA, the Executive Order, and the Regulations.  Plaintiffs tacitly acknowledge this insofar as they do not attempt to make a textual argument supporting this assertion.  *See id.* at 18–24.  Nor do Plaintiffs argue that signing a contract is not encompassed

27

within the definition of the term "services," instead recognizing that such act could be deemed provision of services.  *See id.* at 22–24.  Thus, the broadly worded, plain text of the Executive Order and the Regulations supports OFAC's interpretation, but it fails to supports Plaintiffs' claimed understanding.

OFAC's consistent position that executing a contract with a blocked person falls within the scope of conduct prohibited by the Regulations is supported by the purpose and intent of the sanctions program.  *See Banki*, 685 F.3d at 108 (looking to purpose of Iran sanctions to confirm understanding of definition of "service"); *Paradissiotis v. Rubin*, 171 F.3d 983, 987 (5th Cir. 1999) (considering purpose of Libya sanctions regulations in determining their meaning); *see also United States v. Lindh*, 212 F. Supp. 2d 541, 574 (E.D. Va. 2002) (looking to "[t]he obvious scope and purpose of [OFAC's] Regulations" in denying vagueness challenge to prohibition on providing "services" to terrorist organizations).  In *Banki*, the Second Circuit found that "isolation of Iran" was the purpose of the sanctions at issue and that, as a result, it would make no sense for the definition of "service" to be limited to services provided for a fee.  685 F.3d at 108.  Similarly, in *Paradissiotis*, this Circuit considered, in interpreting definitions contained within the Libya sanctions regulations, that their purpose was "to cast the widest possible net over individuals who are or have been or are suspected of being actors directly or indirectly on behalf of the government of Libya."  171 F.3d at 987.

The Ukraine-Related Sanctions Regulations have a similarly expansive purpose: to isolate blocked individuals and entities and, by doing so, to impose costs on the Government of Russia. *See, e.g.*, Statement by the President on Ukraine (Defs.' App. 23) (explaining the intent of sanctions "to increase the cost on Russia and on those responsible for what is happening in Ukraine" and to "mak[e] it clear that there are consequences for their actions"); Fact Sheet: Ukraine-Related Sanctions (Defs.' App. 25, 26) (explaining that the purpose of sanctions was "to

impose costs on named individuals who wield influence in the Russian government" and to "send a strong message to the Russian government that there are consequences for their actions"); Background Conference Call on Ukraine Sanctions (Defs.' App. 30) ("with these additional steps, the impact on the Russian economy will only grow, just as Russia's political isolation is growing"); *see also* AR 45 (finding that Exxon Mobil's conduct caused significant harm to OFAC's sanctions policy objectives because it contravened the goal of isolating Igor Sechin).  In light of these policy objectives, it would be nonsensical for such broad language as "services of any nature whatsoever" and "contracts of any nature whatsoever," 31 C.F.R. § 589.308, to be interpreted to *exclude* the execution of contracts by a blocked person on behalf of his employer with a U.S. person.  To the contrary, the purpose underlying the Regulations mandates an expansive interpretation of what constitutes prohibited conduct.  As a policy matter, prohibiting transactions in which a blocked person acts in a representational capacity helps to isolate that individual, because it prevents others (including his employer) from using his services.  *See* AR 27 (pointing to "OFAC's policy aim of targeting individuals in part to isolate them from company operations").  And were the countertextual interpretation of the Regulations that Exxon Mobil urges to be accepted—that blocked persons could freely transact with U.S. persons in a "representative" capacity—it would create an easy mechanism for blocked persons to evade the sanctions by, among other things, incorporating companies for the purpose of continuing to engage in prohibited business activities ostensibly on behalf of the non-blocked corporate entity.  *See* AR 3; AR 26.  As OFAC explained in its memorandum supporting the Penalty Notice, allowing such a loophole "would undermine the goal of isolating SDNs across all sanctions programs" and significantly diminish "a core tool of U.S. foreign policy."  AR 26.

Exxon Mobil's contention that contemporaneous White House and Treasury statements support its interpretation of the Regulations is therefore wrong.  Pls.' Mot. 24–28.  The statements

to which Exxon Mobil points are entirely consistent with the plain text of the Regulations.  The thrust of all of the White House statements to which Exxon Mobil cites is that, at the time Executive Order 13661 was issued, its intent was to target named individuals, rather than the companies they run, and that U.S. persons would be able to do business with non-blocked companies.[10]  *See id.*  In the same series of briefings, White House officials made clear that "U.S. persons are prohibited from doing business with [persons designated pursuant to the Order]."  Background Briefing by Senior Administration Officials on Ukraine, (Defs.' App. 7).

The only way to read these contemporaneous statements harmoniously is to conclude that transacting with a non-blocked company was permissible, but transacting with an blocked individual employed by the company was not.  This logical understanding squares with the plain meaning of the Regulations.  And OFAC has unswervingly made clear, as it did in the press release accompanying Mr. Sechin's designation more than a month after the cited White House statements, "transactions by U.S. persons or within the United States involving the individuals and entities designated today are generally prohibited."  Announcement of Additional Treasury Sanctions on Russian Government Officials and Entities (Defs.' App. 20).

