## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION;<br>EXXONMOBIL DEVELOPMENT<br>COMPANY; and EXXONMOBIL<br>OIL CORPORATION, | §<br>§<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. 3:17-CV-1930-B |
| STEVEN MNUCHIN, in his official<br>capacity as Secretary of the U.S.<br>Department of the Treasury;<br>ANDREA M. GACKI, in her official<br>capacity as the Director of the U.S.<br>Department of the Treasury's Office<br>of Foreign Assets Control; and the U.S.<br>DEPARTMENT OF THE TREASURY'S<br>OFFICE OF FOREIGN ASSETS<br>CONTROL, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs Exxon Mobil Corporation, ExxonMobil Development Company, and ExxonMobil Oil Corporation's Motion for Summary Judgment (Doc. 92), as well as Defendants Steven Mnuchin, Andrea Gacki, and the Office of Foreign Assets Control's Cross-Motion for Summary Judgment (Doc. 95). The parties dispute whether the Office of Foreign Assets Control's imposition of a two-million-dollar fine upon Plaintiffs for alleged violations of Ukraine-related sanctions regulations was lawful. Because the Court concludes that Plaintiffs lacked fair notice that their conduct was prohibited, the Court **GRANTS** Plaintiffs' motion (Doc. 92) and **DENIES** Defendants' cross-motion (Doc. 95). Further, the Court **VACATES** the Office of Foreign Asset

Control's Penalty Notice.

# I.

# BACKGROUND[1]

This is an administrative case prompting the Court to determine which party receives the benefit of having its cake and eating it, too—the regulating agency that failed to clarify, or the regulated party that failed to ask. Plaintiffs Exxon Mobil Corporation, ExxonMobil Development Company, and ExxonMobil Oil Corporation (collectively "Exxon") filed a motion for summary judgment challenging the Office of Foreign Assets Control (OFAC)'s imposition of a penalty against Exxon for alleged violations of Ukraine-related sanctions regulations.[2] Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 1. Thereafter, Defendants Steven Mnuchin, Andrea Gacki, and OFAC (collectively "Government") filed a cross-motion for summary judgment, urging the Court to uphold OFAC's penalty decision. Doc. 95, Defs.' Cross-Mot., 1; Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 1. Before reaching the merits of the parties' claims, the Court reviews the relevant events leading up to the case.

A.    *The Ukraine-Related Sanctions Regulations*

On March 6, 2014, President Barack Obama issued Executive Order 13660, which declared that the "actions and policies of persons . . . who have asserted government authority in the Crimea region without the authorization of the Government of Ukraine . . . constitute an unusual and

---

[1] All citations to the administrative record (AR) refer to the revised AR. *See* Doc. 108, Defs.' Notice of Filing of Redacted Portion of Revised Administrative Record.

[2] Exxon challenges OFAC's penalty decision on three grounds, one being a lack of fair notice in violation of the Due Process Clause of the Fifth Amendment. *See* Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 1–3. Because the Court agrees that OFAC failed to provide fair notice and vacates the penalty on this ground, the Court declines to address the remaining grounds set forth in Exxon's motion.

extraordinary threat to the national security and foreign policy of the United States . . . ." Exec. Order No. 13660, 79 Fed. Reg. 13,493 (Mar. 6, 2014). Subsequently, President Obama expanded Executive Order 13660 through the issuance of Executive Order 13661, which found that "the actions and policies of the Government of the Russian Federation with respect to Ukraine" were also a threat to the United States. Exec. Order No. 13661, 79 Fed. Reg. 15,535 (Mar. 16, 2014).

Executive Order 13661 authorizes the Secretary of the Treasury to promulgate regulations "as may be necessary to carry out the purposes of [the] order," as well as to designate individuals and entities—commonly known as Specially Designated Nationals (SDNs)—whose property would be "blocked" based on their ties to the Russian government. *See id.* at 15,535–36. Under Section 1 of the Order, "blocked" property that is "within the possession or control" of any United States individual or entity cannot "be transferred, paid, exported, withdrawn, or otherwise dealt in" by these individuals or entities. *See id.* at 15,535. Further, under Section 4 of the Order, the prohibitions of Section 1 "include . . . the receipt of any contribution or provision of . . . services." *Id.* at 15,536.

One day after the issuance of Executive Order 13661, the White House Office of the Press Secretary released a "Fact Sheet" on the Ukraine-related sanctions, which indicated: "Our current focus is to identify these individuals and target their personal assets, but not companies that they may manage on behalf of the Russian state." AR 360. Similarly, the Press Secretary released a "Background Briefing by Senior Administration Officials on Ukraine," which stated, "[O]ur current focus is to identify these cronies of the Russian government and target their personal assets and wealth, rather than the business entities and industries that they may manage or oversee." AR 23490. It also stated that "U.S. persons are prohibited from doing business with [designated persons.]" AR 23489.

Roughly one month later, the U.S. Department of the Treasury ("the Treasury") designated Igor Sechin as an SDN pursuant to Executive Order 13661. AR 23689–91. Sechin is the President and Chairman of the Management Board of Rosneft, a leading petroleum company in Russia. AR 23689. In announcing Sechin's designation, the Treasury noted that Rosneft "[had] not been sanctioned," though the Treasury did designate other entities that were "owned or controlled by persons . . . whose property and interests in property are blocked . . . ." *Id.* The announcement also stated that "transactions by U.S. persons or within the United States involving the individuals and entities designated today are generally prohibited." AR 23690. On the same day, the White House Office of the Press Secretary released a transcript of a conference call, which stated, "We are imposing sanctions on Sechin . . . individually." AR 23501. Similarly, in an interview with *PBS NewsHour*, the White House Deputy National Security Advisor stated that "U.S. companies will not be able to do business with [designated individuals] in their individual capacities." AR 206. Further, the Advisor noted that Rosneft was not designated—Sechin "was in his individual capacity," but the Advisor had already seen "an impact on the company itself." AR 204–05.

Several major news outlets echoed this individual-capacity distinction. For example, *Foreign Policy* reported: "Treasury officials said the designation [of Sechin] wouldn't impact U.S. companies' ability to do business with Rosneft because Sechin does not control the firm." AR 23522. Likewise, based on representations from the Treasury, the *New York Times* reported that U.S. persons could still deal with Rosneft, such as by participating in meetings of the company board, despite Sechin sitting on this board. AR 23579. And the *Wall Street Journal*—albeit weeks later—reported, based on statements from the Treasury, that board interactions were permissible as long as "they are covering Rosneft business and not Mr. Sechin's personal business." AR 23584.