Nor do press reports quoting Treasury officials undermine the plain meaning of the Regulations.  *See* Pls.' Mot. 27.  These reports indicate nothing more than that it would be permissible for U.S. persons to interact with Rosneft, or sit on Rosneft's board.  They say nothing

---

[10] Exxon Mobil places much emphasis on a quote from a television interview in which a senior administration official explained that "U.S. persons [and] U.S. companies will not [be] able to do business with [designated persons] in their individual capacities," which was intended "to have a chilling effect on their ability to do business elsewhere around the world."  AR 201–03; *see also* AR 206.  Exxon Mobil does not appear to have been aware of this interview until long after its violation of the Regulations.  *See* AR 201–03 (bringing the interview to OFAC's attention in July 2017 as "newly discovered facts").  Moreover, this interview makes clear that the intent of the sanctions is to chill the ability of blocked persons to do business with U.S. persons—exactly what Exxon Mobil allowed Igor Sechin to do here.

about executing contracts with designated individuals employed by Rosneft.  It therefore would have been unreasonable to conclude, in light of the Regulations' inclusive definition of "services," that these statements indicated that U.S. persons could enter into contracts with blocked persons as long as they were acting in a representative capacity.  To the contrary, OFAC's consistent position, predating Exxon Mobil's conduct, has been that entering into a contract with a blocked person would be problematic, even when that person is acting on behalf of a non-designated employer.  *See* AR 133–35 (issuing a license to allow a U.S. person to execute a contract with a designated bank governor acting on behalf of a non-designated bank); AR 1100 ("U.S. persons should . . . be cautious in dealings with the ministry to ensure that they are not, for example, entering into any contracts signed by the SDN."); *see also* AR 23716 ("We've often drawn the line at entry into executory contracts . . . ."); AR 23741 ("signing a contract with Rosneft executed by Sechin could be prohibited (citing prior analogous guidance OFAC has given in the Burma context (FAQ 285))"); AR 23768 ("[T]he particular issue of 'no signing contracts with an SDN' has long been the subject of a public FAQ in the Burma program.").  And executing a contract and participating in a board meeting are, as a matter of common sense, different in character:  one involves a transaction, whereas the other does not.  Indeed, Exxon Mobil held multiple meetings with Mr. Sechin following the imposition of the sanctions and was not penalized for doing so.  *See, e.g.*, AR 390; AR 1102; AR 1569–86.  These Treasury press statements therefore do not contradict the plain meaning of the Regulations.  At most, they support the position that doing business with Rosneft was permissible as a general matter—which OFAC does not contest—without broaching the subject of signing a contract with a blocked person.

Exxon Mobil also focuses upon the fact that Mr. Sechin signed the documents at issue in a representative capacity to argue that it did not deal in his blocked services.  *See* Pls.' Mot. 19–24. This is a distinction without a difference.  Although Exxon Mobil devotes pages to the issue, it is

of no moment whether Mr. Sechin is personally a party to the contracts he executed with Exxon Mobil or merely the signatory; whether he could be held liable under them; or whether the contracts themselves are his personal property. *See id.* 19–22. OFAC's penalty rests on none of these factors. *See* AR 1–11. The contracts are not the "property" at issue here. Rather, OFAC's penalty is based on the fact that Mr. Sechin provided a service to Exxon Mobil by signing the contracts, which falls within both the Executive Order's and the Regulations' definitions of "property" and "interests in property." *See* E.O. 13661, 79 Fed. Reg. 15535, § 4; 31 C.F.R. § 589.308. As explained *supra*, the broad language defining services to constitute those of "any nature whatsoever," the plain meaning of the term "services," and the purpose of the Ukraine-related sanctions program all make plain that Mr. Sechin's acts constituted services within the Regulations' understanding of that term. Exxon Mobil is incorrect that *Rosneft* was providing the service; to the contrary, Plaintiffs concede that corporations can act only through their agents. Pls.' Mot. 23.

Finally, perhaps recognizing the futility of their other arguments, Plaintiffs raise for the first time the tenuous contention that Mr. Sechin's services were never in Exxon Mobil's "possession" or "control." Pls.' Mot. 23–24. But Plaintiffs' argument ignores the fact that Executive Order 13661 makes clear that "receipt" of "services" from a designated person, EO 13661 § 4, is included within the scope of "property and interests in property . . . within the possession or control of any United States person," *id.* at § 1. What is more, although services, of course, are intangible and cannot be physically possessed, the ordinary definition of services" includes providing a "benefit." *See Merriam-Webster*, https://www.merriam-webster.com/dictionary/service. The fact that Exxon Mobil benefited from Mr. Sechin's services by entering into lucrative contracts with Rosneft as a direct result, and retained the benefit of those contracts, provides further proof that Exxon Mobil was in possession of Mr. Sechin's services for

these purposes.  Finally, if Exxon Mobil's constrained construction of the meaning of "possession" or "control" were correct, a U.S. person could never be in "possession" or "control" of a blocked person's services when those services involve executing a contract—even if that individual were acting on his own behalf.  Given that it appears undisputed that a U.S. person would violate the Regulations by executing a contract with a blocked person in his individual capacity, Exxon Mobil's interpretation cannot be correct.

In light of the plain language of the Ukraine-Related Sanctions Regulations (and the Executive Order they incorporate by reference), as well as the purpose underlying their issuance, there can be no dispute that Exxon Mobil's conduct—executing eight contracts with a known, high-profile designated individual—was prohibited, and that OFAC's imposition of a penalty was appropriate.  *Accord Knapp*, 796 F.3d at 458.