On May 14, 2014, OFAC issued the Ukraine-related sanctions regulations ("the Regulations") pursuant to Executive Orders 13660 and 13661. *See* 31 C.F.R. §§ 589.101–.901 (2019); Exec. Order 13661, 79 Fed. Reg. 15,536–37 (Mar. 16, 2014) (authorizing the Secretary of the Treasury to "redelegate any of [the functions laid out in Executive Order 13661] to . . . agencies of the United States"). The Regulations prohibit all transactions that are prohibited under Executive Order 13661. 31 C.F.R. § 589.201. Additionally, the Regulations define "property" and "property interest" expansively, stating that these terms "include, but are not limited to . . . services of any nature whatsoever [and] contracts of any nature whatsoever . . . ." *Id.* § 589.308. Moreover, the Regulations warn that "[d]iffering foreign policy and national security circumstances may result in differing interpretations of similar language among the parts of this chapter." *Id.* § 589.101. Finally, the a Note in the Regulations advises that "OFAC intends to supplement this part with a more comprehensive set of regulations, which may include additional interpretive and definitional guidance . . . ." *Id.*

B.    *Exxon's Alleged Violations of the Regulations*

Exxon Mobil Corporation is a publicly traded oil-and-gas company that includes two subsidiary companies. AR 254–55. Exxon has done business in Russia—including with Rosneft—for over twenty years. AR 23408. Following the imposition of the Regulations in 2014, this business did not halt; rather, Exxon proceeded to execute eight contracts with Rosneft. AR 1; *see* AR 1564–66; AR 1825–915. The first seven were completion deeds related to a parent agreement entered into by the parties in June of 2013. *See* AR 1825–915. The eighth was an extension of an existing agreement between Exxon and Rosneft that was initially executed in September of 2013. *See* AR 1564. Sechin, as a representative of Rosneft, signed each of these eight contracts on May 23,

2014. AR 1566; *see* AR 1825, 1830; AR 1838, 1843; AR 1851, 1856; AR 1864, 1869; AR 1877, 1882; AR 1890, 1895; AR 1903, 1908. Exxon concedes it never sought guidance from OFAC prior to executing the contracts. *See* Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 37.

These transactions form the basis for OFAC's penalty notice. Specifically, OFAC found that the transactions violated Section 4 of Executive Order 13661, which prohibits the receipt of services from a blocked individual. Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 26; Exec. Order No. 13661, 79 Fed. Reg. 15,536 (Mar. 16, 2014).

C.      *Guidance from OFAC*

On August 13, 2014, after Exxon's penalized transactions, OFAC published Frequently Asked Questions (FAQs) 398 and 400. *See* AR 23605–06. As the Government explains, "OFAC's FAQs are 'answers to question[s] of general applicability frequently asked by the public' and are 'part of OFAC's commitment to regulatory transparency.'" Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 8 n.5 (citation omitted). In FAQ 398, OFAC clarified that an entity controlled by a blocked person is not automatically blocked, but OFAC may nevertheless choose to designate such an entity. AR 23605. FAQ 398 goes on to state that "persons should be cautious in dealings with such a non-blocked entity to ensure that they are not, for example, dealing with a blocked person representing the non-blocked entity, such as entering into a contract that is signed by a blocked person." *Id.* Likewise, FAQ 400 reiterates that "OFAC sanctions generally prohibit transactions involving, directly or indirectly, a blocked person . . . even if the blocked person is acting on behalf of a non-blocked entity. . . . U.S. persons may not, for example, enter into contracts that are signed by a blocked individual." AR 23606.

Though the above guidance came *after* Exxon's alleged violations, FAQ 285, published in

2013, contained similar statements, albeit with respect to a different sanctions program. *See* AR 1100. FAQ 285 asked, "If a Burmese Government minister is an SDN, how does that impact the ministry he leads?" *Id.* OFAC's response stated that "U.S. persons should . . . be cautious in dealings with the ministry to ensure that they are not, for example, entering into any contracts that are signed by the SDN." *Id.* But FAQ 3—published in 2006—warns that "[b]ecause each [sanctions] program is based on different foreign policy and national security goals, prohibitions may vary between programs." AR 23595.

D.     *OFAC's Issuance of a Penalty to Exxon*

On July 22, 2014, OFAC issued an administrative subpoena to Exxon based on OFAC's "reason to believe" that Exxon violated the Regulations. *See* AR 336–42. Then, after months of back-and-forth communications, in June of 2015, OFAC issued a Prepenalty Notice (PPN) to Exxon based on its execution of the eight contracts—alleged violations of the Regulations. AR 52–54. The PPN proposed a penalty of $2,000,000 based on OFAC's analysis of several factors. AR 54–55.

After Exxon responded to the PPN and presented its defense to OFAC in person, *see* AR 23406–36, 224–39, 101, OFAC finally issued its Penalty Notice, which imposed a civil penalty of $2,000,000. *See* AR 1–13. On the same day, Exxon filed this suit. *See* Doc. 1, Compl.

## II.

## LEGAL STANDARD

A.     *Federal Rule of Civil Procedure 56(a)*

Ordinarily, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a

verdict for the nonmoving party." *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a fact "is 'material' if its resolution . . . might affect the outcome of the [action]." *Id.* (citing *Anderson*, 477 U.S. at 248). The summary-judgment movant initially bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to "identif[y] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

B.      *Summary Judgment in Judicial Review of Agency Action*

When the court reviews a federal administrative agency's decision, "a motion for summary judgment stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *Tex. Comm. on Nat. Res. v. Van Winkle*, 197 F. Supp. 2d 586, 595 (N.D. Tex. 2002) (citation and quotation marks omitted). "As a result, the movant's burden in proving his motion for summary judgment is similar to his ultimate burden on the merits." *Id.*

The Administrative Procedure Act (APA) "provides a way for persons . . . 'adversely affected . . . by agency action . . .' to obtain judicial review of that action." *Id.* (quoting 5 U.S.C. § 702). Section 706 of the APA establishes the scope of judicial review, which "has the function of determining whether the administrative action is consistent with the law . . . ." *See Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 215 (5th Cir. 1996) (citation and quotation marks omitted) (citing 5 U.S.C. § 706). Thus, the summary-judgment standard for APA claims is not whether there is a

genuine dispute of material fact, but whether the agency action violated Section 706. *See, e.g., Tex. Comm. on Nat. Res.*, 197 F. Supp. 2d at 596 (analyzing whether the agency action violated § 706(2)(A)); *City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992, 1004 (S.D. Tex. 2004) (same).

Section 706 directs courts to set aside agency actions that are "contrary to constitutional right . . . ." 5 U.S.C. § 706(2)(B). "The intent of Congress in 5 U.S.C. [§] 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979). Accordingly, when reviewing constitutional claims under the APA, courts apply a de novo standard of review. *Poett v. United States*, 657 F. Supp. 2d 230, 241 (D.D.C. 2009); *see also Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014).

## III.

## ANALYSIS

Exxon challenges OFAC's penalty decision on three independent grounds: (1) the Regulations do not prohibit Exxon's conduct, and OFAC's interpretation of the Regulations is not entitled to deference; (2) OFAC drew arbitrary and capricious distinctions by imposing the penalty; and (3) OFAC failed to provide fair notice of its interpretation of the Regulations in violation of due process. *See* Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 1–3. As explained below, the Court concludes that OFAC did not provide fair notice of its interpretation. Accordingly, the Court declines to address the merits of Exxon's alternative grounds for relief and discusses only whether Exxon received fair notice in accordance with the Due Process Clause of the Fifth Amendment.[3]

---

[3] Though the Court does not address the propriety of deference, it nonetheless finds the parties' textual arguments regarding the propriety of deference relevant to its fair-notice determination. Accordingly, the Court incorporates those contentions in its discussion below.