2.  Even If the Language Were Ambiguous, OFAC's Reasonable Interpretation of Its Regulations Is Entitled to Deference.

OFAC's application of the Ukraine-Related Sanctions Regulations is consistent with their plain meaning.  But even if this Court were to determine that the Regulations are ambiguous, OFAC's reasonable interpretation of its own regulations is entitled to deference.

As the Supreme Court recently reaffirmed, where an agency decision is ambiguous, and where certain other conditions are met, the agency has "significant leeway to say what its own rules mean."  *Kisor*, 139 S. Ct. at 2418.  For a court to apply such deference, the agency's reading of its regulation must be "reasonable," meaning that "it must come within the zone of ambiguity the court has identified."  *Id.* at 2415–16 (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)).  In addition, "the regulatory interpretation must be one actually made by the agency," representing its "authoritative" position.  *Id.* at 2416 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 257 (2001) (Scalia, J. dissenting)).  The agency's interpretation must also "in

33

some way implicate its substantive expertise." *Id.* at 2417. Finally, the agency's interpretation must "reflect 'fair and considered judgment,'" not a "convenient litigating position" or "*post hoc* rationalization[n]." *Id.* (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). All of these criteria are met here, and OFAC's interpretation of the Regulations warrants deference. Indeed, although pre-*Kisor*, the Fifth Circuit has previously deferred to OFAC's reasonable interpretation of its own sanctions regulations. *See Paradissiotis*, 171 F.3d at 987–88.

First, OFAC's interpretation of the term "services" to include a blocked person executing a contract on behalf of his employer certainly "fall[s] 'within the bounds of reasonable interpretation.'" *Kisor*, 139 S. Ct. at 2416 (quoting *Arlington v. FCC*, 569 U.S. 290, 296 (2013)). As explained previously, this understanding of the term comports with its ordinary meaning. *See supra* pp. 26–28. It is also consistent with OFAC's past broad interpretation of the term. *See Banki*, 685 F.3d at 108; *Lindh*, 212 F. Supp. 2d at 574. Nor is there anything in the text, structure, or history of the Regulations that would suggest a different meaning. *See Kisor*, 139 S. Ct. at 2416 ("The text, structure, history, and so forth [of a regulation] at least establish the outer bounds of permissible interpretation."). Accordingly, OFAC's interpretation is reasonable.

Second, OFAC's interpretation represents the official position of the agency. Indeed, OFAC has issued public FAQs explicitly stating, in connection with the Ukraine-Related Sanctions Regulations, that "persons should be cautious in dealings with [] a non-blocked entity to ensure that they are not, for example, dealing with a blocked person representing the non-blocked entity, such as entering into a contract that is signed by a blocked person," OFAC FAQ 398 (Defs.' App. 51); and that "U.S. persons should be careful when conducting business with non-blocked entities in which blocked individuals are involved; U.S. persons may not, for example, enter into contracts that are signed by a blocked individual," OFAC FAQ 400 (*Id.*). OFAC's FAQs represent its official position insofar as they "highlight key issues and topics relating to economic sanctions and

the procedures and practices of OFAC" and provide "general information to assist persons subject to United States jurisdiction to comply with legal requirements and to facilitate an understanding of the scope and purposes of sanctions programs."  U.S. Dep't of the Treasury, Resource Center, Note on Frequently Asked Questions, https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/note.aspx.  OFAC has been consistent in providing the same public guidance in past sanctions programs.  FAQ 285, issued in March 2013 in connection with the Burma sanctions program advised that, where a government minister was designated but the ministry itself was not, "U.S. persons should . . . be cautious in dealings with the ministry to ensure that they are not, for example, entering into any contracts signed by the SDN."  AR 1100.  The interpretation at issue thus represents the official position of the agency.

Third, OFAC's interpretation draws upon its substantive expertise.  OFAC's purpose is to "administer[] and enforce[] economic sanctions programs primarily against countries and groups of individuals . . . using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals."  OFAC FAQ 1 (Sept. 10, 2002), https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#1 (Defs.' App. 43).  Determining what its economic sanctions programs cover, in accordance with policy goals, falls directly within OFAC's wheelhouse.  That other courts have deferred to OFAC's interpretation of its regulations with respect to the scope and application of sanctions programs supports this conclusion.  *See Paradissiotis*, 171 F.3d at 988 ("OFAC's interpretation of its own regulations is not plainly inconsistent with the regulatory language, nor is it unreasonable, and in fact it represents the only practical interpretation."); *see also, e.g.*, *Holy Land Found. for Relief & Dev.*, 333 F.3d at 162–63 (deferring to OFAC's broad interpretation of the term "interest"); *Sacks v. Office of Foreign Assets*

*Control*, 466 F.3d 764, 778 (9th Cir. 2006) (deferring to OFAC's interpretation of its regulations);

*OKKO Business PE v. Lew*, 133 F. Supp. 3d 17, 25–26 (D.D.C. 2015) (same).[11]

Lastly, OFAC's interpretation of its Regulations is fair and considered, not adopted for litigation purposes.  Instead, it is consistent with OFAC's past practices and with the plain meaning of the Regulations.  Exxon Mobil is incorrect when it argues that OFAC's interpretation "unexpectedly departed from a previous interpretation."  Pls.' Mot. 31.  To the contrary, the operative text in the definition of "property" and "property interest" located in 31 C.F.R. § 589.308—"services of any nature" and "contracts of any nature"—has not changed.  Moreover, when it has had cause to address the issue, OFAC has consistently considered executing a contract with a blocked person on behalf of his or her non-designated employer to be a violation.  In 2006, for example, in connection with the Zimbabwe sanctions program, OFAC required a license for a U.S. person to execute a contract with a designated bank governor acting on behalf of a non-designated bank.  *See* AR 133–35.  Likewise, in 2013, OFAC issued FAQ 285 in connection with the Burma sanctions program, which advised that, where a government minister was designated but the ministry itself was not, "U.S. persons should . . . be cautious in dealings with the ministry to ensure that they are not, for example, entering into any contracts signed by the SDN."  AR 1100.  Plaintiffs cannot point to contrary guidance because none exists.