*A.*     *Whether Exxon Received Fair Notice of OFAC's Interpretation*

The Court must determine whether, as Exxon alleges, OFAC's Penalty Notice "depriv[ed] [Exxon] of its property without fair notice," because OFAC did not provide "ascertainable certainty" of its interpretation of the Regulations. Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 36 (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995); *Diamond Roofing Co. v. Occupational Safety & Health Review Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976)).

Under the Due Process Clause of the Fifth Amendment, laws that regulate individuals or entities "must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). An agency's failure to provide fair notice "justifies setting aside the imposed fine" resulting from the alleged violation of a regulation. *See Emp'r Sols. Staffing Grp II, LLC v. Office of Chief Admin. Hearing Officer*, 833 F.3d 480, 489 n.7 (5th Cir. 2016) (citing *FCC*, 567 U.S. at 254–58) (resolving the case on other grounds because the parties failed to brief *FCC*'s applicability); *Trinity Broad., Inc. v. FCC*, 211 F.3d 618, 619 (D.C. Cir. 2000)(vacating an agency's decision on fair-notice grounds); *Gen. Elec.*, 53 F.3d at 1330 (reversing an agency's imposition of liability and a fine based on fair notice).

As the Supreme Court noted in *Christopher v. SmithKline Beecham Corporation*:

> It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time . . . .

567 U.S. 142, 158–59 (2012). Nonetheless, "a rule requiring explicit notice of any conceivable violation as a condition of imposing civil sanctions would leave open 'large loopholes allowing conduct which should be regulated to escape regulation.'" *Consol Buchanan Mining Co. v. Sec'y of*

*Labor*, 841 F.3d 642, 649 (1st Cir. 2016) (quoting *Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997)).

In the administrative agency context, "fair notice requires the agency to have 'state[d] with ascertainable certainty what is meant by the standards [it] has promulgated.'" *ExxonMobil Pipeline Co. v. U.S. Dept't of Transp.*, 867 F.3d 564, 578 (5th Cir. 2017) (alterations in *ExxonMobil*) (quoting *Diamond Roofing*, 528 F.2d at 649). Thus, "[i]f, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith [could] identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *Gen. Elec.*, 53 F.3d at 1329 (citing *Diamond Roofing*, 528 F.2d at 649).

The Court first turns to whether the text of the Regulations provides fair notice of OFAC's interpretation of the language of Executive Order 13661 as incorporated in the Regulations. Concluding that it does not, the Court then examines whether other factors nevertheless support a finding of fair notice. Specifically, the Court considers the import of: (1) OFAC's alleged internal uncertainty of its interpretation; (2) Exxon's failure to seek guidance before proceeding with its transactions; and (3) public statements issued by OFAC and the executive branch. Given the lack of clarity in both the Regulations and the public statements relevant to the Court's analysis, the Court concludes that OFAC did not provide fair notice of its interpretation.

### 1.    Whether the Text of the Regulations Provides Fair Notice

First, the Court analyzes whether the text of the Regulations provides fair notice. The Regulations prohibit "all transactions" that are prohibited under Executive Order 13661. 31 C.F.R. § 589.201. Section 1 of Executive Order 13661 states, in relevant part:

> All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person (including any foreign branch) of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in . . . .

Exec. Order No. 13661, 79 Fed. Reg. 15,535 (Mar. 16, 2014). Section 1 continues by listing those whose property is blocked, including "persons determined by the Secretary of the Treasury, in consultation with the Secretary of State . . . to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly . . . a senior official of the Government of the Russian Federation . . . ." *Id.* Further, Section 4 states:

> The prohibitions in section 1 of this order include but are not limited to . . . the making of any contribution or provision of funds, goods, or services by, to or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and . . . the *receipt of any contribution or provision of funds, goods, or services from any such person.*

*Id.* at 15,536 (emphasis added). The Regulations define "property" and "property interest" to include "services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.308.

The Court addresses three matters based on the plain language of the Regulations: (1) whether a violation of Section 4, based on the receipt of services, requires the recipient to have possession or control over those services; (2) whether Sechin's signing of the contracts constitutes a service; and (3) whether Exxon had fair notice that it received a service from Sechin by entering the contracts.

As a preliminary matter, the Court dispenses with Exxon's contention that a violation of the Regulations based on the receipt of services requires possession or control of those services. Exxon

suggests that even if it accepted a service of Sechin, it still did not violate the Regulations because it lacked possession and control over Sechin's alleged services—a requirement set forth in Section 1. Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 23–24. According to Exxon, Section 4, which prohibits the receipt of services from an SDN, "does not create a wholly new source of potential liability; rather, it merely confirms that 'property' includes 'services' and that the prohibition in Section 1 against dealing in blocked property extends to the receipt of blocked services." Doc. 104, Pls.' Sealed Mem. in Resp. to Defs.' Cross-Mot., 13 n.9 (quoting 31 C.F.R. § 589, App. B).

But the Government points out that Section 4 prohibits the "receipt" of "services"; thus, Section 1's reference to "property and interests in property . . . within the possession or control of any United States person" includes the receipt of services. Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 32 (citing Exec. Order No. 13661, 79 Fed. Reg. 15,535 (Mar. 16, 2014)). The Government explains that Section 1 of Executive Order 13661 "incorporates within [its] prohibition Section 4 of that Order." Doc. 107, Reply Br. in Supp. of Defs.' Cross-Mot., 7. Since Exxon engaged in conduct prohibited by Section 4, the Government contends, Exxon's conduct likewise violates Section 1. *Id.* at 7–8. Though Exxon argues that it did not have possession or control of Sechin's services, the Government suggests that the possession-or-control requirement is "nothing more than a jurisdictional hook, designed to ensure that OFAC has the authority to oversee the conduct at issue." *Id.* at 8. (citing 50 U.S.C. § 1702(a)(1)(B)).

The Court agrees with the Government. Section 4 states that "[t]he prohibitions in section 1 of this order include . . . the . . . receipt of any . . . provision of . . . services from any such person." Exec. Order No. 13661, 79 Fed. Reg. 15,536 (Mar. 16, 2014). This language unambiguously indicates that Section 1 prohibits the receipt of services from a blocked person. Under Section 4,

then, if a U.S. person receives a service provided by an SDN, that person has violated Section 1. Exxon's suggestion that Section 4 reincorporates the requirements of Section 1 thus attempts to muddle language that is already clear. The Court follows the plain language of Section 4, concluding that a U.S. person's receipt of services from an SDN—as addressed in Section 4—constitutes a violation of Section 1.

Next, the Court must consider whether the execution of a contract is a "service" under the Regulations. Exxon does not concede that signing a contract is a service, though it does not argue against such an interpretation. *See* Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 23. Section 1 covers "services of any nature whatsoever," suggesting a broad interpretation of services throughout the Regulations. *See* Exec. Order No. 13661, 79 Fed. Reg. 15,535 (Mar. 16, 2014). Further, Black's Law Dictionary defines "service" as "[l]abor performed in the interest or under the direction of others; specif[ically], the performance of some useful act or series of acts for the benefit of another, usu[ally] for a fee . . . ." *Service*, BLACK'S LAW DICTIONARY (11th ed. 2019). Based on this definition, the Court concludes that the signing of a contract could be a service, given that it is labor performed in the interest of others—here, Sechin's act of signing the contracts was undoubtedly performed in Rosneft's interest.