---

[11] Certain of these decisions, which were issued before *Kisor*, apply a standard of deference that *Kisor* appears to have superseded.  *Compare Kisor*, 139 S. Ct. at 2416 ("Some courts have thought . . . that at this stage of the analysis, agency constructions of rules receive greater deference than agency construction of statutes. . . . But that is not so.") *with Paradissiotis*, 171 F.3d at 987 ("[A]n agency's application of its own regulations[] receives an even greater degree of deference than the *Chevron* standard . . . ." (citation omitted)) *and OKKO Business*, 133 F. Supp. 3d at 25 ("OFAC's construction merits an even greater deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation." (citation omitted)).  Nevertheless, the analysis in these opinions demonstrates that deference to OFAC would have been appropriate in those circumstances under even a higher standard.  *See Paradissiotis*, 171 F.3d at 988 ("OFAC's interpretation of its own regulation . . . represents the only practical interpretation.").

Nor does the fact that OFAC issued FAQs 398 and 400 after Exxon Mobil's prohibited conduct indicate that the agency was engaging in post-hoc rationalizations to justify the penalty it eventually issued to Exxon Mobil. *Accord United States v. Ehsan*, 163 F.3d 855, 859–60 (4th Cir. 1998) (finding that the issuance of an Executive Order clarifying the meaning of a prior Executive Order "di[d] not undermine the simple, unambiguous bar" expressed in the initial Order). FAQs 398 and 400, which were issued a few months after Exxon Mobil executed contracts with Mr. Sechin, state that, in connection with the Ukraine-Related Sanctions Regulations, "U.S. persons may not . . . enter into contracts that are signed by a blocked individual." OFAC FAQ 400 (Defs.' App. 51); *see also* FAQ 398 (*Id.*). But as explained, these FAQs did not represent a change in policy; they merely reiterated OFAC's previous stance on entering into contracts with blocked persons, as expressed in connection with the Zimbabwe and Burma sanctions programs. The FAQs were also, as OFAC explained in the Penalty Notice, consistent with the prohibitions contained in Executive Order 13661 and the Regulations, both of which were publicly available at the time of Exxon Mobil's violations. AR 4. Moreover, internal OFAC communications demonstrate the agency's understanding, prior to Exxon Mobil's conduct, that it would be a violation for a U.S. person or entity to enter into a contract with a blocked person, regardless of whether that individual executed the contract in a representative capacity. *See* AR 23716 ("We've often drawn the line at entry into executory contracts . . . ."); AR 23741 ("signing a contract with Rosneft executed by Sechin could be prohibited"). There is, in short, no evidence that OFAC changed its position.

Exxon Mobil erroneously asserts that OFAC's internal communications demonstrate that "OFAC had not reached a definitive interpretation of the Ukraine-related regulations until after ExxonMobil had executed the documents at issue." Pls.' Mot. 14–16. Not so, as entering into a contract with a blocked person is a violation. OFAC's internal communications reflect nothing

more than the reality that all potential enforcement actions are evaluated on a "case by case" basis, and therefore OFAC cannot ascertain the appropriate penalty for a given violation without a full understanding of the relevant facts and circumstances. *See* AR 23741. Indeed, both OFAC's regulations and basic principles of due process require such individualized consideration. *See generally* 31 C.F.R. § 501, App. A. Moreover, Exxon Mobil has identified no internal communications that evidence a belief that entering into a contract with a blocked person would be permissible. Quite the opposite: the documents reflect OFAC's stance, expressed prior to Exxon Mobil's conduct, that entering into a contract with a designated individual is a violation of the program. *See, e.g.*, AR 23716; AR 23741. In addition, such predecisional internal deliberations do not reflect the agency's official position, which is why the Government maintains that these documents are protected pursuant to the deliberative process privilege. *See, e.g.*, *Skelton v. U.S. Postal Serv.*, 678 F.2d 35, 38 (5th Cir. 1982) ("The purpose of the privilege is to protect the decision-making process from the inhibiting effect that disclosure of predecisional advisory opinions and recommendations might have on the frank discussion of legal or policy matters in writing." (citation omitted)).

For all of these reasons, even if the Court determines that the Ukraine-Related Sanctions Regulations are ambiguous, it should defer to OFAC's reasonable interpretation and uphold the penalty issued to Exxon Mobil.