But the Court must still determine whether the text of the Regulations provides fair notice that Exxon's transactions violate Section 4 by constituting the *receipt* of Sechin's services. *See* Exec. Order No. 13661, 79 Fed. Reg. 15,536 (Mar. 16, 2014). Put differently, did Exxon have fair notice, based on the language of the Regulations, that Sechin's signing of the contracts was a service received by Exxon?

Exxon contends that the text of Executive Order 13661 does not prohibit the execution of

a contract with a non-blocked entity where an SDN signs on the entity's behalf. Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 37. Specifically, Exxon argues that because Sechin was acting in a representative capacity for Rosneft, Exxon transacted only with Rosneft—not Sechin. *Id.* at 18. Exxon points out that the parties to the contracts at issue were Exxon and Rosneft. *Id.* at 20 (citing, *e.g.*, AR 1879, 1565). Further, Exxon believes that the transactions "carried no relative economic value to Sechin," *id.* (citation omitted), and the signed documents created rights and obligations only between Exxon and Rosneft, not Exxon and Sechin. *Id.* at 20–21 (citing, *e.g.*, AR 23219; AR 1565, 1557).

Based on Sechin's representative capacity, Exxon contends that it did not receive Sechin's services in violation of the text of Section 4. *Id.* at 23. Because the text of the Regulations does not prohibit Exxon's conduct, Exxon concludes, the text fails to provide fair notice of OFAC's interpretation. *Id.* at 37.

The Government, on the other hand, argues that from the plain language of the Regulations, "it should have been reasonably clear" that Exxon's transactions were prohibited. Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 44. The Government avers that the "sweeping language" of the Regulations is consistent with their purpose: to "isolat[e] designated individuals such as Mr. Sechin by prohibiting U.S. persons from engaging in transactions with them." *Id.*

Addressing Exxon's alleged receipt of services, the Government explains that "[o]ne common meaning of service includes providing a 'benefit' to a person, and Mr. Sechin plainly provided a benefit to [Exxon] . . . ." *Id.* at 45; *see also id.* at 27. In support of this interpretation, the Government points out that Exxon has conceded that corporations act only through their agents. *Id.* at 32 (citing Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 23). Further, the Government finds no textual basis in

the Regulations for inferring "any intention to limit blocked property to services conducted in a blocked person's 'individual capacity.'" *Id.* at 27.

Exxon, in response, suggests that generally, "a service is performed at the direction of the recipient or pursuant to an agreement with the recipient." Doc. 104, Pls.' Sealed Mem. in Resp. to Defs.' Cross-Mot., 14. And Exxon argues that the Government's interpretation of the Regulations—that there is a violation when an U.S. person benefits from an SDN's actions—would lead to "absurd results." *Id.* at 15. Under the Government's theory, Exxon states, "virtually any transaction with Rosneft . . . could violate the regulations, whether or not Sechin signed a document, even though Rosneft itself is not blocked." *Id.*

Regardless of the breadth of the Government's interpretation, the Court finds that the text of the Regulations does not provide fair notice of its interpretation. First, the text fails to address what constitutes a "receipt" of services. Do the Regulations prohibit *any* incidental receipt of a benefit resulting from the services? If so, Exxon's conduct violates the Regulations—after all, Rosneft was contractually bound to fulfill its obligations to Exxon only after Sechin signed the documents. Or do the Regulations limit "receipt" to circumstances in which an SDN's services are aimed at benefitting a U.S. person? In that case, Exxon would violate the Regulations where Sechin signed on Exxon's behalf—not where Sechin signed on Rosneft's behalf. The distinction is subtle, but it is nonetheless meaningful.

Typically, the Court would look to the plain meaning of "receipt" to aid its analysis. *See Diamond Roofing*, 528 F.2d at 649 (noting that "[a] regulation should be construed to give effect to the natural and plain meaning of its words") (citation omitted). To "receive" is "[t]o take (something offered, given, sent, etc)" or "to come into possession of or get from some outside source . . . ."

*Receive*, BLACK'S LAW DICTIONARY (11th ed. 2019). This definition would be useful if the receipt of Sechin's *signature* was the alleged violation. But Exxon's alleged violation is based on the receipt of a service, and the service was Sechin's act of signing. When does an entity "take," "come into possession," or "get" a service? On this point, the Regulations are silent.

31 C.F.R. § 589.406, a provision in the Regulations distinct from the provision banning the receipt of services from an SDN, does address an SDN's entanglement with a non-blocked entity. It states:

> A person whose property and interests in property are blocked . . . has an interest in all property and interests in property of an entity in which it owns, directly or indirectly, a 50 percent or greater interest. The property and interests in property of such an entity, therefore, are blocked . . . regardless of whether the name of the entity is incorporated into OFAC's Specially Designated Nationals and Blocked Persons list . . . .

31 C.F.R. § 589.406. This provision suggests an intent to prohibit an SDN from acting through a non-blocked entity—the situation at issue here—under certain circumstances. Indeed, under 31 C.F.R. § 589.406, if Sechin owned a fifty-percent-or-greater interest in Rosneft, Rosneft would be blocked. Then, Exxon's transactions with Rosneft would clearly be prohibited by the Regulations. *See* Exec. Order No. 13661, 79 Fed. Reg. 15,535 (Mar. 16, 2014).

But the Government concedes that 31 C.F.R. § 589.406 does not apply here—Rosneft's property was not blocked at the time of the alleged violations. *See* Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 6 & n.2. As a result, any intention to prohibit SDNs from working through non-blocked entities, as expressed in 31 C.F.R. § 589.406, is inapplicable to the case at hand. Accordingly, the text of the Regulations does not provide fair notice that a U.S. entity is prohibited from signing contracts that are also signed by an SDN.

Additionally, the Fifth Circuit in *Employer Solutions* considered an agency's decision to later clarify the language at issue to be "at least some support" that the language lacked clarity at the time of an alleged violation. *See* 833 F.3d at 488–89. Likewise, here, OFAC issued an FAQ explicitly prohibiting Exxon's conduct after Exxon's alleged violations. *See* AR 23606 (stating that "U.S. persons may not, for example, enter into contracts that are signed by a blocked individual"). This guidance lends "at least some support" to the Court's conclusion that the Regulations' text fails to provide ascertainable certainty. *See Emp'r Sols.*, 833 F.3d at 488–89.