### C.  OFAC's Actions Are Consistent with Treasury's Public Statements.

Exxon Mobil next argues that OFAC's penalty determination is arbitrary and capricious because it supposedly contradicts statements provided to the press by Treasury. Pls.' Mot. 32–34. This contention is also incorrect. First, OFAC's interpretation of the Regulations is consistent with contemporaneous White House and Treasury statements. The statements to which Exxon Mobil points simply concern a different issue. Moreover, the "guidance" to which it refers is, in

fact, statements provided to the press which lack the force of law and predate the issuance of the controlling Regulations. It therefore would have been unreasonable for Exxon Mobil to rely on such news reports (as opposed to looking to the plain text of the Regulations, or reaching out to OFAC) in determining how to comply with OFAC's Regulations.

First, as OFAC explained in its analysis in support of the Penalty Notice, OFAC's determination that Exxon Mobil violated the Ukraine-Related Sanctions Regulations is consistent with contemporaneous White House and Treasury statements. *See* AR 25. In addition to the plain text of Executive Order 13661 and the Regulations implementing it, multiple governmental public statements made clear that U.S. persons were not permitted to transact with designated persons. On the day Executive Order 13661 was issued, a senior administration official explained that "U.S. persons are prohibited from doing business with [persons designated pursuant to the Order]." Background Briefing by Senior Administration Officials on Ukraine (Defs.' App. 7). The press release announcing Mr. Sechin's designation explained that "transactions by U.S. persons or within the United States involving the individuals and entities designated today are generally prohibited." Announcement of Additional Treasury Sanctions on Russian Government Officials and Entities (Defs.' App. 20). And OFAC had publicly advised years before, in an analogous context, where a government minister was designated but the ministry itself was not, that "U.S. persons should . . . be cautious in dealings with the ministry to ensure that they are not, for example, entering into any contracts signed by the SDN." AR 1100.

The purpose underlying the sanctions—to isolate Mr. Sechin and impose costs on the Russian government—which mandates a broad interpretation of their scope, was also plain from contemporaneous press statements. A Fact Sheet issued by the White House on the day Executive Order 13661 was issued pointed out, for example, that the purpose of sanctions was "to impose costs on named individuals who wield influence in the Russian government" and to "send a strong

message to the Russian government that there are consequences for their actions."  *See* Fact Sheet: Ukraine-Related Sanctions (Defs.' App. 25, 26).  Similarly, on the day Mr. Sechin was designated, a senior administration official explained that "we've already seen that these sanctions and the isolation of Russia has had an impact, a substantial impact, on the Russian economy" and emphasized that "with these additional steps, the impact on the Russian economy will only grow, just as Russia's political isolation is growing."  Background Conference Call on Ukraine Sanctions (Defs.' App. 30).  A senior White House official explained during a television interview that "U.S. persons [and] U.S. companies will not [be] able to do business with [designated persons] in their individual capacities," which "tends to have a chilling impact on their ability to do business elsewhere around the world."  AR 206.

Exxon Mobil seeks to highlight statements made by Treasury to the press indicating that participating in meetings of Rosneft's board with Mr. Sechin (among others), was not prohibited by the sanctions.  Pls.' Mot. 32–34.  But such public statements are not incompatible with the Government's contemporaneous guidance that U.S. persons could not do business with designated individuals.  As explained *supra*, this dispute is about executing contracts, not participating in meetings, and the two activities are very different in character—one involves a transaction, whereas the other does not.  The only sensible reading of these statements is therefore to interpret them in harmony, which is consistent with OFAC's interpretation of its Regulations:  that U.S. persons could do business with the company—including participating in meetings—but were prohibited from transacting with a designated individual.  As noted, OFAC did not penalize Exxon Mobil for holding multiple meetings with Mr. Sechin following his designation.  *See, e.g.*, AR 390; AR 1102; AR 1569–86.  And contrary to Exxon Mobil's assertion, OFAC addressed this argument in its memorandum in support of the Penalty Notice, concluding that participating in meetings and signing contracts were different activities, and that because the press statements

40

addressed only the former, they did not bear upon the decision to impose the Penalty Notice.  *See* AR 28–29.

Even if the Court were to find that these statements are inconsistent with the Regulations, the Regulations would trump for two principal reasons.  First, the Regulations represent the official position of OFAC.  In contrast, statements to the press "lack the force of law," and therefore are not treated the same as OFAC's official positions.  *Cf. Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.").  Second, the Regulations were issued *after* the statements to which Plaintiffs cite, but before Exxon Mobil's prohibited conduct, and thus clarified the meaning of the above-referenced press statements.  And finally, Exxon Mobil could have followed OFAC's guidance and contacted OFAC regarding the effect of the Regulations on U.S. persons' transactions with Igor Sechin.  *See* OFAC FAQ 15 (Defs.' App. 45) ("OFAC . . . strongly encourages parties to exercise due diligence when their business activities may touch on an OFAC-administered program and to contact OFAC if they have any questions about their transactions.").  Given Exxon Mobil's commercial sophistication and experience dealing with OFAC, it is reasonable to expect that the company would exercise due diligence by reaching out to OFAC, rather than relying upon tangentially related press statements, to make decisions regarding its interactions with a known designated individual.

For these reasons, OFAC's issuance of a penalty to Exxon Mobil is not inconsistent with Treasury public statements, nor is it arbitrary or capricious.

**D.   OFAC's Distinction between Contracts Executed by Blocked Persons and Those Executed by Non-Blocked Parties Is Principled and Logical.**

Exxon Mobil's final argument is that OFAC's actions are arbitrary and capricious because they draw distinctions between contracts signed by Igor Sechin and contracts signed by a non-designated Rosneft executive.  Pls.' Mot. 34–36.  This contention lacks merit entirely.