Accordingly, based on its review of the Regulations' text, the Court concludes that the text does not "fairly address" whether a U.S. entity receives a service from an SDN when that SDN performs a service enabling the U.S. person to contract with a non-blocked entity. *Emp'r Sols.*, 833 F.3d at 489. Thus, the text alone fails to provide "ascertainable certainty." *See id.*

2.  Whether Other Factors Warrant a Finding of Fair Notice

Given that the text of the Regulations is insufficient to provide fair notice, the Court now turns to other circumstances bearing upon the fair-notice inquiry. Below, the Court disregards OFAC's alleged internal uncertainty as irrelevant to Exxon's fair-notice claim; acknowledges the relevance of Exxon's failure to seek guidance from OFAC; and examines the significance of public statements released by OFAC and the executive branch. Based on this discussion, along with the Court's analysis of the text of the Regulations, the Court holds that Exxon was not provided fair notice.

i.  *OFAC's alleged uncertainty of its interpretation*

The Court first addresses whether OFAC's alleged internal uncertainty is relevant in the fair-notice analysis. Exxon suggests that OFAC did not internally determine how Executive Order 13661

applied to Exxon's conduct until after the allegedly prohibited transactions. *See* Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 40. For instance, Exxon points out that after OFAC issued an administrative subpoena to Exxon, it "did not dispute that it had not formulated a position, stating that it preferred to review [Exxon's] response to its subpoena and would only then act 'expeditiously . . . to resolve the legal question.'" *Id.* (quoting AR 23602). Additionally, Exxon points to an internal OFAC e-mail exchange in which a senior OFAC official acknowledged "confusion" regarding whether "signing a new contract with an SDN is prohibited . . . ." *Id.* at 41 (citing AR 23768).

The Government, however, contests Exxon's suggestion that OFAC was uncertain of its interpretation before Exxon's alleged violations. Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 44. Though "OFAC staff avoided providing formal guidance without knowing the 'facts and circumstances of a given scenario,'" the Government claims that it "[was] clear that 'signing a contract with Rosneft executed by Sechin could be prohibited . . . .'" *Id.* at 48 (quoting AR 23741).

Regardless, the Court finds that OFAC's internal uncertainty as to the meaning of the Regulations is irrelevant to Exxon's fair-notice claim. In suggesting that OFAC's lack of internal certainty bears upon fair notice, Exxon relies on *General Electric*. *See* Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 41 (citing 53 F.3d at 1333–34). In *General Electric*, the District of Columbia Circuit stated:

> Where . . . the regulations and other policy statements are unclear, where the petitioner's interpretation is reasonable, and where the agency itself struggles to provide a definitive reading of the regulatory requirements, a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations, and may not be punished.

53 F.3d at 1333–34. But in *General Electric*, "different divisions of the enforcing agency disagree[d] about [the meaning of the regulations.]" *Id.* at 1332. Specifically, the regulated party proved one

(and alleged another) instance in which the agency's regional office concluded that the regulated party did not need a permit for its conduct—a conclusion that contradicted the agency's proposed interpretation in *General Electric. See id.* at 1331, 1332. And this fact, the court reasoned, made it "unlikely that [the] regulations provide[d] adequate notice . . . ." *Id.* at 1332.

Here, however, Exxon does not allege that OFAC openly *disagreed* on the correct interpretation of the Regulations. Rather, Exxon points to OFAC's internal, equivocal statements that suggest confusion within OFAC—not disagreement. Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 40–41 (citing, *e.g.*, AR 23768, an e-mail exchange in which a senior OFAC official acknowledged "confusion" regarding whether "signing a new contract with an SDN is prohibited . . ."). Thus, *General Electric* is inapposite.

Further, the First Circuit has noted, and this Court agrees, that cases assessing ascertainable certainty fail to suggest that "non-public statements may create the kind of confusion that supports a finding of a due process violation." *United States v. Lachman*, 387 F.3d 42, 58 & n.16 (1st Cir. 2004) (citing *Gen. Elec.*, 53 F.3d at 1329, for the proposition that "regulated parties must be able to ascertain the meaning . . . by 'reviewing the regulations and other public statements issued by the agency'") (emphasis omitted). Indeed, regulated parties have no access to an agency's internal deliberations; thus, these communications should have no bearing upon whether the agency has given fair notice. Accordingly, the Court declines to consider OFAC's internal deliberations when assessing Exxon's fair-notice claim.

### ii. *Exxon's failure to seek guidance from OFAC*

Next, the Court turns to the significance of Exxon's failure to seek clarification from OFAC before completing the transactions at issue. In its summary-judgment motion, Exxon refutes OFAC's

previous contention that Exxon "could have 'sought guidance from OFAC' . . . ." Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 37 (quoting AR 4)). The Government has the burden, Exxon states, to convey its interpretation of regulations to the public so that the public can comply. *Id.* (citing *Diamond Roofing*, 528 F.2d at 649). Accordingly, Exxon concludes that the Government's suggestion that Exxon could have sought guidance "turns the fair-notice standard on its head." Doc. 104, Pls.' Sealed Mem. in Resp. to Defs.' Cross-Mot., 26.

In contrast, the Government relies upon cases analyzing void-for-vagueness challenges, where courts have considered a party's ability to seek clarity on the meaning of an ordinance or regulation. *See* Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 47 (citing *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991)). According to the Government, both the void-for-vagueness doctrine and the fair-notice standard involve "whether a regulated party has adequate notice that its conduct would violate the law." Doc. 107, Reply Br. in Supp. of Defs.' Cross-Mot., 25 n.7.

But Exxon contends that the Government's reliance on cases involving void-for-vagueness challenges is misplaced, given that the Fifth Circuit treats these challenges as distinct from fair-notice claims. Doc. 104, Pls.' Sealed Mem. in Resp. to Defs.' Cross-Mot., 27 n.17 (pointing out that "[the Government] cites no authority in which a regulated entity's failure to make an inquiry to the agency regarding the meaning of a statute or regulation was a factor in determining whether the entity received constitutionally required fair notice") .

While the Court agrees with Exxon that void-for-vagueness claims and fair-notice claims are distinct, the Court nonetheless concludes that factors relevant in the former context are also relevant

in the latter. Here, the crux of the dispute is whether cases analyzing void-for-vagueness challenges are instructive in cases involving fair-notice challenges, like the case at hand. *See* Doc. 104, Pls.' Sealed Mem. in Resp. to Defs.' Cross-Mot., 27 n.17; Doc. 107, Reply Br. in Supp. of Defs.' Cross-Mot., 25 n.7.

The Court notes that the void-for-vagueness and fair-notice doctrines are related. As the Supreme Court stated in *Federal Communications Commission*:

> Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.

567 U.S. at 253 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)). The Supreme Court in *Federal Communications Commission* continued by indicating that the first concern was "implicated" where a regulated party claimed a lack of "sufficient notice . . . ." *Id.* at 254. This dicta suggests that a fair-notice claim derives from the void-for-vagueness doctrine.

Moreover, in discussing fair-notice challenges, the Supreme Court in *Christopher v. SmithKline Beecham* cited to *Kropp Forge Company v. Secretary of Labor*, 657 F.2d 119, 122 (7th Cir. 1981). *See Christopher*, 567 U.S. at 156 n.15. In *Kropp Forge Company*, the Seventh Circuit held that a regulation was "unconstitutionally vague" based on a lack of notice. 657 F.2d at 123–24. By citing to *Kropp Forge Company* in its fair-notice discussion in *Christopher*, the Supreme Court suggested an overlap between vagueness and fair-notice challenges.

In light of the Supreme Court's linking of vagueness and fair notice, and in the absence of precedent suggesting otherwise, the Court acknowledges that cases involving void-for-vagueness challenges based on a lack of fair notice are persuasive here. Accordingly, the Court will consider

Exxon's failure to seek guidance from OFAC to the extent that these cases consider a regulated party's failure to seek guidance: as a relevant factor among others. *See Roark*, 522 F.3d at 552; *Vill. of Hoffman*, 455 U.S. at 498–99; *Clinical Leasing*, 925 F.2d at 122.