The Secretary of the Treasury determined, pursuant to the authority provided in Executive Order 13661, that it was appropriate to designate Mr. Sechin.  *See* Announcement of Additional Treasury Sanctions on Russian Government Officials and Entities (Defs.' App. 19–20).  As a result of this determination, U.S. persons were prohibited from, *inter alia*, "the receipt of any contribution or provision of funds, goods, or services" from Mr. Sechin.  E.O. 13661, 79 Fed. Reg. 15535 § 4(b); *see also* 31 C.F.R. § 589.201.  This included "services of any nature whatsoever [and] contracts of any nature whatsoever."   31 C.F.R. § 589.308.   Following Mr. Sechin's designation and the issuance of the Ukraine-Related Sanctions Regulations, Exxon Mobil executed contracts with Mr. Sechin, and OFAC found that Exxon Mobil had dealt in the blocked services of Mr. Sechin by doing so.  AR 1–11.

The fact that Exxon Mobil could have executed a contract with a non-designated person is of no moment.  Such is the case any time one person is designated and another is not.  The principled distinction between a contract entered into by a designated individual and a contract entered into by a non-blocked person employed by the same company is that the latter individual *is not blocked*.  Plainly, the provision of blocked services is the problematic element in the equation, not the contract itself.  Such interpretation is consistent with the Secretary's designation determination, the Regulations, and the purpose underlying the designation: to isolate Mr. Sechin. *See supra* pp. 28–29.  Nor are the principles of Russian corporate law Exxon Mobil tentatively cites relevant.  *See* Pls.' Mot. 35.  As OFAC observed in its memorandum in support of the Penalty

42

Notice, OFAC is not required to follow Russian corporate law or any interpretations of Russian corporate law in implementing its sanctions.  AR 29.  It was incumbent upon Exxon Mobil to be aware of the blocked nature of its business partners and to take appropriate measures to ensure that it did not engage in prohibited activities.

Thus, OFAC's decision to penalize Exxon Mobil for entering into a contract with a blocked individual, even though it could have entered into the same contract with a non-blocked individual, is not arbitrary or capricious, but rather comports with the text and purpose of Executive Order 13361 and the Regulations.

## II.    Exxon Mobil Had Fair Notice that Its Conduct Was Prohibited.

Exxon Mobil contends that OFAC's penalty should be set aside because the company did not have "fair notice" that its conduct would be deemed unlawful, in supposed violation of the Due Process Clause of the Fifth Amendment.  Pls.' Mot. at 36.  As shown below, Exxon Mobil is mistaken.

"Due process requires that parties receive fair notice before being deprived of property." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328 (D.C. Cir. 1995).  In order for a regulation to provide fair notice to a regulated party that its conduct may result in a civil penalty, an agency must state with "ascertainable certainty" what conduct is prohibited.  *Diamond Roofing Co. v. Occupational Safety & Health Review Comm'n,* 528 F.2d 645, 649 (5th Cir. 1976).  The "challenged statute or agency action must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  *Emp'r Sols. Staffing Grp. II, LLC v. Office of the Chief Admin. Hearing Officer*, 833 F.3d 480, 488 (5th Cir. 2016) (internal citation omitted); *see also Roark and Hardee LP v. City of Austin*, 522 F.3d 533, 552-53 (5th Cir. 2008) ("[T]his circuit has held that '[o]nly a *reasonable degree of certainty* is required' under the Due Process Clause before criminal or civil liability may be imposed.") (quoting *United States v. Tansley*, 986 F.2d

43

880, 885 (5th Cir. 1993)).  Put another way, due process creates a duty on the part of an agency to

ensure that a regulation be "'sufficiently clear to warn a party about what is expected of it'" before

the agency may impose a fine.  *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564,

578 (5th Cir. 2017) (quoting *Gen. Elec. Co*., 53 F.3d at 1328–29)); *Diamond Roofing Co.*, 528

F.2d at 649 (regulation must provide a "reasonably clear standard of culpability" before an agency

may impose a fine).

 OFAC's penalty did not violate Exxon Mobil's due process rights because it should have

been reasonably clear to the company that executing eight contracts with Igor Sechin constituted

dealing in the services of an blocked person based on the plain language of Executive Order 13661

and OFAC's implementing regulations.  *See Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628

(D.C. Cir. 2000) (reviewing "the regulations and other public statements issued by the agency" to

determine whether "a regulated party acting in good faith would be able to identify, with

ascertainable certainty, the standards with which the agency expects parties to conform" (internal

citation omitted)).  The sweeping language employed by these materials was also consistent with

and furthered the Executive's stated purpose of isolating designated individuals such as Mr. Sechin

by prohibiting U.S. persons from engaging in transactions with them.  *See Kisor*, 139 S. Ct. at

2415 (courts should not only look to the text of a regulation but also its "structure, history, and

purpose" to determine whether a regulation is clear or ambiguous).  In addition, OFAC's prior

guidance concerning similar conduct involving a sanctioned party signing a contract on behalf of

a non-sanctioned entity is also relevant to the question of whether Exxon had fair notice that its

conduct could result in a fine.  And contrary to Exxon Mobil's argument, there is no evidence that

OFAC was unsure of its interpretation of the Regulations prior to Exxon Mobil's conduct.