Specifically, in *Village of Hoffman Estates*, the Supreme Court noted that "economic regulation is subject to a less strict vagueness test" in part because a "regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry . . . ." 455 U.S. at 498. And in *Clinical Leasing Service, Inc.*, the Fifth Circuit quoted the same language, prefacing it by noting: "We do not apply the vagueness standard mechanically; a *variety of factors* may affect the determination [of] whether a statute passes constitutional muster." 925 F.2d at 122 (emphasis added). Likewise, the Fifth Circuit in *Roark* noted—among other considerations—that the regulated party challenging an ordinance on vagueness grounds could "clarify the meaning of its provisions by their own inquiry." *See* 522 F.3d at 552–55.

Following these cases, the Court considers Exxon's failure to seek guidance from OFAC as a relevant—though not dispositive—factor in assessing whether Exxon received fair notice of OFAC's interpretation of the Regulations.

Indeed, in *Howmet Corporation v. EPA*, a District of Columbia district court did the same. *See* 656 F. Supp. 2d 167, 173–74 (D.D.C. 2009), *aff'd*, 614 F.3d 544 (D.C. Cir. 2010). In *Howmet Corporation*, the district court analyzed a fair-notice claim and found the regulated party's failure to inquire about the meaning of a regulation to be relevant in concluding that the party received fair notice. *Id.* Not only did the party fail to inquire, but the regulating agency's position "was [also] reiterated in publicly available advisory letters" and discernable from the agency's guidance manual. *Id.* Based on these circumstances, the district court found that the regulated party had fair notice of

the agency's interpretation. *Id.* at 174.

Like the district court in *Howmet Corporation*, this Court considers Exxon's failure to seek guidance from OFAC to be a relevant factor in its fair-notice analysis. But the burden of providing fair notice remains with the agency—not the regulated party. *See Emp'r Sols.*, 833 F.3d at 488 ("Fair notice requires that the agency have 'state[d] with ascertainable certainty what is meant by the standards [it] has promulgated.'" (quoting *Diamond Roofing*, 528 F.2d at 649 (alterations in original))); *Howmet Corp.*, 656 F. Supp. 2d at 173–74 (pointing out, in addition to a regulated party's failure to inquire, the regulating agency's efforts to convey its interpretation to the public). Thus, while the Court acknowledges that Exxon's failure to seek guidance weighs in favor of a finding fair notice, this fact is not dispositive.

### iii.     *Public statements by OFAC and executive officials*

The Court now turns to the impact of FAQ 285—the only public statement issued by OFAC itself—in its fair-notice determination. Thereafter, the Court addresses the relevance of statements released by the press, the White House Office of the Press Secretary, and the Treasury prior to Exxon's alleged violations.

### A.     *FAQ 285*

The Court now analyzes the relevance of FAQ 285 in the fair-notice determination. FAQ 285 asked, "If a Burmese Government minister is an SDN, how does that impact the ministry he leads?" AR 1100. The answer, as originally published in 2013, stated, "A government ministry is not blocked solely because the minister heading it is an SDN. U.S. persons should, however, be cautious in dealings with the ministry to ensure that they are not, for example, entering into any contracts that are signed by the SDN." *Id.*

Because FAQ 285, published in 2013, was specific to the Burma sanctions program, and did not pertain to the Ukraine-related Regulations of 2014, Exxon contends that FAQ 285 "is plainly inapposite here." Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 42. In support, Exxon points to OFAC's acknowledgment that some of OFAC's regulations may be interpreted differently than others, depending on the context. *See id.* (citing 31 C.F.R. § 598.101 (2019));[4] Doc. 104, Pls.' Sealed Mem. in Resp. to Defs.' Cross-Mot., 25 (citing FAQ 3, which states that "prohibitions may vary between [sanctions] programs"). Further, Exxon indicates that OFAC removed FAQ 285 from its website when it lifted the Burma sanctions in October 2016—highlighting FAQ 285's applicability to only the Burma sanctions program. Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 43.

On the other hand, the Government points out that like Executive Order 13661, the executive order pertaining to Burma sanctions "prohibited U.S. persons from dealing in the blocked property and interests in property of designated persons" and did not distinguish between the execution of a contract by an SDN in an individual versus a representative capacity. Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 46 (citation omitted). And OFAC interpreted that prohibition in FAQ 285 to ban the "entering into any contracts signed by the SDN." *Id.* (citing AR 1100). Moreover, although FAQ 285 was issued in relation to the Burma sanctions program, the Government contends, this does not "make it irrelevant to the interpretation of a later sanctions program corresponding to an executive order that is identical in material respects." *Id.* at 47 (citing *Trinity Broad.*, 211 F.3d at 629).

On this point, the Court disagrees with the Government and concludes that FAQ 285 does

---

[4] Section 598.101 makes this point with respect to Foreign Narcotics Kingpin Sanctions Regulations. Presumably, Exxon intended to cite § 589.101, which makes this point with respect to the Ukraine-related Sanctions Regulations.

not provide fair notice of the Government's interpretation of the Regulations. The very Regulations at issue state, "Differing foreign policy and national security circumstances may result in differing interpretations of similar language among the parts of this chapter." 31 C.F.R. § 589.101. The Regulations are in Chapter V: "Office of Foreign Assets Control, Department of the Treasury." *See id.* Likewise, the Burma sanctions regulations were in Chapter V and contained identical language. *See* 31 C.F.R. § 537.101 (2017); *see also* Removal of Burma Sanctions Regulations, 82 Fed. Reg. 27,613-01 (June 16, 2017). By including such a disclaimer in both the Burma and Ukraine sanctions regulations, OFAC forfeited its right to claim that the interpretation of the former provided fair notice of its interpretation of the latter. While OFAC may reserve the opportunity to interpret sanctions programs differently, it may not then claim that a regulated party should know that OFAC interprets the programs identically without OFAC's explicit clarification. Accordingly, the Court finds that FAQ 285, even in conjunction with the text of the Regulations, fails to provide fair notice.

### B. *Statements released by the executive branch*

Finally, the Court considers whether public statements issued in conjunction with the Regulations provide fair notice that Exxon's conduct was prohibited. Exxon suggests that public statements made by executive officials immediately following the issuance of Executive Order 13661 "made clear that it was permissible to execute documents with Rosneft (including with Sechin signing in his capacity as a Rosneft representative)." Doc. 93, Sealed Mem. in Supp. of Pls.' Mot., 38.

For example, Exxon points to a conference call transcript released by the White House Office of the Press Secretary, which indicates that the Regulations targeted the "personal assets" of the "cronies of the Russian government," "rather than the business entities and industries that they may manage or oversee." *Id.* (citing AR 23490). Likewise, Exxon relies upon a Fact Sheet also issued by

the White House, which states, "Our current focus is to identify these individuals and target their personal assets, but not companies that they manage on behalf of the Russian state." *Id.* (citing AR 23484). And Exxon emphasizes the White House Deputy National Security Advisor's remark, during a *PBS NewsHour* interview, that "U.S. companies will not be able to do business with [designated individuals] in their individual capacities." *Id.* at 39 (citing AR 206).