 As explained at length above, Section 1 of Executive Order 13661 states that "[a]ll property

and interests in property" of a designated individuals are blocked and "may not be . . . otherwise

dealt in" by a U.S. person.  E.O. 13661, 79 Fed. Reg. 15585, § 1.  Section 4 of the order goes on

to add that "[t]he prohibitions in Section 1 of this order include but are not limited to . . . the receipt

[by a U.S. person] of . . . services" from a designated person.  *Id*. § 4.  Similarly, OFAC's Ukraine-

Related Sanctions Regulations define the "terms property and property interests" very broadly to

include "services of any nature whatsoever" and "contracts of any nature whatsoever."  31 C.F.R.

§ 589.308.  In short, Exxon Mobil was on notice that it was not permitted to deal in the services of

Mr. Sechin.  One common meaning of service includes providing a "benefit" to a person, *see supra*

p. 27, and Mr. Sechin plainly provided a benefit to Exxon Mobil by executing a contract and seven

completion deeds, which concerned an agreement to study the economic viability of constructing

a liquefied natural gas project in the Russian Far East, a project of potentially enormous value to

Exxon Mobil.  *See* AR 23409–10; AR 1565–66.  Thus, it should have been "sufficiently clear" for

fair notice purposes based on the language of Executive Order 13661 and OFAC's regulations that

Exxon Mobil's conduct could result in a fine, *see ExxonMobil Pipeline Co.*, 867 F.3d at 578, since

these materials provided a "person of ordinary intelligence a reasonable opportunity to know what

is prohibited," *Emp'r Sols. Staffing Grp. II, LLC*, 833 F.3d at 488 (internal citation omitted).

    Contrary to Exxon Mobil's argument, neither Executive Order 13661 nor OFAC's

Regulations draw a distinction between executing a contract with a blocked person in a

representative or individual capacity.  *See supra* p. 26–28.  Moreover, Exxon Mobil's non-textual

interpretation would undermine, rather than further, the stated purposes of sanctioning Mr. Sechin,

which were to isolate him and impose costs on the Russian government by prohibiting U.S. persons

from doing business with him.  *See* AR 67 (explaining that "OFAC designated [Mr.] Sechin in

order to isolate him and deny him access both to the U.S. financial system and to business deals

with U.S. persons," whereas Exxon Mobil "afforded him access to business deals with U.S.

persons"); *see also Kisor*, 139 S. Ct. at 2415 (looking to regulation's purpose, among other things,

to determine whether a regulation is ambiguous).  While press guidance provided by the Executive at the time of Mr. Sechin's designation explained that U.S. persons could generally do business with Rosneft, including sitting on Rosneft's board with Mr. Sechin, this guidance did nothing to deviate from the agency's long-standing position that a U.S. person may not deal in the services of a blocked person, and did not suggest that Exxon Mobil was permitted to enter into a contract signed by Igor Sechin.  *See supra* pp. 29–31, 38–41.

Indeed, OFAC interpreted identical language in its Burma sanctions program to conclude that conduct similar to that at issue here would be unlawful.  As is true of Executive Order 13661, the relevant Burma executive order prohibited U.S. persons from dealing in the blocked property and interests in property of designated persons and similarly made no distinction between entering into a contract with a designated person in a representative or individual capacity.  *See* Blocking Property of Persons Threatening the Peace, Security, or Stability of Burma, Exec. Order 13619, 77 Fed. Reg. 41243, § 1 (July 11, 2012) (Defs.' App. 55–57) (providing that "[a]ll property and interests in property" of designated individuals are blocked and may not be "otherwise dealt in" by U.S. persons); *id.* § 4 (explaining that the prohibitions in Section 1 of the Executive Order include the "receipt" by a U.S. person of "services" from a designated person).  In FAQ 285, OFAC interpreted this prohibition on dealing in the services of a blocked person under the Burma sanctions program, advising that, where a government minister was designated but the ministry itself was not, "U.S. persons should . . . be cautious in dealings with the ministry to ensure that they are not, for example, entering into any contracts signed by the SDN."  AR 1100; *see also* AR 133–35 (issuing a license for a U.S. person to execute a contract with a designated bank governor acting on behalf of a non-designated bank).

In short, Exxon Mobil ignores the fact that OFAC previously interpreted the very language at issue here (*i.e.*, the prohibition on dealing in blocked services of a designated person) and

cautioned U.S. persons not to enter into a contract signed by a designated person acting on behalf of a non-designated entity. *See* AR 1100. Contrary to Exxon Mobil's assertion, the fact that FAQ 285 was issued in relation to one sanctions program does not make it irrelevant to the interpretation of a later sanctions program corresponding to an executive order that is identical in material respects. *See Trinity Broad.*, 211 F.3d at 629 (looking to an agency's earlier interpretation of a regulation with "virtually identical" language to the regulation at issue to determine whether a party had fair notice that its conduct could result in a fine). Exxon Mobil's strained argument that entering into a contract signed by a blocked person representing a non-blocked party was only unlawful under the Burma sanctions program because those sanctions were concerned with preventing government corruption, *see* Pls.' Mot. at 43–44, not only fails to acknowledge that both sanctions regimes prohibited the receipt of services from a blocked person, but also ignores that signing a contract with an blocked person representing a non-blocked entity would be at odds with *both* the purposes of the Burma sanctions and the Ukraine-related sanctions program, the latter of which was designed to isolate Mr. Sechin by preventing him from doing business with U.S. persons, *see supra* pp. 28–29.