Additionally, Exxon points to statements by unnamed Treasury officials, as reported in *Foreign Policy* and the *Wall Street Journal*, which suggest that U.S. companies may continue doing business with Rosneft despite the Regulations. *Id.* (citing AR 23522 and AR 23584). Exxon states that "[w]here an agency issues 'conflicting advice,' or had 'implicitly approved' the practice for which the agency seeks to impose penalties, the agency cannot be said to have provided fair notice to the public." *Id.* (quoting *Rollins Envtl. Servs. Inc. v. EPA*, 937 F.2d 649, 653 (D.C. Cir. 1991); *Trinity Marine Nashville, Inc. v. Occupational Safety & Health Review Comm'n*, 275 F.3d 423, 431 (5th Cir 2001)). Accordingly, Exxon alleges that based on these statements, it could not have determined OFAC's interpretation of the Regulations with ascertainable certainty. *Id.*

Further, Exxon argues that the contemporaneous statements demonstrate the executive's intent to target designated individuals' "personal assets and wealth"—not to isolate Rosneft. Doc. 104, Pls.' Sealed Mem. in Resp. to Defs.' Cross-Mot., 21. Exxon points out that while the Government suggests that the statements demonstrate an intent to prohibit all business transactions with Sechin, the statements explicitly permitted some interactions, like those of board meetings. *Id.* at 21–22 (citing AR 204, 23584). Indeed, according to Exxon, the statements indicated that the prohibitions "were limited to dealings with Sechin 'in his individual capacity.'" *Id.* at 22 (citing AR 204, 23584).

The Government, however, avers that "press guidance . . . did nothing to deviate from the agency's long-standing position that a U.S. person may not deal in the services of a blocked person . . . ." Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 46. Moreover, the Government attempts to reconcile the press statements with its interpretation of the Regulations. In doing so, the Government points to the conference call upon which Exxon relies and quotes the senior administration official's statement that "U.S. persons are prohibited from doing business with [the blocked individuals.]" *Id.* at 30 (quoting AR 23489). Additionally, the Government refers to a press release from the Treasury accompanying Sechin's designation, which stated that "transactions by U.S. persons or within the United States involving the individuals and entities designated today are generally prohibited." *Id.* (quoting AR 23690). The Government suggests that, reading the press statements in harmony, transacting with a non-blocked company is permissible, but transacting with a blocked individual is not. *Id.*

Further, addressing the news reports about interactions with Sechin, the Government suggests that these reports "indicate nothing more than that it would be permissible for U.S. persons to interact with Rosneft, or sit on Rosneft's board." *Id.*

Before determining the significance of the statements at hand, the Court must first decide whether it can consider third-party press statements quoting executive officials and statements from the executive branch in its fair-notice inquiry. The fair-notice inquiry focuses upon "the regulations and other public statements issued by the agency . . . ." *Gen. Elec.*, 53 F.3d at 1329 (citing *Diamond Roofing*, 528 F.2d at 649).While "published agency guidance" may provide fair notice, *Howmet Corporation v. EPA*, 614 F.3d 544, 554 (D.C. Cir. 2010), "[g]eneral references to a regulation's policy" do not. *Trinity Broad.*, 211 F.3d at 631. But a regulated party may be justified in relying, in

good faith, upon an "extra-regulatory" source, such as where the regulating agency has endorsed the source "numerous" times. *ExxonMobil*, 867 F.3d at 579.

Here, Exxon relies upon extra-regulatory sources—statements issued by third-party news outlets and the executive branch—to contradict the Government's interpretation of the Regulations and claim a lack of fair notice. But neither party addresses whether these statements are "public statements" for fair-notice purposes.

Nevertheless, the Government, in addressing Exxon's arbitrary-and-capricious claim, does contend that the Regulations "trump" the press statements because: (1) the Regulations—unlike statements to the press that "lack the force of law"—reflect OFAC's official position, and (2) the Regulations were issued after the statements, thereby clarifying the meaning of the press statements. Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 40–41 (citation and quotation marks omitted). Thus, the Government argues that it would be "unreasonable for Exxon to rely on such news reports . . . in determining how to comply with OFAC's Regulations." *Id.* at 39. Though these arguments pertain to Exxon's arbitrary-and-capricious claim, the Court nonetheless addresses them.

The Court dismisses the Government's first point as irrelevant in the fair-notice context, given that statements providing fair notice need not have the force of law. *See Gen. Elec.*, 53 F.3d at 1333 (considering whether a policy statement provided fair notice); *Howmet Corp.*, 656 F. Supp. 2d at 174 (reasoning that an agency guidance manual supported a finding of fair notice); *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (noting that both "interpretations contained in policy statements . . . and agency manuals . . . lack the force of law"); *see also Tr. Under Will of Wills v. Burwell*, 306 F. Supp. 3d 684, 694 (E.D. Pa. 2018) (noting that "adequate notice can come from a variety of publicly-available resources").

Further, the Court rejects the Government's second contention—that the Regulations superseded the statements—because fair-notice cases draw no distinction between pre-regulations and post-regulations guidance. Indeed, by relying upon FAQ 285, the Government argues that an interpretation of a regulation published in 2013 is relevant to the fair-notice determination. *See* Doc. 99, Br. in Supp. of Defs.' Resp. & Cross-Mot., 46–47 (citing AR 1100). Accordingly, the Government itself relies upon pre-regulations guidance to support a finding of fair notice.

Nonetheless, the Court agrees with the Government that a regulated party could not reasonably rely, "in good faith," upon statements from third-party news outlets. *Gen. Elec.*, 53 F.3d at 1329. Exxon has not cited to, nor has the Court encountered, any fair-notice cases in which a regulated party relied upon the press's reporting to provide regulatory guidance. Perhaps this absence of legal authority underscores the unique facts of this case, or perhaps most regulated parties do not purport to bring a fair-notice claim based on information released by news outlets. Either way, the Court believes that a regulated party, in good faith, would not rely upon statements released by third-party news outlets in ensuring compliance with Ukraine-related sanctions regulations. *Cf. ExxonMobil*, 867 F.3d at 569, 579 (finding that a regulated party "was entirely justified to rely in good faith" upon a "third-party report" that the agency "commissioned and published" in light of the agency's "numerous endorsements" of the report).

Accordingly, the Court declines to consider: (1) the *Foreign Policy* article, AR 23522–25; (2) the *New York Times* article, AR 23579–81; (3) the *Wall Street Journal* article, AR 23583–86; and (4) *PBS NewsHour*'s interview with Deputy National Security Advisor Tony Blinken, AR 204–07.

In contrast, the Court concludes that a regulated party, in good faith, might rely upon statements issued by the executive branch, even if not necessarily issued by OFAC itself. Indeed,

OFAC's authority to issue the Regulations comes from an executive order. *See* Exec. Order No. 13661, 79 Fed. Reg. 15,535 (Mar. 16, 2014) (bestowing authority upon "The Secretary of the Treasury, in consultation with the Secretary of State" to promulgate regulations and allowing the Secretary to delegate that authority to "other officers and agencies"). Under these circumstances, a regulated party would be "entirely justified to rely in good faith" upon public, released statements from the White House and the Treasury. *ExxonMobil*, 867 F.3d at 579.