Finally, to the extent Exxon Mobil had any doubts about whether its conduct was lawful, it could have contacted OFAC for advice. *Cf. Roark & Hardee LP*, 522 F.3d at 552 (treating as relevant to vagueness challenge the fact that "[t]he evidence reveals that the owners and operators regulated by the ordinance may clarify the meaning of its provisions by their own inquiry"); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) (noting that regulated business activity is subject to a less strict vagueness standard due in part to the enterprise's "ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process"); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991) (same). Instead, Exxon Mobil ignored the extremely broad language of the Executive Order

47

and OFAC's Regulations; the U.S. government's stated goal of isolating blocked persons such as Mr. Sechin; and the fact that OFAC's previous guidance addressed materially identical language to conclude that the very conduct at issue here would violate OFAC's regulations.  *See* AR 1100.

There is no evidence to support Exxon Mobil's contention that OFAC was unsure of its interpretation of the Regulations prior to Exxon Mobil's conduct.[12]  *See* Pls.' Mot. 39–41.  Exxon Mobil cites to an internal, deliberative email, pre-dating both Exxon Mobil's conduct and the issuance of the Regulations, in which OFAC employees discussed the potential scope of Executive Order 13661 in the abstract.  AR 23741.  As is appropriate, OFAC staff avoided providing formal guidance without knowing the "facts and circumstances of a given scenario," but were clear that "signing a contract with Rosneft executed by Sechin could be prohibited (citing prior analogous guidance OFAC has given in the Burma context (FAQ 285))."  *Id.*  This internal email, which is a summary of a call, does not indicate that signing a contract with a blocked person would be permitted under the Ukraine-Related Executive Orders.  *See id.*  But it does recognize that OFAC does not make penalty determinations without going through a formal process, as required by OFAC regulations, which require the assessment of relevant facts and circumstances where an apparent violation has occurred.  *See* 31 C.F.R. § 501, App. A.

It is for this same reason that OFAC did not express a position as to whether it would impose a penalty, or what type of penalty it would impose, on Exxon Mobil prior to Exxon Mobil's

---

[12] Exxon Mobil attempts to characterize a sentence from Defendants' Objections to Magistrate Judge Toliver's Order, ECF No. 71, as a concession that OFAC had not determined the meaning of its regulations prior to Exxon Mobil's conduct.  *See* Pls.' Mot. 11.  This is untrue.  The sentence in question includes a broad descriptive statement about the types of deliberative documents included on Defendants' privilege log, and does not add anything to or alter the content of the log.  *See* Pls.' MSJ App. 324.  It certainly does not constitute any sort of concession.  Moreover, as a result of the Court's July 8 Order, ECF No. 76, Plaintiffs are now in possession of all of the documents to which the sentence refers, and they have not pointed to any evidence in these documents that OFAC was unsure—prior to or following Exxon Mobil's conduct—as to whether executing a contract with an SDN would violate the Regulations.

completion of its response to OFAC's administrative subpoena.  *See* Pls.' Mot. 40.  OFAC's regulations explain that an OFAC investigation may lead to a "no action" response if "based on an analysis of the General Factors . . . , [OFAC] concludes that the conduct does not rise to a level warranting an administrative response."  *See* 31 C.F.R. § 501, App. A(II).  In other words, it is possible under OFAC's regulations for a U.S. person to have technically violated a sanctions program, but for OFAC to determine that no action is warranted.  In order to make such a determination, OFAC must assess the facts and circumstances relevant to the General Factors, which include a consideration of whether any apparent violation was willful or reckless, the subject person or entity's awareness of the conduct, involvement of senior management in the conduct, harm to the sanctions program objectives, and individual factors such as the commercial sophistication and size of the subject person or entity.  *Id.* § 501, App. A(III).  OFAC cannot make such determinations in the abstract.  Here, of course, after considering extensive materials submitted by Exxon Mobil and, in light of the application of the General Factors, OFAC determined that a civil monetary penalty was indeed appropriate.  *See* AR 1–11.

Though it could have, Exxon Mobil did not seek an opinion from OFAC about whether its conduct would violate the Ukraine-Related Sanctions Regulations.  Rather than risk receiving an adverse opinion, Exxon Mobil chose to execute multiple agreements with Mr. Sechin to advance its business interests and to placate those who wanted its relationship with Mr. Sechin to continue.  *See* AR 1102.  Put simply, it appears that Exxon Mobil was willing to risk a million-dollar fine from OFAC to avoid jeopardizing a billion-dollar relationship with the Russian oil and gas industry.  While economically rational, this conduct, which flew in the face of reasonably clear legal prohibitions and undermined U.S. foreign policy, is deserving of a penalty.

For the reasons set forth above, Exxon had fair notice that entering into a contract signed by designated person Igor Sechin constituted dealing in Mr. Sechin's services, in violation of the

49

Ukraine-Related Sanctions Regulations.  Accordingly, Exxon's due process argument should be rejected.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

DATED:  September 16, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director,
Federal Programs Branch

*s/ Leslie Cooper Vigen*
LESLIE COOPER VIGEN
D.C. Bar No. 1019782
NICHOLAS P. CARTIER
D.C. Bar No. 495850
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0727
Fax: (202) 616-8470
Email:  Leslie.Vigen@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

On September 23, 2019, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court for the Northern District of Texas using the electronic case filing system of that court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

s/ *Leslie Cooper Vigen*
LESLIE COOPER VIGEN
Trial Attorney