Thus, the Court considers statements released by the White House Office of the Press Secretary, as well as those released by the Treasury, to decide whether public statements provide ascertainable certainty. *See Gen. Elec.*, 53 F.3d at 1329. To summarize the relevant public statements, the Court relays the statements, along with pertinent events, in the following timeline:

<u>March 16, 2014</u>

- President Obama issues Executive Order 13661, which contains Sections 1 and 4, prohibiting the receipt of services. Exec. Order No. 13661, 79 Fed. Reg. 15,535–36 (Mar. 16, 2014).

<u>March 17, 2014</u>

- White House Office of the Press Secretary releases "Background Briefing by Senior Administration Officials on Ukraine" which states:
  - "[W]hile we will not rule out taking additional steps in the future, our current focus is to identify these cronies of the Russian government and target their personal assets and wealth, rather than the business entities and industries that they may manage or oversee." AR 23490.

  - "Any assets these [designated] individuals have within U.S. jurisdiction are frozen, and U.S. persons are prohibited from doing business with them." AR 23489.

- White House Office of the Press Secretary releases "FACT SHEET: Ukraine-Related Sanctions," which states:
  - "Our current focus is to identify these individuals and target their personal assets, but not companies that they may manage on behalf of the

Russian state." AR 360.

**April 28, 2014**

- OFAC designates Sechin. AR 23689–91.

- White House Office of the Press Secretary releases "Background Conference Call on Ukraine Sanctions," which states:
  - "We are imposing sanctions on Sechin . . . individually." AR 23501.

- The Treasury releases "Announcement of Additional Treasury Sanctions on Russian Government Officials And Entities," which states:
  - "Igor Sechin is the President and Chairman of the Management Board for Rosneft . . . . Rosneft is a state-owned company and has not been sanctioned." AR 23689.
  - "[T]ransactions by U.S. persons or within the United States involving the individuals and entities designated today are generally prohibited." AR 23690.
  - The Announcement also lists entities that were designated "because they are owned or controlled by persons (either individuals or entities) whose property and interests in property are blocked . . . ." AR 23689.

**May 8, 2014**

- OFAC issues the Ukraine-related Regulations, which prohibit all transactions prohibited pursuant to Executive Order 13661. 31 C.F.R. § 589.201. They also state:
  - "Differing foreign policy and national security circumstances may result in differing interpretations of similar language among the parts of this chapter." *Id.* § 589.101.
  - "This part has been published in abbreviated form for the purpose of providing immediate guidance to the public. OFAC intends to supplement this part with a more comprehensive set of regulations, which may include additional interpretive and definitional guidance . . . ." *Id.*

**May 23, 2014**

- Sechin signs the contracts at issue. *See, e.g.,* AR 1877–82 (one of the seven completion deeds); AR 1566.

Under these circumstances, the Court finds that the public statements at issue, in conjunction with the Regulations, do not provide fair notice. Some of the statements suggest that

an SDN may transact on behalf of a non-blocked entity without subjecting a U.S. entity, as a party to the transaction, to sanctions. For example, the March 17, 2014 Background Briefing and Fact Sheet both indicate that the intention of the Ukraine-related sanctions is to target the personal assets of SDNs—not the businesses they oversee. *See* AR 23490, 360. Additionally, contemporaneously with Sechin's designation, the Background Conference Call clarifies that Sechin was designated as an individual. *See* AR 23501 (stating that Sechin was designated "individually").

Yet other statements suggest an intent to isolate a blocked person in all business transactions—not just those conducted in the person's individual capacity. For instance, in the March 17, 2014 Background Briefing, where an official explains the intent to target personal assets of blocked persons, an official also states that U.S. persons are prohibited from doing business with SDNs. AR 23489. Likewise, the Treasury's April 28, 2014 Announcement explicitly states, "[T]ransactions by U.S. persons or within the United States involving the individuals and entities designated today are generally prohibited." AR 23690.

Overall, the public statements do not provide ascertainable certainty of proscribed conduct: they emphasize that Sechin was targeted as an individual, and Rosneft was not designated, yet they purport to prohibit transactions involving Sechin—the President of Rosneft's Management Board. AR 23501. What's more, the executive statements even acknowledge Sechin's role at Rosneft. AR 23689. Perhaps OFAC was not ready to definitively articulate how Executive Order 13661's prohibitions would affect transactions like Exxon's. After all, OFAC "intended[ed] to supplement [the Regulations] with a more comprehensive set . . . ." 31 C.F.R. § 589.101. But by May 23, 2014—the day that Exxon allegedly received Sechin's services—OFAC had not done so. Rather, OFAC relied upon Regulations that fail to address Exxon's conduct. Though the Regulations and

public statements, taken together, would likely lead a regulated party, acting in good faith, to hesitate before completing transactions like Exxon's, they do not create ascertainable certainty that such conduct would be prohibited.

Moreover, even if the Court were to ignore the released statements from the Treasury and the White House Office of the Press Secretary, its conclusion would not change. Without considering these public statements, the Court is left only to examine: (1) the text of the Regulations; and (2) the only relevant public statement released by OFAC itself—FAQ 285. As discussed above, neither provides fair notice of the Government's interpretation of the Regulations. Further, Exxon's failure to seek guidance from OFAC prior to executing the contracts at issue does not sway the Court's decision. As noted above, though courts have considered a party's opportunity to seek guidance, it is only one relevant consideration among many others. Exxon's decision to proceed with the contracts absent guidance from OFAC was risky—and perhaps imprudent. But this factor does not overcome others suggesting a lack of fair notice.

Namely, public statements leading up to the Regulations were equivocal with respect to Exxon's conduct. Yet despite these equivocal statements, OFAC issued the Regulations with broad language that fails to delineate their boundaries. Further, after penalizing Exxon, OFAC provided guidance clarifying that conduct like Exxon's was prohibited. To ignore these circumstances and find fair notice based on Exxon's failure to inquire is to shift the fair-notice burden entirely. Indeed, "a regulation cannot be construed to mean what an agency intended but did not adequately express." *Diamond Roofing*, 528 F.2d at 649.

Thus, the Court holds that, under the circumstances, "a regulated party acting in good faith" would not "be able to identify, with 'ascertainable certainty,' the standards with which [OFAC]

expects parties to conform . . . ." *Gen. Elec.*, 53 F.3d at 1329 (citation omitted). Accordingly, OFAC's penalty notice violates the Due Process Clause of the Fifth Amendment by depriving Exxon of fair notice. *See Diamond Roofing*, 528 F.2d at 649. The Court thus **VACATES** the Penalty Notice.

## IV.

## CONCLUSION

For the forgoing reasons, the Court **GRANTS** Exxon's motion (Doc. 92) and **DENIES** the Government's cross-motion (Doc. 95). Further, the Court declares that OFAC's Penalty Notice violates the Due Process Clause of the Fifth Amendment and thus **VACATES** the Penalty Notice. Finally, the Court finds Exxon's Motion for Oral Argument (Doc. 109) **MOOT**.


SO ORDERED.

SIGNED: December 31, 2019.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE